Catherine J. Bick, Esq. (034561997)
**GIORDANO, HALLERAN & CIESLA, P.C.**
125 Half Mile Road, Red Bank, N.J. 07701
(732) 741-3900
Attorneys for Plaintiff, Pulte Homes of NJ, Limited Partnership

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PULTE HOMES OF NJ, LIMITED PARTNERSHIP,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ARCH SPECIALTY INSURANCE COMPANY, AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY, and HARLEYSVILLE INSURANCE COMPANY OF NEW JERSEY,<br><br>　　　　Defendants. | **COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Case No.　　2:23cv3904 |

Plaintiff Pulte Homes of NJ, Limited Partnership ("Pulte"), by and through its undersigned counsel, for its Complaint and Demand for Jury Trial against Defendants Arch Specialty Insurance Company ("Arch"), American Empire Surplus Lines Insurance Company ("American Empire"), and Harleysville Insurance Company of New Jersey ("Harleysville"), alleges as follows:

## PARTIES

1.     Plaintiff Pulte is a limited partnership formed under the laws of Michigan with its principal place of business located at 3350 Peachtree Road NE in Atlanta, Georgia.  Pulte is comprised of one general partner and one limited partner.

2.     The general partner of Pulte is Pulte Home Corporation of the Delaware Valley.  Pulte Home Corporation of the Delaware Valley is a corporation formed under the laws of Michigan with its principal place of business located at 3350 Peachtree Road NE in Atlanta, Georgia.

3.     The limited partner of Pulte is Preserve II, Inc.  Preserve II, Inc. is a corporation formed under the laws of Michigan with its principal place of business located at 3350 Peachtree Road NE in Atlanta, Georgia.

4.     Upon information and belief, Defendant Arch is a corporation organized under the laws of Missouri with its principal place of business located at 210 Hudson Street in Jersey City, New Jersey.  Arch is licensed to and does carry on business as a surplus lines insurer in New Jersey.

5.     Upon information and belief, Defendant American Empire is a corporation organized under the laws of Delaware with its principal place of business located at 301 East Fourth Street in Cincinnati, Ohio.  American Empire is licensed to and does carry on business as a surplus lines insurer in New Jersey.

6.     Upon information and belief, Defendant Harleysville is a corporation organized under the laws of New Jersey with its principal place of business located at 400 Crossing Boulevard in Bridgewater, New Jersey.  Harleysville is licensed to and does carry on business as a property/casualty insurer in New Jersey.

## JURISDICTION AND VENUE

7.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because this matter involves a dispute between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District; the property that is the subject of the underlying lawsuit for which Pulte seeks insurance coverage is situated in this District; and the insurer defendants conduct business in this District.

## FACTUAL ALLEGATIONS – THE RIVER POINTE COMMUNITY

## I.     PULTE'S CONTRACTORS

9.     Pulte was the developer of a residential community known as River Pointe involving the construction of single-family dwellings and other common improvements, including a clubhouse and recreational amenities, located in Manchester Township, New Jersey ("Project").

10.     Pulte and Acies Group, LLC ("Acies") entered into a Contractor Agreement ("Acies Contract"), pursuant to which Acies agreed to perform work on the Project.  A copy of the Acies Contract is attached as Exhibit 1.

11.     The Acies Contract required that Pulte be added as an additional insured on Acies' liability insurance policies using ISO Form CG 20 10 11 85 or its equivalent, including coverage for completed operations.  Pulte's additional insured status under the policies could not be limited by amendatory language.  The Acies Contract also required that the policies provide primary coverage to Pulte.

12.     Pulte and Nassau Construction Co., Inc. ("Nassau") entered into a Contractor Agreement ("Nassau Contract"), pursuant to which Nassau agreed to perform work on the Project.  A copy of the Nassau Contract is attached as Exhibit 2.

13.     The Nassau Contract required that Pulte be added as an additional insured on Nassau's liability insurance policies using ISO Form CG 20 10 11 85 or its equivalent, including coverage for completed operations.  Pulte's additional insured status under the policies could not be limited by amendatory language.  The Nassau Contract also required that the policies provide primary coverage to Pulte.

14.     Pulte and Utilities Contracting Services, Inc. ("UCS") entered into a Contractor Agreement ("UCS Contract"), pursuant to which UCS agreed to perform work on the Project.  A copy of the UCS Contract is attached as Exhibit 3.

4

15.     The UCS Contract required that Pulte be added as an additional insured on UCS's liability insurance policies using ISO Form CG 20 10 11 85 or its equivalent, including coverage for completed operations.  Pulte's additional insured status under the policies could not be limited by amendatory language.  The UCS Contract also required that the policies provide primary coverage to Pulte.

## II.     THE RIVER POINTE LAWSUIT

16.     The River Pointe Homeowners Association, Inc. ("Association") filed a lawsuit against Pulte, styled *River Pointe Homeowners Association, Inc. v. Pulte Homes of NJ, Limited Partnership, et al.*, New Jersey Superior Court, Ocean County, Law Division, Docket No. OCN-L-2491-17 ("Lawsuit").

17.     On or about September 1, 2017, the Association filed a Complaint and Jury Demand ("Complaint") in the Lawsuit.  In addition to Pulte, the Complaint specifically names Acies and Nassau as defendants, among others.  A copy of the Complaint is attached as Exhibit 4.

18.     On or about September 27, 2019, the Association filed a First Amended Complaint ("Amended Complaint") in the Lawsuit.  In addition to Pulte, the Amended Complaint specifically names Acies and Nassau as defendants, among others.  A copy of the Amended Complaint is attached as Exhibit 5.

19.     The Complaint and Amended Complaint (collectively, "Complaints") allege that defective work, including work performed by Acies, Nassau, and UCS, resulted in property damage to the Project for which Pulte is liable.

20.     The Complaints allege that these damages to the Project "have caused, and will in the future cause, the Association to expend substantial sums of money," for which Pulte is alleged to be liable.

### A.     <u>Work Performed by Acies</u>

21.     The Complaints allege that Acies was "responsible for constructing and installing the stucco, exterior trim, masonry stone veneer and performed other work on the buildings throughout the Community."

22.     The Complaints allege that "defects in the masonry stone veneer allowed, and continue to allow, substantial amounts of water to infiltrate behind the stone veneer and other exterior finishes," which "allows water to saturate the building sheathing and framing elements" and has "damaged, deteriorated, and continues to deteriorate the building sheathing, the framing elements . . . [and] the interior of the clubhouse and other locations."

23.     The Complaints allege that defects in the hard coat stucco cladding "allowed, and continue to allow, substantial amounts of water to infiltrate behind the stucco and other exterior finishes," which has "damaged, deteriorated, and continued to deteriorate the interior of the clubhouse and other locations."  The Amended

Complaint further alleges that these defects damaged the guardhouse and gatehouse structures at the Project.

24.     The Complaints allege that the damage to the building sheathing and framing elements resulting from Acies' defective work "impairs the structural integrity" and the "habitability" of the clubhouse building at the Project.   The Amended Complaint further alleges that these damages impaired the "structural integrity" of the guardhouse and gatehouse structures at the Project.

**B.     Work Performed by Nassau**

25.     The Complaints allege that Nassau was "responsible for constructing and installing the framing, attics, sheathing, windows, doors and building wrap [i.e., weather resistant barrier] on the buildings throughout the Community."

26.     The Complaints allege that improperly installed building wrap "allows water to saturate the building sheathing and framing elements," which has "damaged, deteriorated and continues to deteriorate the building sheathing" and "the framing elements."

27.     The Complaints allege that the lack of caulk "at the interface of dissimilar materials," including missing caulking between the windows and doors, causes "water infiltration."

28.     The Complaints allege that defective flashing "allowed, and continues to allow, water to infiltrate into" the interior of the clubhouse building, and that the

water "damages the interior" and "has deteriorated, and continues to deteriorate," the clubhouse interior.

## FACTUAL ALLEGATIONS – ARCH

29.     Upon information and belief, Arch issued at least one general liability policy to Acies for the period from August 11, 2012, to June 18, 2013, Policy No. GAP0051340-00 ("Arch Policy").  Pulte is not in possession of the Arch Policy, but upon information and belief, Arch has a copy of the Arch Policy.

30.     Upon information and belief, the insuring agreement of the Arch Policy states, in relevant part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" . . . to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages . . . .

31.     Upon information and belief, the Arch Policy incorporates the standard definition of "property damage," which includes:

> a.     Physical injury to tangible property, including all resulting loss of use of that property . . . . or
>
> b.     Loss of use of tangible property that is not physically injured . . . .

32.     Upon information and belief, for coverage to be afforded under the Arch Policy, "property damage" must be caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

33.     Upon information and belief, the Blanket Additional Insured Endorsement in the Arch Policy states, in relevant part:

> **Section II – Who Is An Insured** is amended to include as an additional insured those persons or organizations who are required under written contract with you to be named as an additional insured, but only with respect to liability for "bodily injury", "property damage", or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of your subcontractors:
>
> A.     In the performance of your ongoing operations or "your work", including "your work" that has been completed . . . .

34.     The Acies Contract required that Pulte be named as an additional insured.

35.     The Arch Policy provides coverage to Pulte as an additional insured and requires that Arch defend Pulte against allegations of liability because of property damage resulting from Acies' work.

36.     On November 21, 2017, Pulte tendered the Lawsuit to Arch and demanded a defense and indemnity in connection therewith.

37.     On January 14, 2019, more than a year after Pulte's tender, Arch refused to provide a defense and denied coverage to Pulte as an additional insured under the Arch Policy.

38.     The Complaints specifically name Acies as a defendant and allege that defective work performed by Acies resulted in property damage to the Project for which Pulte is liable.

39.     On November 16, 2018, Arch agreed to provide a defense to Acies in the Lawsuit.

40.     Arch nevertheless denied coverage to Pulte on the basis that Pulte's alleged liability was not caused, in whole or in part, by Acies' work.

41.     As a result of Arch's denial, Pulte has been forced to bear the costs of defending against the Lawsuit.

## FACTUAL ALLEGATIONS – AMERICAN EMPIRE

42.     Upon information and belief, American Empire issued at least two general liability policies to Nassau for the period from November 25, 2008, to March 22, 2010, Policy Nos. 8CG36111 and 9CG36236 (collectively, "American Empire Policies").  A copy of the 2008-09 American Empire Policy currently in Pulte's possession is attached as Exhibit 6.  Pulte is not in possession of the 2009-10 American Empire Policy, but upon information and belief, American Empire has a copy of the 2009-10 American Empire Policy.  Upon information and belief, the 2009-10 American Empire Policy contains the same relevant terms as the 2008-09 American Empire Policy.

43.   The insuring agreement of the American Empire Policies states, in relevant part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages . . . .

44.   The American Empire Policies define "property damage" to include:

> a.   Physical injury to tangible property, including all resulting loss of use of that property . . . . or
>
> b.   Loss of use of tangible property that is not physically injured . . . .

45.   For coverage to be afforded under the American Empire Policies, "property damage" must be caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

46.   The Additional Insured – Owners, Lessees or Contractors – Completed Operations Endorsement in the American Empire Policies states, in relevant part:

> **Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

47.     The Schedule of the endorsement states:  "All entities required by written contract to be included for coverage as additional insured's [*sic*] in respect to operations performed by the Named Insured or on their behalf."

48.     The Nassau Contract required that Pulte be named as an additional insured.

49.     The American Empire Policies provide coverage to Pulte as an additional insured and require that American Empire defend Pulte against allegations of liability because of property damage resulting from Nassau's work.

50.     On November 6, 2017, Pulte tendered the Lawsuit to American Empire and demanded a defense and indemnity in connection therewith.

51.     On August 11, 2020, almost three years after Pulte's tender, American Empire refused to provide a defense and denied coverage to Pulte as an additional insured under the American Empire Policies.

52.     The Complaints specifically name Nassau as a defendant and allege that defective work performed by Nassau resulted in property damage to the Project for which Pulte is liable.

53.     Upon information and belief, American Empire agreed to provide a defense to Nassau in the Lawsuit.

54.     American Empire nevertheless denied coverage to Pulte on the basis that the Lawsuit does not concern property damage caused, in whole or in part, by Nassau.

55.     As a result of American Empire's denial, Pulte has been forced to bear the costs of defending against the Lawsuit.

## FACTUAL ALLEGATIONS – HARLEYSVILLE

56.     Upon information and belief, Harleysville issued at least four general liability policies to UCS for the period from November 1, 2006, to July 2, 2010, Policy No. MPA 000000 50971D (collectively, "Harleysville Policies").  Pulte is not in possession of the Harleysville Policies, but upon information and belief, Harleysville has copies of the Harleysville Policies.

57.     On December 24, 2019, Pulte tendered the Lawsuit to Harleysville and demanded a defense and indemnity in connection therewith.

58.     On August 12, 2020, almost eight months after Pulte's tender, Harleysville issued a reservation of rights in which it agreed to defend Pulte in the Lawsuit as an additional insured under the Harleysville Policies.

59.     Harleysville admitted that UCS was required to add Pulte as an additional insured on UCS's liability insurance policies.

60.     Harleysville thus admitted that Pulte is an additional insured under the Harleysville Policies.

61.     Harleysville also admitted that "the Complaint includes allegations of property damage arising from the work performed by UCS."

62.     Harleysville thus admitted that the allegations in the Lawsuit trigger its duty to defend Pulte as an additional insured under the Harleysville Policies.

63.     In the three years since Harleysville admitted its duty to defend, Pulte has made multiple defense cost submissions to Harleysville.  However, Harleysville has failed to reimburse any of Pulte's defense costs.

64.     It has also been nearly one year since Harleysville has responded to any of Pulte's communications.

65.     As a result of Harleysville's breach of its admitted duty to defend, Pulte has been forced to bear the costs of defending against the Lawsuit.

## FIRST CAUSE OF ACTION
### *Declaratory Judgment Against Arch*

66.     Pulte re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 4, 7 through 11, 16 through 24, and 29 through 41 as if fully set forth herein.

67.     Upon information and belief, Arch disputes one or more of the allegations herein, including, without limitation, the allegation that Arch owes a duty to defend Pulte as an additional insured in connection with the Lawsuit.  As a result, Pulte is in doubt as to its rights under the Arch Policy.

68.     By reason of the foregoing, an actual and justiciable controversy exists between Pulte and Arch regarding their respective rights and obligations under the Arch Policy, including, but not limited to, Arch's obligation to defend Pulte as an additional insured in connection with the Lawsuit.

69.     An order from this Court will resolve these disputes between the parties concerning their respective rights and obligations.

70.     Pulte is entitled to a declaratory judgment, *inter alia*, that:

(a)     Arch's duty to defend Pulte was triggered by the Complaints in the Lawsuit;

(b)     Arch has a current and ongoing obligation to provide a defense to Pulte in the Lawsuit; and

(c)     Arch is obligated to reimburse Pulte for attorneys' fees, expenses, and other litigation costs incurred in connection with its defense of the Lawsuit from no later than the earliest date on which Arch was notified of the Lawsuit.

**WHEREFORE**, Pulte respectfully requests that the Court enter judgment against Arch awarding Pulte the relief outlined above, together with prejudgment interest, attorneys' fees pursuant to New Jersey Rule 4:42-9(a)(6), costs, and such other and further relief as the Court may deem just and proper, including, without limitation, incidental and consequential damages.

15

## SECOND CAUSE OF ACTION
### *Breach of the Duty to Defend Against Arch*

71.     Pulte re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 4, 7 through 11, 16 through 24, and 29 through 41 as if fully set forth herein.

72.     Upon information and belief, the Arch Policy is a written contract of insurance obligating Arch to defend Pulte, as an additional insured, against any suit seeking damages because of property damage to which the Arch Policy applies. Arch's contractual duty to defend is separate and apart from its duty to indemnify and is triggered if there is any potential for coverage.

73.     The Complaints allege facts that create the potential for coverage under the Arch Policy, thereby triggering Arch's duty to defend.

74.     Arch breached its contractual duty to defend Pulte under the Arch Policy by refusing to provide a defense to Pulte in the Lawsuit.

75.     As a direct and proximate result of Arch's breach of its duty to defend, Pulte has suffered damages, including, but not limited to, attorneys' fees and other costs and expenses Pulte has been forced to incur to defend itself in the Lawsuit. These damages are continuing in nature.

**WHEREFORE**, Pulte respectfully requests that the Court enter judgment against Arch awarding Pulte compensatory damages directly and proximately caused by Arch's breach of its contractual duty to defend Pulte, together with

prejudgment interest, attorneys' fees pursuant to New Jersey Rule 4:42-9(a)(6), costs, and such other and further relief as the Court may deem just and proper, including, without limitation, incidental and consequential damages.

## THIRD CAUSE OF ACTION
### *Declaratory Judgment Against American Empire*

76.     Pulte re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 3, 5, 7 through 9, 12 through 13, 16 through 20, 25 through 28, and 42 through 55 as if fully set forth herein.

77.     Upon information and belief, American Empire disputes one or more of the allegations herein, including, without limitation, the allegation that American Empire owes a duty to defend Pulte as an additional insured in connection with the Lawsuit.  As a result, Pulte is in doubt as to its rights under the American Empire Policies.

78.     By reason of the foregoing, an actual and justiciable controversy exists between Pulte and American Empire regarding their respective rights and obligations under the American Empire Policies, including, but not limited to, American Empire's obligation to defend Pulte as an additional insured in connection with the Lawsuit.

79.     An order from this Court will resolve these disputes between the parties concerning their respective rights and obligations.

80.     Pulte is entitled to a declaratory judgment, *inter alia*, that:

(a)     American Empire's duty to defend Pulte was triggered by the Complaints in the Lawsuit;

(b)     American Empire has a current and ongoing obligation to provide a defense to Pulte in the Lawsuit; and

(c)     American Empire is obligated to reimburse Pulte for attorneys' fees, expenses, and other litigation costs incurred in connection with its defense of the Lawsuit from no later than the earliest date on which American Empire was notified of the Lawsuit.

**WHEREFORE**, Pulte respectfully requests that the Court enter judgment against American Empire awarding Pulte the relief outlined above, together with prejudgment interest, attorneys' fees pursuant to New Jersey Rule 4:42-9(a)(6), costs, and such other and further relief as the Court may deem just and proper, including, without limitation, incidental and consequential damages.

## FOURTH CAUSE OF ACTION
### *Breach of the Duty to Defend Against American Empire*

81.     Pulte re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 3, 5, 7 through 9, 12 through 13, 16 through 20, 25 through 28, and 42 through 55 as if fully set forth herein.

82.     The American Empire Policies are written contracts of insurance obligating American Empire to defend Pulte, as an additional insured, against any suit seeking damages because of property damage to which the American Empire

18

Policies apply.  American Empire's contractual duty to defend is separate and apart from its duty to indemnify and is triggered if there is any potential for coverage.

83.     The Complaints allege facts that create the potential for coverage under the American Empire Policies, thereby triggering American Empire's duty to defend.

84.     American Empire breached its contractual duty to defend Pulte under the American Empire Policies by refusing to provide a defense to Pulte in the Lawsuit.

85.     As a direct and proximate result of American Empire's breach of its duty to defend, Pulte has suffered damages, including, but not limited to, attorneys' fees and other costs and expenses Pulte has been forced to incur to defend itself in the Lawsuit.  These damages are continuing in nature.

**WHEREFORE**, Pulte respectfully requests that the Court enter judgment against American Empire awarding Pulte compensatory damages directly and proximately caused by American Empire's breach of its contractual duty to defend Pulte, together with prejudgment interest, attorneys' fees pursuant to New Jersey Rule 4:42-9(a)(6), costs, and such other and further relief as the Court may deem just and proper, including, without limitation, incidental and consequential damages.

## FIFTH CAUSE OF ACTION
### *Breach of the Duty to Defend Against Harleysville*

86.     Pulte re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 3, 6 through 9, 14 through 20, and 56 through 65 as if fully set forth herein.

87.     The Harleysville Policies are written contracts of insurance obligating Harleysville to defend Pulte, as an additional insured, against any suit seeking damages because of property damage to which the Harleysville Policies apply. Harleysville's contractual duty to defend is separate and apart from its duty to indemnify and is triggered if there is any potential for coverage.

88.     Harleysville acknowledged and accepted its duty to defend Pulte as an additional insured under the Harleysville Policies in connection with the Lawsuit.

89.     Harleysville breached its acknowledged duty to defend Pulte as an additional insured under the Harleysville Policies by failing to reimburse Pulte for any defense costs it has incurred in connection with the Lawsuit.

90.     As a direct and proximate result of Harleysville's breach of its duty to defend, Pulte has suffered damages, including, but not limited to, attorneys' fees and other costs and expenses that Pulte has been forced to incur to defend itself in the Lawsuit.  These damages are continuing in nature.

**WHEREFORE**, Pulte respectfully requests that the Court enter judgment against Harleysville awarding Pulte compensatory damages directly and

proximately caused by Harleysville's breach of its contractual duty to defend Pulte, together with prejudgment interest, attorneys' fees pursuant to New Jersey Rule 4:42-9(a)(6), and such other and further relief as the Court may deem just and proper, including, without limitation, incidental and consequential damages.

## JURY DEMAND

Pulte hereby demands a trial by jury of all issues triable as of right by jury in its Complaint.

Dated:  July 21, 2023              Respectfully submitted,

                                    _/s/ Catherine J. Bick_____

                                    GIORDANO, HALLERAN & CIESLA
                                    A Professional Corporation
                                    Attorneys for Plaintiff, Pulte Homes of NJ,
                                    Limited Partnership

# EXHIBIT 1

## CONTRACTOR AGREEMENT

Acies Group LLC  ("Contractor") agrees to furnish, at its own cost and expense, all labor, materials, tools, equipment and facilities necessary to do and fully complete the work described herein in accordance with the terms and conditions set forth below and attached hereto. Contractor shall pay all sales, consumer use and other similar taxes required by law. Contractor shall secure and pay for all permits, governmental fees and licenses necessary for the proper execution and completion of the work.

Pulte Homes of NJ, Limited Partnership ("Pulte") agrees to pay Contractor such amounts and in such installments as set forth in the attached Schedule A, subject to additions and deductions as provided elsewhere herein.

Work is generally described as: **Exterior Finishes and Interior Pool Room Finish** and is more specifically described in Schedule A, the General Specifications and the Trade Specifications which are part of this Agreement.

For the community known as: **River Point @ Manchester** said work shall be commenced and completed in accordance with Schedule A.

1. FAMILIARITY WITH SITE AND CODES
   A. Contractor hereby certifies and agrees: that it has examined all the plans and read and examined all the specifications prepared by Pulte, that it has visited the site; that it and its contractors will be and are bound by any and all parts of said plans and specifications insofar as they relate in any part of in any way to the work undertaken herein and shall be further bound to the Trade Specifications attached. It is hereby specifically agreed that Contractor shall not sublet, assign or transfer this Agreement, or any part thereof, without the written consent of Pulte.
   B. Contractor certifies that it is familiar with all codes and requirements set forth by governing bodies and agencies having authority over the project and that all work performed shall meet or exceed said codes or requirements.

2. PROSECUTION OF WORK
   A. As an express condition precedent to the commencement of work and Contractor's right to receive any payment under this Agreement, Contractor will supply Pulte with the following:
      1. a Certificate of Insurance evidencing Pulte as the Certificate Holder and also complying with the insurance provisions delineated herein;
      2. a list of any individuals, previously approved by Pulte, to whom any portions of this Agreement have been sub-subcontracted out to with pertinent certificates of insurance for each sub-contractor;
      3. a Class "A" license to perform the work in the jurisdiction in which the project is located; and
      4. a list of all suppliers and material men to be utilized on the project. In the event Contractor should change suppliers and/or material men during the pendency of this Agreement, Contractor shall immediately notify Pulte, in writing, of the new suppliers/material men.

   Failure of Contractor to comply with this paragraph shall be, at Pulte's sole option, grounds for immediate termination of this Agreement.
   B. It is understood and agreed by and between the parties hereto, that the work included in this Agreement is to be done under the direction of the superintendent of Pulte, or other authorized representative of Pulte, and that their decisions as to the true construction and meaning of drawings and specifications shall be final.
   C. Contractor shall provide sufficient, safe and proper facilities at all times for the inspection of the work by Pulte and its authorized representatives, and shall, within twenty-four (24) hours after receiving written notice of unsound or improper work, proceed to take down all portions of such work and remove from the grounds and building all material, whether worked or un-worked, which Pulte and/or its authorized representatives shall condemn as unsound or improper, or as in any way failing to conform to the drawings and specifications. Contractor shall make good all work so condemned, and all other work damaged or destroyed in the making good of such condemned work, at Contractor's sole expense.
   D. Contractor agrees to perform the work, and all parts thereof, promptly, diligently and in such order and sequence as Contractor may direct, including Saturdays and/or Sundays and holidays, to assure the efficient, expeditious and timely prosecution of the work under this Agreement, including furnishing sufficient forces, supervision, equipment and materials, at such times and for such periods, as Pulte may direct. Pulte may, upon forty-eight (48) hours prior written notice, require Contractor to provide additional labor and supervision at the project site. Pulte reserves the right to modify any such progress schedule with respect to the required sequence or duration of the work or any portion thereof, and Pulte makes no representation that Contractor will be able to commence, prosecute or complete the work in accordance with any progress schedule. In the event Contractor cannot adequately supply enough labor or equipment for the work, Pulte may obtain additional labor and equipment to assist Contractor and all costs thereof, including a reasonable fee for expenses of administration, supervision and accounting, shall be paid by Contractor.
   E. Contractor shall not be entitled to any claim for damages on account of hindrance or delay from any cause whatsoever; but if hindrance or delay is occasioned by any act of God, or any act or omission on the part of Pulte, Contractor will be entitled only to an extension of time to complete the work; however, no such extension shall be made unless a claim therefore is presented in writing to Pulte within forty-eight (48) hours of the onset of such delay. Contractor shall not be obligated to agree with such extension.
   F. It shall be the duty and responsibility of Contractor to give all notices, be present at and obtain all required inspections related to the work according to the progress schedule. Any fees required for inspections and re-inspections shall be at Contractor's expense.
   G. Contractor shall cut and properly fit its work to accommodate the work of others unless Contractor finds that the existing work is in any manner defective. In such situation, Contractor shall immediately notify Pulte of said defects. Failure to so notify Pulte prior to Contractor commencing work shall result in Contractor being liable for any correction, repair or replacement to its work necessary to correct the defects caused by others. Accordingly, commencement of work by Contractor constitutes acknowledgment that all prior, related, adjacent and/or dependent work is acceptable to it, including "clean-up" in connection with prior work, and shall not furnish a basis for any future claims for damages, extras or excusable non-compliance with the plans, specifications or time schedule. Contractor is to notify Pulte of any existing violations regarding "clean-up" before Contractor commences its work or Contractor will be held accountable for the "clean-up" of the existing debris.

Page 1
Pulte: _____   Date: _____   Pulte: _____   Date: _____
Contractor: _____   Contractor: _____

ACIES-132

H. Contractor shall allow Pulte and other contractors, laborers and material men reasonable opportunity for the introduction and storage of their materials and equipment and the execution of their work, and Contractor shall properly conduct and coordinate its work with theirs. Further, Contractor shall prosecute its work in such a manner so as to protect adjacent properties and the work of others from any damage, and Contractor shall pay for any repairs to others' work made necessary by any acts of Contractor.

I. If, under the provisions set forth in Schedule A of this Agreement, there are materials furnished for Contractor's use by Pulte, or by a third party supplier, at Pulte's instance, order, cost and expense, it shall be the duty and responsibility of Contractor to receive and accept, or reject, delivery of those materials. Failure of materials so delivered to conform with the specifications shall be cause for rejection. Pulte shall rely solely on Contractor's written acceptance of each delivery as to the quantity and as a basis for payment to the supplier. Contractor shall keep, store and maintain such material in good order, protecting same from all damage and losses. If such material suffers damage or loss, Contractor shall, on demand, reimburse Pulte to the extent of the damage or loss.

J. Contractor shall walk, inspect and correct all defects upon completion of each operation. Pulte will make final inspection to determine if work is acceptable. Contractor assumes all risk of loss or damage to the work it performs until such time as the work is accepted by Pulte. Any decision concerning "acceptability" is in the sole discretion of Pulte. Any items deemed unacceptable by Pulte must be fixed to Pulte's satisfaction prior to Contractor invoicing for the work.

K. Contractor agrees to provide sufficient manpower on the job site to perform all "punch-out" work necessitated by its phase of construction. Said work shall be completed as directed by Pulte. Failure of Contractor to perform accordingly may result in the withholding of payments due. Normal punch-out and repair work has been anticipated by Contractor and Contractor has budgeted for this work in the Agreement price listed on Schedule A. Acceptance of work does not free Contractor of any of the responsibilities outlined in this Agreement.

L. It is Contractor's responsibility to remove all trash and debris generated by its phase of construction from the project site, whether such trash and debris are remnants of Pulte- or Contractor-supplied material. Interiors of houses will be held in a "broom clean" condition daily and interiors and exteriors will, in no case, be held in such a condition as to be in violation of any OSHA housekeeping regulations. In the event Pulte is required to perform this function for Contractor, Contractor will be back-charged against Contractor's invoices for all expenses at a minimum rate of $50.00 per hour, per occurrence.

3. EXTRA/CHANGE ORDER WORK

Contractor hereby agrees to make any and all changes, furnish the materials and perform work which Pulte may require, without nullifying this Agreement, at a reasonable addition to, or reduction from, the Agreement price. NO ALTERATIONS OR CHANGES SHALL BE MADE, HOWEVER, EXCEPT UPON THE WRITTEN ORDER OF PULTE. Pulte assumes no obligation to pay for changes or alterations performed without prior written authorization. The amount to be paid by Pulte, or allowed by Contractor, by virtue of such changes, shall be stated in the change order. In the event that a firm amount for a change cannot be determined at the time the change is ordered, the final amount of the change must be submitted for approval to Pulte within twenty-four (24) hours after the work ordered has been completed. Individual invoices for each change ordered and approved must be submitted, in a form acceptable to Pulte within thirty (30) days of the approval date. Failure to invoice in acceptable form, or within the time allowed, shall automatically constitute a forfeiture by Contractor of any money due with respect to such change.

4. METHOD OF PAYMENT

A. Contractor shall, as an expressed condition precedent for obtaining payments, execute and deliver to Pulte:
   1. full and complete waivers and/or releases of lien and affidavits for all labor, material, equipment, supervision, and services furnished by Contractor toward the performance hereof;
   2. such formal guarantees as to pertain to the work; and
   3. such other documents as Pulte may require.

B. Separate invoices must be prepared, per lot/unit, containing either Agreement work and options, or extras. Invoices for extras must reference the Pulte's work order. All invoices must indicate the community, lot and block where the work was performed.

C. Contractor shall invoice promptly. Invoices for Agreement work and options, as reflected on Schedule A, not submitted within ninety (90) days of the date the invoiced work was performed will be, at Pulte's sole discretion, null and void and Contractor waives any and all rights to any claims arising from said untimely invoices, it being an expressed condition precedent to payment that work be invoiced within ninety (90) days of performance.

D. All payments shall be made in strict accordance with the payment schedule. No partial payments per invoice, as well as draws, shall be made unless agreed to in writing between the parties. Requests for payments will be submitted for approval to the Superintendent on or before the tenth (10th) and the twenty-fifth (25th) of each month.

E. Contractor acknowledges that Pulte may, at its sole discretion and at any time during the pendency of this Agreement, withhold ten (10%) percent of each invoice as retainage. Retainage will be released to Contractor on a per unit basis thirty (30) days after final completion, acceptance by Pulte and completion of all punch-outwork by Contractor on each unit. Pulte's failure to require this retainage at the commencement of work pursuant to this Agreement shall not constitute a waiver of its rights, under this provision, to require such retainage for work in progress and/or work yet to be performed.

F. It is mutually agreed between the parties hereto, that no payment made under this Agreement shall be conclusive evidence of the performance of this Agreement, either in whole or in part, and that no payment shall be construed to be an acceptance of defective stock or improper materials. **Contractor shall insure his own risk in and about the building, unless special agreement is made to the contrary.**

G. Contractor shall not delay work by reason of Pulte's failure to make any payments if such failure is a result of a dispute as to the amount of the payment or whether payment is due.

5. WARRANTIES, INSURANCE AND INDEMNIFICATION

A. Contractor warrants that all work and/or materials provided hereunder meet or exceed all applicable Federal, State, and local laws, building codes and agency regulations and that said work and/or materials are intended for use in a residential structure and meet all VA/FHA compliance regulations.

B. Contractor warrants that all materials and workmanship are not defective and are of an acceptable nature and guarantees such workmanship and materials to be free from defects for twenty-four (24) months or the Residential Warranty Corporation standards (or equivalent,) whichever is applicable, from the date of conveyance of each unit/lot by Pulte and

ACIES-133

shall repair any defects during said period at its cost and expense immediately after being notified of any such defect or defects by Pulte. Contractor shall also repair to the satisfaction of Pulte, all work of third parties damaged or destroyed in repairing Contractor's work.

C. All materials furnished by Contractor shall be new and free of all liens, security interests, claims or encumbrances when placed in the community.

D. Contractor agrees that ten (10%) percent of the value of this Agreement, on a per unit basis, shall constitute sums paid for future warranty work and should the Contractor fail to perform warranty work within forty-eight (48) hours, Pulte shall have a right to money from Contractor based on the above stated percentage. Contractor shall provide an effective service policy for warranty work. It is understood that should Contractor be adjudged insolvent, adjudicated a bankrupt, make a general assignment for the benefit of creditors, or if a receiver is appointed on account of insolvency during the time in which Contractor's work is still under a warranty period, then Pulte shall have an immediate right to an amount based on the above stated percentage as a result of Contractor's inability to perform warranty work. Once it is determined that Contractor owes Pulte money for failure to perform warranty work, pursuant to the preceding sentence or Contractor's failure to perform warranty work immediately upon Pulte's request, Contractor shall not be entitled to receive any further payments under this, or any other Agreement between the parties until such time as Pulte has received the sums owed it by Contractor pursuant to this or any other provision of this Agreement. Pulte shall have the right to a credit equal to the money owed, and said credit shall be against any balance owed Contractor from Pulte pursuant to this or any other Agreement between the parties, but if the sums due Pulte exceed such unpaid balances, then Contractor shall pay the difference to Pulte.

E. Warranty work shall be performed in conformance with the guidelines set forth in the General Specifications, attached hereto and incorporated hereby by this reference.

F. To the maximum extent permitted by law, Contractor hereby agrees to save, indemnify and keep harmless Pulte, its subsidiaries and affiliates, and their respective officers, directors, partners, members, employees, successors and assigns against:

All liability, claims, judgments, suits, or demands for damages to persons or property arising out of, resulting from or relating to Contractor's performance of the work under this Agreement ("Claims") **including Claims for Pulte's own negligence** unless such Claims have been specifically determined by the trier of fact to be the sole negligence of Pulte. Contractor will defend Claims which may be brought or threatened against Pulte and will pay on behalf of Pulte any expenses incurred by reason of such Claims including, but not limited to, court costs, expert costs and reasonable attorney fees incurred in defending or investigating such Claims. Such payment on behalf of Pulte shall be in addition to any and all other legal remedies available to Pulte and shall not be considered Pulte's exclusive remedy.

In the event Pulte is required to mediate or arbitrate a claim with a homeowner arising out of or relating to the work performed under this Agreement, Pulte may, in its sole discretion, require Contractor to participate in the mediation and/or arbitration in accordance with the Federal Arbitration Act. The Construction Industry Arbitration Rules of the American Arbitration Association ("AAA") and the Supplementary Consumer/Residential Construction Industry Arbitration Rules of the AAA Rules shall apply. Any judgment rendered by the arbitrator may be confirmed, entered, and enforced in any court having jurisdiction and the Contractor shall be bound by that decision.

The provisions of this paragraph shall survive expiration or termination of this Agreement and/or completion of the Work of Contractor/Supplier and shall continue until such time is determined by final judgment that the Claim against Pulte is fully and finally barred by the statute of limitations. Contractor indemnification and defense obligations shall not be limited by the amounts or types of insurance that Contractor is required to carry under this Agreement or that Contractor does in fact carry.

Contractor represents that it does carry and will continue to carry, with insurance companies acceptable to Pulte, the following insurance coverage continuously during the life of this Agreement (and in the case of products and completed operations coverage, for two (2) years after the expiration of this Agreement):

**Commercial General Liability Coverage.** Commercial general liability insurance on an Occurrence Form containing a per occurrence limit of at least $1,000,000 protecting against bodily injury, property damage and personal injury claims arising from the exposures 1) premises-operations (with an aggregate limit at least equal to the per occurrence limit); 2) products and completed operations including materials designed, furnished and/or modified in any way by Contractor (with a separate aggregate limit at least equal to the per occurrence limit); 3) independent subcontractors; 4) contractual liability risk covering the indemnify obligations set forth in this Agreement; and 5) where applicable, property damage resulting from explosion, collapse, or underground (x, c, u) exposures. The policy may not contain exclusions for residential construction; attached product or in California SB800 liability.

**Automobile Liability Coverage.** Automobile liability coverage insuring against bodily injury and/or property damage arising out of the operation, maintenance, use, loading or unloading of any auto including, owned, non-owned, hired and employee autos, with limits at least equal to the minimum required by the state In which work covered by this Agreement is performed.

**Workers' Compensation and Employers' Liability Coverage.** Worker's compensation insurance providing statutory benefits imposed by applicable state or federal law such that (a) Pulte will have no liability to Contractor or its employees, subcontractors and agents and (b) Contractor will satisfy all Worker's Compensation obligations imposed by state law. If Contractor has any employees who are subject to the rights and obligations of the Longshoremen and Harbor Workers Act, then the Worker's Compensation insurance must be broadened to provide such coverage.

In addition, Contractor agrees to carry Employer's liability coverage with limits of not less than:

| | |
|---|---|
| $100,000 | Each Accident |
| $500,000 | Aggregate Policy Limit for Disease |
| $100,000 | Each Employee |

Contractor shall add Pulte as an additional insured on the above general liability policy by having the insurance carrier issue an ISO-2010 Endorsement, Owners, Lessees or Contractors - Form B, Edition date 11/85, or its equivalent. Such endorsement must include completed operations coverage for the benefit of the additional insured. This extension shall apply to the full extent of the actual limits of Contractor's coverage even if such actual limits exceed the minimum limits required by this Agreement. Pulte's additional insured status under the policy(ies) must be limited by language to the policy. To the extent umbrella or excess insurance is available above the minimum required limits states in this Agreement, the protection afforded Pulte in the umbrella or excess liability insurance shall be a broad or broader than

Page 3
Pulte: _____       Date: _____       Pulte: _____
Contractor: _____                      Contractor: _____       Date: _____

the coverage present in the underlying insurance and in accordance with this Agreement. Each general liability, umbrella or excess policy shall specifically state that the insurance provided by the Contractor shall be considered primary, and insurance of Pulte shall be considered excess for purposes of responding to Claims. Contractor shall evidence that such insurance is in force by furnishing Pulte with a Certificate of Insurance, or if requested by Pulte, certified copies of the policies. The Certificate shall accompany and become a part of this Agreement. Each Certificate of Insurance shall (1) contain an unqualified statement that the policy shall not be subject to cancellation, nonrenewable, adverse change or reduction of amounts of coverage without thirty (30) days prior written notice to Pulte, but in the event of non-payment of premium ten (10) days notification will be provided; (2) show Pulte as additional insured by either referencing or attaching the required endorsement; (3) indicate that Contractor's coverage is primary and Pulte's insurance is excess for any Claims; and (4) indicate that coverage applies in the state where operations are being performed; and (5) as to CGL coverage shall state "Policy includes contractual liability coverage insuring the agreement and obligations of the insured to indemnify Pulte and others to the extent set forth in the Subcontract Agreement between the insured and Pulte Homes Metro NY/NJ Division".

If Contractor should sublet any of the work to a third party, Contractor guarantees that such third party shall indemnify Pulte as set forth in this Agreement and shall carry insurance as set forth in the Agreement prior to permitting such third party to commence work. Contractor shall obtain a signed agreement from such third party indemnifying Pulte as set forth in this Agreement an agreeing to carry insurance as set forth above. In addition, Contractor shall require in its purchase orders that each supplier indemnify Contractor and Pulte from all losses arising from any materials or supplies included in such work.

Any attempt by Contractor to cancel or modify such insurance coverage, or any failure by Contractor to maintain such coverage, shall be a default under this Agreement and, upon such default, Pulte will have the right to terminate this Agreement and/or exercise any of its rights at law or equity. In addition to any other remedies, Pulte may, at its discretion, withhold payment of any sums due under this Agreement until Contractor provides the proof of insurance. The amounts and types of insurance set forth above are minimums required by Pulte and shall not substitute for an independent determination by Contractor of the amounts and types of insurance which Contractor shall determine to be reasonably necessary to protect itself and its work. Pulte reserves the right to modify these provisions relating to indemnification and insurance, and Contractor agrees to be bound by such modifications 30 days after receipt of the modified provisions.

G.  Contractor shall comply with all occupational safety and health standards promulgated by the Secretary of Labor under the Occupational Safety and Health Act of 1970 and all other applicable laws, ordinances, rules, regulations, and orders of any public authority having jurisdiction over the safety of persons or property or to protect them from damage, injury or loss. To the full extent permitted by law, Contractor hereby agrees to indemnify and keep harmless Pulte from and against any and all actions, claims, demands, judgments, liability, expenses, penalties and citations of whatsoever kind, character or description that may arise out of any claimed violation of said Act or regulations In connection with, incident to, resulting from or arising out of Contractor's work. Contractor further agrees that any amounts which have or may become due Contractor under this Agreement, may be retained by Pulte and applied toward any indemnification which is due Pulte pursuant to the terms of Section 11 of which become due Pulte from Contractor for any matter of which Pulte has notice, whether or not there is litigation, at the time such sum would otherwise become due Contractor under this Agreement. It is further understood and agreed that this provision is not in lieu of and shall not in any way impair or exclude Pulte's rights to be indemnified and held harmless by Contractor under any other agreement, any statute, or the common law, and all such rights shall be cumulative.

H.  Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the work. Contractor shall take all reasonable precautions for the safety of, and shall provide all reasonable protection to prevent damage, injury or loss to:

1.  all employees on the work site and any and all other persons who may be affected thereby;
2.  all the work and all materials and equipment to be incorporated therein, whether in storage on or off the site, under the care, custody or control of Contractor or any of its sub-contractors; and
3.  other property at the site or adjacent thereto, including trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

I.  Contractor shall erect and maintain, as required by existing conditions and progress of the work, all reasonable safeguards including posting danger signs and other warning against hazards, promulgating safety regulations and notifying owners and users of adjacent utilities. Contractor shall pay all fines incurred because of safety violations Contractor shall fully comply with all applicable Federal, State, or local legislation relating to the employment of persons. Contractor agrees, in connection with the performance of work under this Agreement, not to discriminate against any employee or applicants for employment because of race, creed, color, sex, or national origin. The aforesaid provisions shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.

J.  Contractor further agrees to post, in places available to employees and applicants for employment, notices required by law setting forth the provisions of this nondiscrimination clause and to state in all solicitations or advertisements for employees, placed by or on behalf of Contractor, that all qualified applicants will receive equal consideration for employment without regard to race, creed, color, sex or national origin.

6.  CONDUCT OF CONTRACTOR

A.  By acceptance of this Agreement, Contractor represents that it is an independent contractor and neither Contractor nor any employee, owner or invester of Contractor are employees of Pulte. Contractor agrees that it will indemnify and hold Pulte harmless and reimburse it for any expense or liability incurred as a result of any claims made against Pulte by Contractor's employees under any applicable Income Tax Withholding or Employment Compensation laws. Contractor shall times have complete charge and control of Contractor's employees engaged in the performance of the work but shall be accountable to Pulte for the completion of the work which shall be in compliance with this Agreement and to the satisfaction of Pulte.

B.  Contractor agrees to give its personal attention to the work and shall at all times maintain a competent supervisor at the job site who will have full authority to act on any and all matters pertaining to the work to be performed under this Agreement

Page 4
Pulte:        _____        Date: _____        Pulte:        _____        Date: _____
Contractor:   _____                                Contractor:   _____

ACIES-135

and whose acts will be binding upon Contractor to the fullest extent. Should Pulte determine that Contractor's supervisor is not satisfactory for any reason whatsoever, then, and in that event, Pulte has the unqualified right to direct Contractor, in writing, to replace such supervisor within forty-eight (48) hours of receipt of the notice.

C. Contractor shall enforce strict discipline and good order among its employees and shall not employ any unfit person or anyone not skilled in the work assigned to him/her or any persons determined by Pulte, it is Pulte's sole discretion, to be unsuitable for working on the project, and Pulte shall, immediately upon notice from Pulte, remove any unfit person from the project. Contractor assumes full responsibility for its Sub-contractors working on the site and Contractor agrees that all sub-contractors working for it will abide by the terms of this Agreement.

D. No alcoholic beverages or illegal drugs of any kind are to be consumed by Contractors employees and/or agents while on the job site. Contractor agrees to impose and strictly enforce a regulations to this effect and to inform employees and/or agents that such a regulation will be strictly enforced. Any employee and/or agents found to have violated said regulation is to be replaced immediately.

E. Pulte conducts its business in such a manner as to comply with all, laws, statutes and regulations, civil and criminal, governing the jurisdiction in which the project is located and Contractor warrants that it complies with the laws, statutes and regulations and that should Pulte become aware of Contractor's failure to so comply with applicable laws, statutes or regulations then Pulte, in its sole discretion, may immediately terminate Contractor. Contractor further acknowledges its obligation to inform Pulte's president or vice-president of any situation it becomes aware of in which anyone connected with this project fails to comply with the laws, statutes or regulations of the jurisdiction. Should Pulte become aware of a situation in which anyone connected with this project, be they another contractor or an individual in Pulte's employ, violates a law, statute or regulation, civil or criminal, and further discovers that Contractor was aware of the violation and failed to inform Pulte, as required by this paragraph, then Pulte may, in its sole discretion, immediately terminate Contractor.

7. ENVIRONMENTAL COMPLIANCE

Contractor agrees to comply with all applicable laws, regulations, orders and guidance administered by the U.S. Environmental Protection Agency, the New Jersey Department of Environmental Protection and any other local agency(s) with jurisdiction. The matters covered by this paragraph include, without limitation, discharge of wastes to air, water or land, solid waste disposal and management of "hazardous substances".

Contractor shall not cause or permit, and shall take every care to prevent any production, deposit, disposal or spill of hazardous substances during the performance of this Agreement. In the event that any hazardous wastes are generated on the work site by Contractor, its agents, employees, Contractors or invites. Contractor shall, at its sole cost, remove such waste daily and shall be solely responsible for transport, storage and disposal in accordance with the Resource Conservation and Recovery Act, Hazardous Materials Transportation Act and all other similar Federal, state and local laws and regulations as now or hereafter enacted or amended. Unused portions of hazardous substances shall not be stored on the work site but shall be removed daily by Contractor and properly handled in accordance with all applicable laws. The terms "hazardous substances" shall be as defined by the Superfund Act (Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended) and shall include any similar definition of a substance subject to similar control by state or local law, including petroleum and petroleum products.

Contractor acknowledges it has read and shall comply with all provisions of Pulte's written hazardous communication program. Contractor shall provide Pulte with appropriate Material Safety Data Sheets (M.S.D.S.) prior to bringing a hazardous chemical to the work site. In the event Contractor's work materials do not require an M.S.D.S. and no hazardous substances are to be used on the work site, Contractor shall so certify, in writing.

8. CONTRACTOR'S DEFAULTS

A. Should Contractor refuse or neglect to supply a sufficient number of properly skilled workers, or a sufficient quantity of materials of proper quality, or fail to make prompt payment to its sub-contractors for materials or labor, or fail, in any respect, to prosecute the work covered by this Agreement, with promptness and diligence, or fail In the performance of any of the provisions of this Agreement, or persistently disregards laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, Pulte may, at its sole option, immediately provide any such labor and materials and deduct the costs thereof from any money then due or thereafter to become due to Contractor under this Agreement, or any other agreement between the parties; and/or in addition, Pulte may, at its sole option, Immediately terminate the employment of Contractor for the work, and shall have the right to enter upon the premises and take possession, for the purpose of completing the work included under this Agreement, of all drawings, materials, tools and appliances thereon, and may employ any other person or persons to finish the work and provide the materials therefore, and in case Pulte must act in accordance with this provision, Contractor shall not be entitled to receive any further payment under this or any other agreement between the parties until the work shall be wholly finished at which time, if the unpaid balance of the amount to be paid under this Agreement exceeds the expenses incurred by Pulte in finishing the work, such excess shall be paid by Pulte to Contractor; but if such expense shall exceed such unpaid balance. Pulte has the right to deduct such excess expense from any money owed Contractor by Pulte pursuant to any other agreement between the parties, and if there still remains an unpaid balance, then Contractor shall pay the difference to Pulte.

In the event Pulte does perform any work or services or enters into further or additional agreements because of any default of Contractor, Pulte shall be entitled to charge Contractor the cost thereof plus fifteen (15%) percent, representing Pulte's overhead expense, and Contractor hereby agrees to pay same. In the event it becomes necessary for Pulte to collect any deficiency from Contractor by legal action, Contractor agrees to reimburse Pulte for all of its legal and court expense in connection with such action, including attorney's fees at thirty (30%) percent of the amount in controversy.

B. Contractor agrees that should Pulte become aware of the situation where Contractor is delinquent in making payments to any of Contractor's suppliers, laborers or material men, Pulte will have the authority to issue checks made out directly to the affected supplier, laborer or material men until such time as the delinquency is resolved and Pulte obtains lien waivers from the affected supplier, laborer or material men with respect to any affected property. This is in addition to, and not in lieu of, Pulte's right to terminate Contractor for failure to provide lien waivers. It is expressly understood that this provision does not alleviate Contractor of sole liability to pay its supplier, laborers or material men and that should Pulte issue checks pursuant to this provision, Pulte in no way assumes any direct liability towards Contractor 'a supplier, laborers or material men.

Contractor waivers any rights to any payments from Pulte once Pulte acts in accordance with this paragraph, until Pulte has obtained fully executed lien waivers from all of Contractor's suppliers, laborers and material men on this project.

C.  In the event Pulte incurs any legal expenses based on any act or omission by Contractor which can result in a mechanic's lien being filed by a supplier, laborer or material men of Contractor, said actual expenses shall constitute an offset to any money owed Contractor by Pulte regardless of whether said sums are owed based on work performed under this Agreement or any other agreement between the parties. If the balance owed Contractor by Pulte is less than the amount constituting an offset under this paragraph then Contractor shall pay the difference.

D.  Should Contractor at any time, either prior to starting any work or after partial completion thereof, be adjudged insolvent, adjudicated a bankrupt, make a general assignment for the benefit of its creditors, or if a receiver is appointed on account of its insolvency, then Pulte has the absolute right to immediately terminate this Agreement and Contractor waives any right to any money owed hereunder, or under any other agreement between the parties, as an asset of Contractor to the extent Contractor is, or will be, indebted to Pulte and/or any suppliers, laborers, material men and/or subcontractors.

E.  In the event Contractor breaches this Agreement or this Agreement is terminated for any reason other than those set forth in Section VIII, Pulte shall have the right to stop all payments to Contractor until such time as Pulte can accurately ascertain its damages resulting from said breach, at which time Pulte is authorized to deduct said damages from any money owed Contractor.

9.  TERMINATION NOT FOR DEFAULT

A.  Nothing contained herein shall constitute a guarantee to Contractor that they will perform all the work contemplated by this Agreement, Pulte expressly reserving the right to employ other contractors to perform the same or similar work contemplated under this Agreement, if, in Pulte's sole discretion, said additional contractors are necessary to comply with the progress schedule of Pulte. Contractor shall have no claim against Pulte should Pulte employ additional contractors. This paragraph is in addition to the other remedies provided Pulte in the event contractor fails to perform work in accordance with Pulte's schedule and/or supply sufficient laborers.

B.  Notwithstanding any other provision of this Agreement, it is agreed by and between the parties hereto that the duration and amount of work to be performed hereunder is unspecified and that Pulte may terminate this Agreement for any reason or for no reason, in which event Contractor shall be fully paid for all work satisfactorily completed less the appropriate retainage and less any back-charges and/or credits pursuant to this Agreement and/or the laws of the State of New Jersey/Pennsylvania. Contractor specifically agrees that it will make no claim nor shall Pulte be liable for damages of any nature including but not limited to loss of profits, cost of materials ordered but not used, actual, consequential or incidental damages. Pulte may purchase specially fabricated material from Contractor at the price Contractor paid for the subject material, to the extent same is feasible, in Pulte's sole discretion.

10.  GENERAL PROVISIONS

A.  To the extent permitted by applicable law, Contractor hereby waives its right to claim any and all liens against the real property for which work is being performed pursuant to this Agreement including, but not limited to, any statutory Mechanics Lien.

B.  Pulte shall have the right to require Contractor to furnish bonds covering the faithful performance of this Agreement and the payment of all obligations arising hereunder in such form and amounts as Pulte may prescribe, and with such sureties as may be agreeable to the parties. If such bonds are stipulated in the bidding requirements, the premiums shall be paid by Contractor; if required subsequent to the submission of bids or the execution of this Agreement, the cost shall be reimbursed by Pulte.

C.  All negotiations, proposals and agreements prior to the date of this Agreement are merged herein and superseded hereby, there being no agreement or understanding other than those written or specified herein. This Agreement shall be binding upon an inure to the benefit of the respective heirs, executors, administrators, successors and assigns of the parties hereto.

D.  A waiver by Contractor of any breach or violation by Contractor of any provision hereof shall not constitute a waiver of any further or additional breach of such provision or of any other provision.

E.  Should any part, term or provision of this Agreement be by a court decided to be unenforceable or in conflict with any application law of the State where made, the validity of the remaining portions or provisions shall not be affected thereby.

F.  Contractor agrees to disclose to Pulte if it is engaged in any business other than that which is the purpose of this Agreement. Pulte may terminate this Agreement if, in its sole discretion, it deems such other business to be in conflict with or have an adverse impact on Contractor's ability to fulfill its obligations hereunder.

IN WITNESS WHEREOF, the parties have executed this Agreement this _____ day of _____, 20_____.

CONTRACTOR:  ACIES GROUP LLC

By: _____

PULTE HOMES METRO NY/NJ DIVISION

By: _____

Page 6
Pulte:            _____     Date:_____
Contractor:  _____

Pulte:            _____     Date:_____
Contractor:

ACIES-137

# EXHIBIT 2

## CONTRACTOR AGREEMENT

<u>Nassau Construction Co. Inc.</u> ("Contractor") agrees to furnish, at its own cost and expense, all labor, materials, tools, equipment and facilities necessary to do and fully complete the work described herein in accordance with the terms and conditions set forth below and attached hereto. Contractor shall pay all sales, consumer use and other similar taxes required by law. Contractor shall secure and pay for all permits, governmental fees and licenses necessary for the proper execution and completion of the work.

Pulte Homes of NJ, Limited Partnership ("Pulte") agrees to pay Contractor such amounts and in such installments as set forth in the attached Schedule A, subject to additions and deductions as provided elsewhere herein.

Work is generally described as: <u>Rough Carpentry</u> and is more specifically described in Schedule A, the General Specifications and the Trade Specifications which are part of this Agreement

For the community known as: <u>River Pointe @ Manchester</u> said work shall be commenced and completed in accordance with Schedule A.

1. **FAMILIARITY WITH SITE AND CODES**
   A. Contractor hereby certifies and agrees: that it has examined all the plans and read and examined all the specifications prepared by Pulte, that it has visited the site; that it and its contractors will be and are bound by any and all parts of said plans and specifications insofar as they relate in any part of in any way to the work undertaken herein and shall be further bound to the Trade Specifications attached. It is hereby specifically agreed that Contractor shall not sublet, assign or transfer this Agreement, or any part thereof, without the written consent of Pulte.
   B. Contractor certifies that it is familiar with all codes and requirements set forth by governing bodies and agencies having authority over the project and that all work performed shall meet or exceed said codes or requirements.

2. **PROSECUTION OF WORK**
   A. As an express condition precedent to the commencement of work and Contractor's right to receive any payment under this Agreement, Contractor will supply Pulte with the following:
      1. a Certificate of Insurance evidencing Pulte as the Certificate Holder and also complying with the insurance provisions delineated herein;
      2. a list of any individuals, previously approved by Pulte, to whom any portions of this Agreement have been sub-subcontracted out to with pertinent certificates of insurance for each sub-contractor;
      3. a Class "A" license to perform the work in the jurisdiction in which the project is located; and
      4. a list of all suppliers and material men to be utilized on the project. In the event Contractor should change suppliers and/or material men during the pendency of this Agreement, Contractor shall immediately notify Pulte, in writing, of the new suppliers/material men.
   Failure of Contractor to comply with this paragraph shall be, at Pulte's sole option, grounds for immediate termination of this Agreement.
   B. It is understood and agreed by and between the parties hereto, that the work included in this Agreement is to be done under the direction of the superintendent of Pulte, or other authorized representative of Pulte, and that their decisions as to the true construction and meaning of drawings and specifications shall be final.
   C. Contractor shall provide sufficient, safe and proper facilities at all times for the inspection of the work by Pulte and its authorized representatives, and shall, within twenty-four (24) hours after receiving notice notice of unsound or improper work, proceed to take down all portions of such work and remove from the grounds and building all material, whether worked or un-worked, which Pulte and/or its authorized representatives shall condemn as unsound or improper, or as in any way failing to conform to the drawings and specifications. Contractor shall make good all work so condemned, and all other work damaged or destroyed in the making good of such condemned work, at Contractor's sole expense.
   D. Contractor agrees to perform the work, and all parts thereof, promptly, diligently and in such order and sequence as Contractor may direct, including Saturdays and/or Sundays and holidays, to assure the efficient, expeditious and timely prosecution of the work under this Agreement, including furnishing sufficient forces, supervision, equipment and materials, at such times and for such periods, as Pulte may direct. Pulte may, upon forty-eight (48) hours prior written notice, require Contractor to provide additional labor and supervision at the project site. Pulte reserves the right to modify any such progress schedule with respect to the required sequence or duration of the work or any portion thereof, and Pulte makes no representation that Contractor will be able to commence, prosecute or complete the work in accordance with any progress schedule. In the event Contractor cannot adequately supply enough labor or equipment for the work, Pulte may obtain additional labor and equipment to assist Contractor and all costs thereof, including a reasonable fee for expenses of administration, supervision and accounting, shall be paid by Contractor.
   E. Contractor shall not be entitled to any claim for damages on account of hindrance or delay from any cause whatsoever; but if hindrance or delay is occasioned by any act of God, or any act or omission on the part of Pulte, Contractor will be entitled only to an extension of time to complete the work; however, no such extension shall be made unless a claim therefore is presented in writing to Pulte within forty-eight (48) hours of the onset of such delay. Contractor shall not be obligated to agree with such extension.
   F. It shall be the duty and responsibility of Contractor to give all notices, be present at and obtain all required inspections related to the work according to the progress schedule. Any fees required for inspections and re-inspections shall be at Contractor's expense.
   G. Contractor shall cut and properly fit its work to accommodate the work of others unless Contractor finds that the existing work is in any manner defective. In such situation, Contractor shall immediately notify Pulte of said defects. Failure to so notify Pulte prior to Contractor commencing work shall result in Contractor being liable for any correction, repair or replacement to its work necessary to correct the defects caused by others. Accordingly, commencement of work by Contractor constitutes acknowledgment that all prior, related, adjacent and/or dependent work is acceptable to it, including "clean-up" in connection with prior work, and shall not furnish a basis for any future claims for damages, extras or excusable non-compliance with the plans, specifications or time schedule. Contractor is to notify Pulte of any existing violations regarding "clean-up" before Contractor commences its work or Contractor will be held accountable for the "clean-up" of the existing debris.

Page 1
Pulte:
Contractor: _____   Date: 9/18/06    Pulte: _____   Date: _____
Contractor: _____

05/24/2000 07:12 FAX 805 766 7493          PULTE HOMES                          Ø002

H. Contractor shall allow Pulte and other contractors, laborers and material men reasonable opportunity for the introduction and storage of their materials and equipment and the execution of their work, and Contractor shall properly conduct and coordinate its work with theirs. Further, Contractor shall prosecute its work in such a manner so as to protect adjacent properties and the work of others from any damage, and Contractor shall pay for any repairs to others' work made necessary by any acts of Contractor.

I. If, under the provisions set forth in Schedule A of this Agreement, there are materials furnished for Contractor's use by Pulte, or by a third party supplier, at Pulte's instance, order, cost and expense, it shall be the duty and responsibility of Contractor to receive and accept, or reject, delivery of those materials. Failure of materials so delivered to conform with the specifications shall be cause for rejection. Pulte shall rely solely on Contractor's written acceptance of each delivery as to the quantity and as a basis for payment to the supplier. Contractor shall keep, store and maintain such material in good order, protecting same from all damage and losses. If such material suffers damage or loss, Contractor shall, on demand, reimburse Pulte to the extent of the damage or loss.

J. Contractor will walk, inspect and correct all defects upon completion of each operation. Pulte will make final inspection to determine if work is acceptable. Contractor assumes all risk of loss or damage to the work it performs until such time as the work is accepted by Pulte. Any decision concerning "acceptability" is in the sole discretion of Pulte. Any items deemed unacceptable by Pulte must be fixed to Pulte's satisfaction prior to Contractor invoicing for the work.

K. Contractor agrees to provide sufficient manpower on the job site to perform all "punch-out" work necessitated by its phase of construction. Said work shall be completed as directed by Pulte. Failure of Contractor to perform accordingly may result in the withholding of payments due. Normal punch-out and repair work has been anticipated by Contractor and Contractor has budgeted for this work in the Agreement price listed on Schedule A. Acceptance of work does not free Contractor of any of the responsibilities outlined in this Agreement.

L. It is Contractor's responsibility to remove all trash and debris generated by its phase of construction from the project site, whether such trash and debris are remnants of Pulte- or Contractor-supplied material. Interiors of houses will be held in a "broom clean" condition daily and interiors and exteriors will, in no case, be held in such a condition as to be in violation of any OSHA housekeeping regulations. In the event Pulte is required to perform this function for Contractor, Contractor will be back-charged against Contractor's invoices for all expenses at a minimum rate of $50.00 per hour, per occurrence.

## 3. EXTRA/CHANGE ORDER WORK

Contractor hereby agrees to make any and all changes, furnish the materials and perform work which Pulte may require, without nullifying this Agreement, at a reasonable addition to, or reduction from, the Agreement price. NO ALTERATIONS OR CHANGES SHALL BE MADE, HOWEVER, EXCEPT UPON THE WRITTEN ORDER OF PULTE. Pulte assumes no obligation to pay for changes or alterations performed without prior written authorization. The amount to be paid by Pulte, or allowed by Contractor, by virtue of such changes, shall be stated in the change order. In the event that a firm amount for a change cannot be determined at the time the change is ordered, the final amount of the change must be submitted for approval to Pulte within twenty-four (24) hours after the work ordered has been completed. Individual invoices for each change ordered and approved must be submitted, in a form acceptable to Pulte within thirty (30) days of the approval date. Failure to invoice in acceptable form, or within the time allowed, shall automatically constitute a forfeiture by Contractor of any money due with respect to such change.

## 4. METHOD OF PAYMENT

A. Contractor shall, as an expressed condition precedent for obtaining payments, execute and deliver to Pulte:
   1. full and complete waivers and/or releases of lien and affidavits for all labor, material, equipment, supervision, and services furnished by Contractor toward the performance hereof;
   2. such formal guarantees as to pertain to the work; and
   3. such other documents as Pulte may require.

B. Separate invoices must be prepared, per lot/unit, containing either Agreement work and options, or extras. Invoices for extras must reference the Pulte's work order. All invoices must indicate the community, lot and block where the work was performed.

C. Contractor shall invoice promptly. Invoices for Agreement work and options, as reflected on Schedule A, not submitted within ninety (90) days of the date the invoiced work was performed will be, at Pulte's sole discretion, null and void and Contractor waives any and all rights to any claims arising from said untimely invoices, it being an expressed condition precedent to payment that work be invoiced within ninety (90) days of performance.

D. All payments shall be made in strict accordance with the payment schedule. No partial payments per invoice, as well as draws, shall be made unless agreed to in writing between the parties. Requests for payments will be submitted for approval to the Superintendent on or before the tenth (10th) and the twenty-fifth (25th) of each month.

E. Contractor acknowledges that Pulte may, at its sole discretion and at any time during the pendency of this Agreement, withhold ten (10%) percent of each invoice as retainage. Retainage will be released to Contractor on a per unit basis thirty (30) days after final completion, acceptance by Pulte and completion of all punch-outwork by Contractor on each unit. Pulte's failure to require this retainage at the commencement of work pursuant to this Agreement shall not constitute a waiver of its rights, under this provision, to require such retainage for work in progress and/or work yet to be performed.

F. It is mutually agreed between the parties hereto, that no payment made under this Agreement shall be conclusive evidence of the performance of this Agreement, either in whole or in part, and that no payment shall be construed to be an acceptance of defective work or improper materials. Contractor shall insure his own risk in and about the building, unless special agreement is made to the contrary.

G. Contractor shall not delay work by reason of Pulte's failure to make any payments if such failure is a result of a dispute as to the amount of the payment or whether payment is due.

## 5. WARRANTIES, INSURANCE AND INDEMNIFICATION

A. Contractor warrants that all work and/or materials provided hereunder meet or exceed all applicable Federal, State, and local laws, building codes and agency regulations and that said work and/or materials are intended for use in a residential structure and meet all VA/FHA compliance regulations.

B. Contractor warrants that all materials and workmanship are not defective and are of an acceptable nature and guarantees such workmanship and materials to be free from defects for twenty-four (24) months or the Residential Warranty Corporation standards (or equivalent,) whichever is applicable, from the date of conveyance of each unit/lot by Pulte and

Page 2
Pulte:
Contractor: _____    Date: _____    Pulte: _____    Date: _____
Contractor:

shall repair any defects during said period at its cost and expense immediately after being notified of any such defect or defects by Pulte. Contractor shall also repair to the satisfaction of Pulte, all work of third parties damaged or destroyed in repairing Contractor's work.

C. All materials furnished by Contractor shall be new and free of all liens, security interests, claims or encumbrances when placed in the community.

D. Contractor agrees that ten (10%) percent of the value of this Agreement, on a per unit basis, shall constitute sums paid for future warranty work and should the Contractor fail to perform warranty work within forty-eight (48) hours, Pulte shall have a right to money from Contractor based on the above stated percentage. Contractor shall provide an effective service policy for warranty work. It is understood that should Contractor be adjudged insolvent, adjudicated a bankrupt, make a general assignment for the benefit of creditors, or if a receiver is appointed on account of insolvency during the time in which Contractor's work is still under a warranty period, then Pulte shall have an immediate right to an amount based on the above stated percentage as a result of Contractor's inability to perform warranty work. Once it is determined that Contractor owes Pulte money for failure to perform warranty work, pursuant to the preceding sentence or Contractor's failure to perform warranty work immediately upon Pulte's request, Contractor shall not be entitled to receive any further payments under this, or any other Agreement between the parties until such time as Pulte has received the sums owed it by Contractor pursuant to this or any other provision of this Agreement. Pulte shall have the right to a credit equal to the money owed, and said credit shall be against any balance owed Contractor from Pulte pursuant to this or any other Agreement between the parties, but if the sums due Pulte exceed such unpaid balances, then Contractor shall pay the difference to Pulte.

E. Warranty work shall be performed in conformance with the guidelines set forth in the General Specifications, attached hereto and incorporated hereby by this reference.

F. To the maximum extent permitted by law, Contractor hereby agrees to save, indemnify and keep harmless Pulte, its subsidiaries and affiliates, and their respective officers, directors, partners, members, employees, successors and assigns against:

All liability, claims, judgments, suits, or demands for damages to persons or property arising out of, resulting from or relating to Contractor's performance of the work under this Agreement ("Claims") including Claims for Pulte's own negligence unless such Claims have been specifically determined by the trier of fact to be the sole negligence of Pulte. Contractor will defend Claims which may be brought or threatened against Pulte and will pay on behalf of Pulte any expenses incurred by reason of such Claims including, but not limited to, court costs, expert costs and reasonable attorney fees incurred in defending or investigating such Claims. Such payment on behalf of Pulte shall be in addition to any and all other legal remedies available to Pulte and shall not be considered Pulte's exclusive remedy.

In the event Pulte is required to mediate or arbitrate a claim with a homeowner arising out of or relating to the work performed under this Agreement, Pulte may, in its sole discretion, require Contractor to participate in the mediation and/or arbitration in accordance with the Federal Arbitration Act. The Construction Industry Arbitration Rules of the American Arbitration Association ("AAA") and the Supplementary Consumer/Residential Construction Industry Arbitration Rules of the AAA Rules shall apply. Any judgment rendered by the arbitrator may be confirmed, entered, and enforced in any court having jurisdiction and the Contractor shall be bound by that decision.

The provisions of this paragraph shall survive expiration or termination of this Agreement and/or completion of the Work of Contractor/Supplier and shall continue until such time it is determined by final judgment that the Claim against Pulte is fully and finally barred by the statute of limitations. Contractor indemnification and defense obligations shall not be limited by the amounts or types of insurance that Contractor is required to carry under this Agreement or that Contractor does in fact carry.

Contractor represents that it does carry and will continue to carry, with insurance companies acceptable to Pulte, the following insurance coverage continuously during the life of this Agreement (and in the case of products and completed operations coverage, for two (2) years after the expiration of this Agreement):

Commercial General Liability Coverage. Commercial general liability insurance on an Occurrence Form containing a per occurrence limit of at least $1,000,000 protecting against bodily injury, property damage and personal injury claims arising from the exposures 1) premises-operations (with an aggregate limit at least equal to the per occurrence limit); 2) products and completed operations including materials designed, furnished and/or modified in any way by Contractor (with a separate aggregate limit at least equal to the per occurrence limit); 3) independent subcontractors; 4) contractual liability risk covering the indemnify obligations set forth in this Agreement; and 5) where applicable, property damage resulting from explosion, collapse, or underground (x, c, u) exposures. The policy may not contain exclusions for residential construction; attached product or in California SB800 liability.

Automobile Liability Coverage. Automobile liability coverage insuring against bodily injury and/or property damage arising out of the operation, maintenance, use, loading or unloading of any auto including, owned, non-owned, hired and employee autos, with limits at least equal to the minimum required by the state in which work covered by this Agreement is performed.

Workers' Compensation and Employers' Liability Coverage. Worker's compensation insurance providing statutory benefits imposed by applicable state or federal law such that (a) Pulte will have no liability to Contractor or its employees, subcontractors and agents and (b) Contractor will satisfy all Worker's Compensation obligations imposed by state law. If Contractor has any employees who are subject to the rights and obligations of the Longshoremen and Harbor Workers Act, then the Worker's Compensation insurance must be broadened to provide such coverage.

In addition, Contractor agrees to carry Employer's liability coverage with limits of not less than:

| | |
|---|---|
| $100,000 | Each Accident |
| $500,000 | Aggregate Policy Limit for Disease |
| $100,000 | Each Employee |

Contractor shall add Pulte as an additional insured on the above general liability policy by having the insurance carrier issue an ISO-2010 Endorsement, Owners, Lessees or Contractors - Form B, Edition date 11/85, or its equivalent. Such endorsement must include completed operations coverage for the benefit of the additional insured. This extension shall apply to the full extent of the actual limits of Contractor's coverage even if such actual limits exceed the minimum limits required by this Agreement. Pulte's additional insured status under the policy(ies) must be limited by amendatory language to the policy. To the extent umbrella or excess insurance is available above the minimum required limits states in this Agreement, the protection afforded Pulte in the umbrella or excess liability insurance shall be a broad or broader than

Page 3
Pulte:
Contractor: [signature]          Date: 9/18/16          Pulte: _____          Date: _____
Contractor:

the coverage present in the underlying insurance and in accordance with this Agreement. Each general liability, umbrella or excess policy shall specifically state that the insurance provided by the Contractor shall be considered primary, and insurance of Pulte shall be considered excess for purposes of responding to Claims.

Contractor shall evidence that such insurance is in force by furnishing Pulte with a Certificate of Insurance, or if requested by Pulte, certified copies of the policies. The Certificate shall accompany and become a part of this Agreement. Each Certificate of Insurance shall (1) contain an unqualified statement that the policy shall not be subject to cancellation, nonrenewable, adverse change or reduction of amounts of coverage without thirty (30) days prior written notice to Pulte, but in the event of non-payment of premium ten (10) days notification will be provided; (2) show Pulte as additional insured by either referencing or attaching the required endorsement; (3) indicate that Contractor's coverage is primary and Pulte's insurance is excess for any Claims; and (4) indicate that coverage applies in the state where operations are being performed; and (5) as to CGL coverage shall state "Policy includes contractual liability coverage insuring the agreement and obligations of the insured to indemnify Pulte and others to the extent set forth in the Subcontract Agreement between the insured and Pulte Homes Metro NY/NJ Division".

If Contractor should sublet any of the work to a third party, Contractor guarantees that such third party shall indemnify Pulte as set forth in this Agreement and shall carry insurance as set forth in the Agreement prior to permitting such third party to commence work. Contractor shall obtain a signed agreement from such third party indemnifying Pulte as set forth in this Agreement an agreeing to carry insurance as set forth above. In addition, Contractor shall require in its purchase orders that each supplier indemnify Contractor and Pulte from all losses arising from any materials or supplies included in such work.

Any attempt by Contractor to cancel or modify such insurance coverage, or any failure by Contractor to maintain such coverage, shall be a default under this Agreement and, upon such default, Pulte will have the right to terminate this Agreement and/or exercise any of its rights at law or equity. In addition to any other remedies, Pulte may, at its discretion, withhold payment of any sums due under this Agreement until Contractor provides the proof of insurance.

The amounts and types of insurance set forth above are minimums required by Pulte and shall not substitute for an independent determination by Contractor of the amounts and types of insurance which Contractor shall determine to be reasonably necessary to protect itself and its work. Pulte reserves the right to modify these provisions relating to indemnification and insurance, and Contractor agrees to be bound by such modifications 30 days after receipt of the modified provisions.

G. Contractor shall comply with all occupational safety and health standards promulgated by the Secretary of Labor under the Occupational Safety and Health Act of 1970 and all other applicable laws, ordinances, rules, regulations, and orders of any public authority having jurisdiction over the safety of persons or property or to protect them from damage, injury or loss. To the full extent permitted by law, Contractor hereby agrees to indemnify and keep harmless Pulte from and against any and all actions, claims, demands, judgments, liability, expenses, penalties and citations of whatsoever kind, character or description that may arise out of any claimed violation of said Act or regulations in connection with, incident to, resulting from or arising out of Contractor's work. Contractor further agrees that any amounts which have or may become due Contractor under this Agreement, may be retained by Pulte and applied toward any indemnification which is due Pulte pursuant to the terms of Section 11 of which become due Pulte from Contractor for any matter of which Pulte has notice, whether or not there is litigation, at the time such sum would otherwise become due Contractor under this Agreement. It is further understood and agreed that this provision is not in lieu of and shall not in any way impair or exclude Pulte's rights to be indemnified and held harmless by Contractor under any other agreement, any statute, or the common law, and all such rights shall be cumulative.

H. Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the work. Contractor shall take all reasonable precautions for the safety of, and shall provide all reasonable protection to prevent damage, injury or loss to:

1. all employees on the work site and any and all other persons who may be affected thereby;
2. all the work and all materials and equipment to be incorporated therein, whether in storage on or off the site, under the care, custody or control of Contractor or any of its sub-contractors; and
3. other property at the site or adjacent thereto, including trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

I. Contractor shall erect and maintain, as required by existing conditions and progress of the work, all reasonable safeguards including posting danger signs and other warning against hazards, promulgating safety regulations and notifying owners and users of adjacent utilities. Contractor shall pay all fines incurred because of safety violations

Contractor shall fully comply with all applicable Federal, State, or local legislation relating to the employment of persons. Contractor agrees, in connection with the performance of work under this Agreement, not to discriminate against any employee or applicants for employment because of race, creed, color, sex, or national origin. The aforesaid provisions shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.

J. Contractor further agrees to post, in places available to employees and applicants for employment, notices required by law setting forth the provisions of this nondiscrimination clause and to state in all solicitations or advertisements for employees, placed by or on behalf of Contractor, that all qualified applicants will receive equal consideration for employment without regard to race, creed, color, sex or national origin.

6. CONDUCT OF CONTRACTOR

A. By acceptance of this Agreement, Contractor represents that it is an independent contractor and neither Contractor nor any employee, owner or investor of Contractor are employees of Pulte. Contractor agrees that it will indemnify and hold Pulte harmless and reimburse it for any expense or liability incurred as a result of any claims made against Pulte by Contractor's employees under any applicable Income Tax Withholding or Employment Compensation laws. Contractor shall stall times have complete charge and control of Contractor's employees engaged in the performance of the work but shall be accountable to Pulte for the completion of the work which shall be in compliance with this Agreement and to the satisfaction of Pulte.

B. Contractor agrees to give its personal attention to the work and shall at all times maintain a competent supervisor at the job site who will have full authority to act on any and all matters pertaining to the work to be performed under this Agreement

and whose acts will be binding upon Contractor to the fullest extent. Should Pulte determine that Contractor's supervisor is not satisfactory for any reason whatsoever, then, and in that event, Pulte has the unqualified right to direct Contractor, in writing, to replace such supervisor within forty-eight (48) hours of receipt of the notice.

C.  Contractor shall enforce strict discipline and good order among its employees and shall not employ any unfit person or anyone not skilled in the work assigned to him/her or any persons determined by Pulte, it is Pulte's sole discretion, to be unsuitable for working on the project, and Pulte shall, immediately upon notice from Pulte, remove any unfit person from the project. Contractor assumes full responsibility for its Sub-contractors working on the site and Contractor agrees that all sub-contractors working for it will abide by the terms of this Agreement.

D.  No alcoholic beverages or illegal drugs of any kind are to be consumed by Contractors employees and/or agents while on the job site. Contractor agrees to impose and strictly enforce a regulations to this effect and to inform employees and/or agents that such a regulation will be strictly enforced. Any employee and/or agents found to have violated said regulation is to be replaced immediately.

E.  Pulte conducts its business in such a manner as to comply with all, laws, statutes and regulations, civil and criminal, governing the jurisdiction in which the project is located and Contractor warrants that it complies with the laws, statutes and regulations and that should Pulte become aware of Contractor's failure to so comply with applicable laws, statutes or regulations then Pulte, in its sole discretion, may immediately terminate Contractor. Contractor further acknowledges its obligation to inform Pulte's president or vice-president of finance of any situation it becomes aware of in which anyone connected with this project fails to comply with the laws, statutes or regulations of the jurisdiction. Should Pulte become aware of a situation in which anyone connected with this project, be they another contractor or an individual in Pulte's employ, violates a law, statute or regulation, civil or criminal, and further discovers that Contractor was aware of the violation and failed to inform Pulte, as required by this paragraph, then Pulte may, in its sole discretion, immediately terminate Contractor.

## 7.  ENVIRONMENTAL COMPLIANCE

Contractor agrees to comply with all applicable laws, regulations, orders and guidance administered by the U.S. Environmental Protection Agency, the New Jersey Department of Environmental Protection and any other local agency(s) with jurisdiction. The matters covered by this paragraph include, without limitation, discharge of wastes to air, water or land, solid waste disposal and management of "hazardous substances".

Contractor shall not cause or permit, and shall take every care to prevent any production, deposit, disposal or spill of hazardous substances during the performance of this Agreement. In the event that any hazardous wastes are generated on the work site by Contractor, its agents, employees, Contractors or invites, Contractor shall, at its sole cost, remove such waste daily and shall be solely responsible for transport, storage and disposal in accordance with the Resource Conservation and Recovery Act, Hazardous Materials Transportation Act and all other similar Federal, state and local laws and regulations as now or hereafter enacted or amended. Unused portions of hazardous substances shall not be stored on the work site but shall be removed daily by Contractor and properly handled in accordance with all applicable laws. The terms "hazardous substances" shall be as defined by the Superfund Act (Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended) and shall include any similar definition of a substance subject to similar control by state or local law, including petroleum and petroleum products.

Contractor acknowledges it has read and shall comply with all provisions of Pulte's written hazardous communication program. Contractor shall provide Pulte with appropriate Material Safety Data Sheets (M.S.D.S.) prior to bringing a hazardous chemical to the work site. In the event Contractor's work materials do not require an M.S.D.S. and no hazardous substances are to be used on the work site, Contractor shall so certify, in writing.

## 8.  CONTRACTOR'S DEFAULTS

A.  Should Contractor refuse or neglect to supply a sufficient number of properly skilled workers, or a sufficient quantity of materials of proper quality, or fail to make prompt payment to its sub-contractors for materials or labor, or fail, in any respect, to prosecute the work covered by this Agreement, with promptness and diligence, or fall in the performance of any of the provisions of this Agreement, or persistently disregards laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, Pulte may, at its sole option, immediately provide any such labor and materials and deduct the costs thereof from any moneys then due or thereafter to become due to Contractor under this Agreement, or any other agreement between the parties; and/or in addition, Pulte may, at its sole option, immediately terminate the employment of Contractor for the work, and shall have the right to enter upon the premises and take possession, for the purpose of completing the work included under this Agreement, of all drawings, materials, tools and appliances thereon, and may employ any other person or persons to finish the work and provide the materials therefore, and in case Pulte must act in accordance with this provision, Contractor shall not be entitled to receive any further payment under this or any other agreement between the parties until the work shall be wholly finished at which time, if the unpaid balance of the amount to be paid under this Agreement exceeds the expenses incurred by Pulte in finishing the work, such excess shall be paid by Pulte to Contractor; but if such expense shall exceed such unpaid balance, Pulte has the right to deduct such excess expense from any money owed Contractor by Pulte pursuant to any other agreement between the parties, and if there still remains an unpaid balance, then Contractor shall pay the difference to Pulte.

In the event Pulte does perform any work or services or enters into further or additional agreements because of any default of Contractor, Pulte shall be entitled to charge Contractor the cost thereof plus fifteen (15%) percent, representing Pulte's overhead expense, and Contractor hereby agrees to pay same. In the event it becomes necessary for Pulte to collect any deficiency from Contractor by legal action, Contractor agrees to reimburse Pulte for all of its legal and court expense in connection with such action, including attorney's fees at thirty (30%) percent of the amount in controversy.

B.  Contractor agrees that should Pulte become aware of the situation where Contractor is delinquent in making payments to any of Contractor's suppliers, laborers or material men, Pulte will have the authority to issue checks made out directly to the affected supplier, laborer or material men until such time as the delinquency Is resolved and Pulte obtains lien waivers from the affected supplier, laborer or material men with respect to any affected property. This is in addition to, and not in lieu of, Pulte's right to terminate Contractor for failure to provide lien waivers. It is expressly understood that this provision does not alleviate Contractor of sole liability to pay its supplier, laborers or material men and that should Pulte issue checks pursuant to this provision, Pulte in no way assumes any direct liability towards Contractor 's supplier, laborers or material men.

Page 5
Pulte:
Contractor:                    Date: _9/14/16_           Pulte:  _____          Date: _____
                                                         Contractor:

Contractor waivers any rights to any payments from Pulte once Pulte acts in accordance with this paragraph, until Pulte has obtained fully executed lien waivers from all of Contractor's suppliers, laborers and material men on this project.

C. In the event Pulte incurs any legal expenses based on any act or omission by Contractor which can result in a mechanic's lien being filed by a supplier, laborer or material men of Contractor, said actual expenses shall constitute an offset to any money owed Contractor by Pulte regardless of whether said sums are owed based on work performed under this Agreement or any other agreement between the parties. If the balance owed Contractor by Pulte is less than the amount constituting an offset under this paragraph then Contractor shall pay the difference.

D. Should Contractor at any time, either prior to starting any work or after partial completion thereof, be adjudged insolvent, adjudicated a bankrupt, make a general assignment for the benefit of its creditors, or if a receiver is appointed on account of its insolvency, then Pulte has the absolute right to immediately terminate this Agreement and Contractor waives any right to any money owed hereunder, or under any other agreement between the parties, as an asset of Contractor to the extent Contractor is, or will be, indebted to Pulte and/or any suppliers, laborers, material men and/or subcontractors.

E. In the event Contractor breaches this Agreement or this Agreement is terminated for any reason other than those set forth in Section VIII, Pulte shall have the right to stop all payments to Contractor until such time as Pulte can accurately ascertain its damages resulting from said breach, at which time Pulte is authorized to deduct said damages from any money owed Contractor.

9. **TERMINATION NOT FOR DEFAULT**

A. Nothing contained herein shall constitute a guarantee to Contractor that they will perform all the work contemplated by this Agreement, Pulte expressly reserving the right to employ other contractors to perform the same or similar work contemplated under this Agreement, if, in Pulte's sole discretion, said additional contractors are necessary to comply with the progress schedule of Pulte. Contractor shall have no claim against Pulte should Pulte employ additional contractors. This paragraph is in addition to the other remedies provided Pulte in the event contractor fails to perform work in accordance with Pulte's schedule and/or supply sufficient laborers.

B. Notwithstanding any other provision of this Agreement, it is agreed by and between the parties hereto that the duration and amount of work to be performed hereunder is unspecified and that Pulte may terminate this Agreement for any reason or for no reason, In which event Contractor shall be fully paid for all work satisfactorily completed less the appropriate retainage and less any back-charges and/or credits pursuant to this Agreement and/or the laws of the State of New Jersey/Pennsylvania. Contractor specifically agrees that it will make no claim nor shall Pulte be liable for damages of any nature including but not limited to loss of profits, cost of materials ordered but not used, actual, consequential or incidental damages. Pulte may purchase specially fabricated material from Contractor at the price Contractor paid for the subject material, to the extent same is feasible, in Pulte's sole discretion.

10. **GENERAL PROVISIONS**

A. To the extent permitted by applicable law, Contractor hereby waives its right to claim any and all liens against the real property for which work is being performed pursuant to this Agreement including, but not limited to, any statutory Mechanics Lien.

B. Pulte shall have the right to require Contractor to furnish bonds covering the faithful performance of this Agreement and the payment of all obligations arising hereunder in such form and amounts as Pulte may prescribe, and with such sureties as may be agreeable to the parties. If such bonds are stipulated in the bidding requirements, the premiums shall be paid by Contractor; if required subsequent to the submission of bids of the execution of this Agreement, the cost shall be reimbursed by Pulte.

C. All negotiations, proposals and agreements prior to the date of this Agreement are merged herein and superseded hereby, there being no agreement or understanding other than those written or specified herein. This Agreement shall be binding upon an inure to the benefit of the respective heirs, executors, administrators, successors and assigns of the parties hereto.

D. A waiver by Contractor of any breach or violation by Contractor of any provision hereof shall not constitute a waiver of any further or additional breach of such provision or of any other provision.

E. Should any part, term or provision of this Agreement be by a court decided to be unenforceable or in conflict with any application law of the State where made, the validity of the remaining portions or provisions shall not be affected thereby.

F. Contractor agrees to disclose to Pulte if it is engaged in any business other than that which is the purpose of this Agreement. Pulte may terminate this Agreement if, in its sole discretion, it deems such other business to be in conflict with or have an adverse impact on Contractor's ability to fulfill its obligations hereunder.

IN WITNESS WHEREOF, the parties have executed this Agreement this 1ˢᵗ day of AUGUST , 20 06 .

CONTRACTOR: NASSAU CONSTRUCTION CO. INC.

By: _____

PULTE HOMES METRO NY/NJ DIVISION

By: _____

Page 6
Pulte:
Contractor: _____   Date: 8/18/06        Pulte:
                                            Contractor: _____   Date: _____

EXHIBIT 3

## CONTRACTOR AGREEMENT

("Contractor") agrees to furnish, at its own cost and expense, all labor, materials, tools, equipment and facilities necessary to do and fully complete the work described herein in accordance with the terms and conditions set forth below and attached hereto. Contractor shall pay all sales, consumer use and other similar taxes required by law. Contractor shall secure and pay for all permits, governmental fees and licenses necessary for the proper execution and completion of the work.

Pulte Homes of NJ, Limited Partnership ("Pulte") agrees to pay Contractor such amounts and in such installments as set forth in the attached Schedule A, subject to additions and deductions as provided elsewhere herein.

Work is generally described as:    HEADER SYSTEM    and is more specifically described in Schedule A, the General Specifications and the Trade Specifications which are part of this Agreement

For the community known as:    RIVER POINTE    said work shall be commenced and completed in accordance with Schedule A.

1. FAMILIARITY WITH SITE AND CODES
   A. Contractor hereby certifies and agrees: that it has examined all the plans and read and examined all the specifications prepared by Pulte, that it has visited the site; that it and its contractors will be and are bound by any and all parts of said plans and specifications insofar as they relate in any part of it any way to the work undertaken herein and shall be further bound to the Trade Specifications attached. It is hereby specifically agreed that Contractor shall not sublet, assign or transfer this Agreement, or any part thereof, without the written consent of Pulte.
   B. Contractor certifies that it is familiar with all codes and requirements set forth by governing bodies and agencies having authority over the project and that all work performed shall meet or exceed said codes or requirements.

2. PROSECUTION OF WORK
   A. As an express condition precedent to the commencement of work and Contractor's right to receive any payment under this Agreement, Contractor will supply Pulte with the following:
      1. a Certificate of Insurance evidencing Pulte as the Certificate Holder and also complying with the insurance provisions delineated herein;
      2. a list of any individuals, previously approved by Pulte, to whom any portions of this Agreement have been sub-subcontracted out to with pertinent certificates of insurance for each sub-contractor;
      3. a Class "A" license to perform the work in the jurisdiction in which the project is located; and
      4. a list of all suppliers and material men to be utilized on the project. In the event Contractor should change suppliers and/or material men during the pendency of this Agreement, Contractor shall immediately notify Pulte, in writing, of the new suppliers/material men.
   Failure of Contractor to comply with this paragraph shall be, at Pulte's sole option, grounds for immediate termination of this Agreement.
   B. It is understood and agreed by and between the parties hereto, that the work included in this Agreement is to be done under the direction of the superintendent of Pulte, or other authorized representative of Pulte, and that their decisions as to the true construction and meaning of drawings and specifications shall be final.
   C. Contractor shall provide sufficient, safe and proper facilities at all times for the inspection of the work by Pulte and its authorized representatives, and shall, within twenty-four (24) hours after receiving written notice of unsound or improper work, proceed to take down all portions of such work and remove from the grounds and building all material, whether worked or un-worked, which Pulte and/or its authorized representatives shall condemn as unsound or improper, or as in any way failing to conform to the drawings and specifications. Contractor shall make good all work so condemned, and all other work damaged or destroyed in the making good of such condemned work, at Contractor's sole expense.
   D. Contractor agrees to perform the work, and all parts thereof, promptly, diligently and in such order and sequence as Contractor may direct, including Saturdays and/or Sundays and holidays, to assure the efficient, expeditious and timely prosecution of the work under this Agreement, including furnishing sufficient forces, supervision, equipment and materials, at such times and for such periods, as Pulte may direct. Pulte may, upon forty-eight (48) hours prior written notice, require Contractor to provide additional labor and supervision at the project site. Pulte reserves the right to modify any such progress schedule with respect to the required sequence or duration of the work or any portion thereof, and Pulte makes no representation that Contractor will be able to commence, prosecute or complete the work in accordance with any progress schedule. In the event Contractor cannot adequately supply enough labor or equipment for the work, Pulte may obtain additional labor and equipment to assist Contractor and all costs thereof, including a reasonable fee for expenses of administration, supervision and accounting, shall be paid by Contractor.
   E. Contractor shall not be entitled to any claim for damages on account of hindrance or delay from any cause whatsoever; but if hindrance or delay is occasioned by any act of God, or any act or omission on the part of Pulte, Contractor will be entitled only to an extension of time to complete the work; however, no such extension shall be made unless a claim therefore is presented in writing to Pulte within forty-eight (48) hours of the onset of such delay. Contractor shall not be obligated to agree with such extension.
   F. It shall be the duty and responsibility of Contractor to give all notices, be present at and obtain all required inspections related to the work according to the progress schedule. Any fees required for inspections and re-inspections shall be at Contractor's expense.
   G. Contractor shall cut and properly fit its work to accommodate the work of others unless Contractor finds that the existing work is in any manner defective. In such situation, Contractor shall immediately notify Pulte of said defects. Failure to so notify Pulte prior to Contractor commencing work shall result in Contractor being liable for any correction, repair or replacement to its work necessary to correct the defects caused by others. Accordingly, commencement of work by Contractor constitutes acknowledgment that all prior, related, adjacent and/or dependent work is acceptable to it, including "clean-up" in connection with prior work, and shall not furnish a basis for any future claims for damages, extras or excusable non-compliance with the plans, specifications or time schedule. Contractor is to notify Pulte of any existing

Page 1
Pulte: 
Contractor:  Date: 11/16/06

Pulte: 
Contractor:  Date: _____

**PHNJ-09098**

violations regarding "clean-up" before Contractor commences its work or Contractor will be held accountable for the "clean-up" of the existing debris.

H. Contractor shall allow Pulte and other contractors, laborers and material men reasonable opportunity for the introduction and storage of their materials and equipment and the execution of their work, and Contractor shall properly conduct and coordinate its work with theirs. Further, Contractor shall prosecute its work in such a manner so as to protect adjacent properties and the work of others from any damage, and Contractor shall pay for any repairs to others' work made necessary by any acts of Contractor.

I. If, under the provisions set forth in Schedule A of this Agreement, there are materials furnished for Contractor's use by Pulte, or by a third party supplier, at Pulte's instance, order, cost and expense, it shall be the duty and responsibility of Contractor to receive and accept, or reject, delivery of those materials. Failure of materials so delivered to conform with the specifications shall be cause for rejection. Pulte shall rely solely on Contractor's written acceptance of each delivery as to the quantity and as a basis for payment to the supplier. Contractor shall keep, store and maintain such material in good order, protecting same from all damage and losses. If such material suffers damage or loss, Contractor shall, on demand, reimburse Pulte to the extent of the damage or loss.

J. Contractor will walk, inspect and correct all defects upon completion of each operation. Pulte will make final inspection to determine if work is acceptable. Contractor assumes all risk of loss or damage to the work it performs until such time as the work is accepted by Pulte. Any decision concerning "acceptability" is in the sole discretion of Pulte. Any items deemed unacceptable by Pulte must be fixed to Pulte's satisfaction prior to Contractor invoicing for the work.

K. Contractor agrees to provide sufficient manpower on the job site to perform all "punch-out" work necessitated by its phase of construction. Said work shall be completed as directed by Pulte. Failure of Contractor to perform accordingly may result in the withholding of payments due. Normal punch-out and repair work has been anticipated by Contractor and Contractor has budgeted for this work in the Agreement price listed on Schedule A. Acceptance of work does not free Contractor of any of the responsibilities outlined in this Agreement.

L. It is Contractor's responsibility to remove all trash and debris generated by its phase of construction from the project site, whether such trash and debris are remnants of Pulte- or Contractor-supplied material. Interiors of houses will be held in a "broom clean" condition daily and interiors and exteriors will, in no case, be held in such a condition as to be in violation of any OSHA housekeeping regulations. In the event Pulte is required to perform this function for Contractor, Contractor will be back-charged against Contractor's invoices for all expenses at a minimum rate of $50.00 per hour, per occurrence.

## 3. EXTRA/CHANGE ORDER WORK

Contractor hereby agrees to make any and all changes, furnish the materials and perform work which Pulte may require, without nullifying this Agreement, at a reasonable addition to, or reduction from, the Agreement price. NO ALTERATIONS OR CHANGES SHALL BE MADE, HOWEVER, EXCEPT UPON THE WRITTEN ORDER OF PULTE. Pulte assumes no obligation to pay for changes or alterations performed without prior written authorization. The amount to be paid by Pulte, or allowed by Contractor, by virtue of such changes, shall be stated in the change order. In the event that a firm amount for a change cannot be determined at the time the change is ordered, the final amount of the change must be submitted for approval to Pulte within twenty-four (24) hours after the work ordered has been completed. Individual invoices for each change ordered and approved must be submitted, in a form acceptable to Pulte within thirty (30) days of the approval date. Failure to invoice in acceptable form, or within the time allowed, shall automatically constitute a forfeiture by Contractor of any money due with respect to such change.

## 4. METHOD OF PAYMENT

A. Contractor shall, as an expressed condition precedent for obtaining payments, execute and deliver to Pulte:
   1. full and complete waivers and/or releases of lien and affidavits for all labor, material, equipment, supervision, and services furnished by Contractor toward the performance hereof;
   2. such formal guarantees as to pertain to the work; and
   3. such other documents as Pulte may require.

B. Separate invoices must be prepared, per lot/unit, containing either Agreement work and options, or extras. Invoices for extras must reference the Pulte's work order. All invoices must indicate the community, lot and block where the work was performed.

C. Contractor shall invoice promptly. Invoices for Agreement work and options, as reflected on Schedule A, not submitted within ninety (90) days of the date the invoiced work was performed will be, at Pulte's sole discretion, null and void and Contractor waives any and all rights to any claims arising from said untimely invoices, it being an expressed condition precedent to payment that work be invoiced within ninety (90) days of performance.

D. All payments shall be made in strict accordance with the payment schedule. No partial payments per invoice, as well as draws, shall be made unless agreed to In writing between the parties. Requests for payments will be submitted for approval to the Superintendent on or before the tenth (10th) and the twenty-fifth (25th) of each month.

E. Contractor acknowledges that Pulte may, at its sole discretion and at any time during the pendency of this Agreement, withhold ten (10%) percent of each invoice as retainage. Retainage will be released to Contractor on a per unit basis thirty (30) days after final completion. acceptance by Pulte and completion of all punch-outwork by Contractor on each unit. Pulte's failure to require this retainage at the commencement of work pursuant to this Agreement shall not constitute a waiver of Its rights, under this provision, to require such retainage for work in progress and/or work yet to be performed.

F. It is mutually agreed between the parties hereto, that no payment made under this Agreement shall be conclusive evidence of the performance of this Agreement, either in whole or in part, and that no payment shall be construed to be an acceptance of defective work or improper materials. **Contractor shall insure his own risk in and about the building, unless special agreement is made to the contrary.**

G. Contractor shall not delay work by reason of Pulte's failure to make any payments if such failure is a result of a dispute as to the amount of the payment or whether payment is due.

## 5. WARRANTIES, INSURANCE AND INDEMNIFICATION

A. Contractor warrants that all work and/or materials provided hereunder meet or exceed all applicable Federal, State, and local laws, building codes and agency regulations and that said work and/or materials are intended for use in a residential structure and meet all VA/FHA compliance regulations.

Page 2
Pulte:     Date: 11/16/06     Pulte:     Date:_____
Contractor:   Contractor:

PHNJ-09099

B. Contractor warrants that all materials and workmanship are not defective and are of an acceptable nature and guarantees such workmanship and materials to be free from defects for twenty-four (24) months or the Residential Warranty Corporation standards (or equivalent,) whichever is applicable, from the date of conveyance of each unit/lot by Pulte and shall repair any defects during said period at its cost and expense immediately after being notified of any such defect or defects by Pulte. Contractor shall also repair to the satisfaction of Pulte, all work of third parties damaged or destroyed in repairing Contractor's work.

C. All materials furnished by Contractor shall be new and free of all liens, security interests, claims or encumbrances when placed in the community.

D. Contractor agrees that ten (10%) percent of the value of this Agreement, on a per unit basis, shall constitute sums paid for future warranty work and should the Contractor fail to perform warranty work within forty-eight (48) hours, Pulte shall have a right to money from Contractor based on the above stated percentage. Contractor shall provide an effective service policy for warranty work. It is understood that should Contractor be adjudged insolvent, adjudicated a bankrupt, make a general assignment for the benefit of creditors, or if a receiver is appointed on account of insolvency during the time in which Contractor's work is still under a warranty period, then Pulte shall have an immediate right to an amount based on the above stated percentage as a result of Contractor's inability to perform warranty work. Once it is determined that Contractor owes Pulte money for failure to perform warranty work, pursuant to the preceding sentence or Contractor's failure to perform warranty work immediately upon Pulte's request, Contractor shall not be entitled to receive any further payments under this, or any other Agreement between the parties until such time as Pulte has received the sums owed it by Contractor pursuant to this or any other provision of this Agreement. Pulte shall have the right to a credit equal to the money owed, and said credit shall be against any balance owed Contractor from Pulte pursuant to this or any other Agreement between the parties, but if the sums due Pulte exceed such unpaid balances, then Contractor shall pay the difference to Pulte.

E. Warranty work shall be performed in conformance with the guidelines set forth in the General Specifications, attached hereto and incorporated hereby by this reference.

F. To the maximum extent permitted by law, Contractor hereby agrees to save, indemnify and keep harmless Pulte, its subsidiaries and affiliates, and their respective officers, directors, partners, members, employees, successors and assigns against:

All liability, claims, judgments, suits, or demands for damages to persons or property arising out of, resulting from or relating to Contractor's performance of the work under this Agreement ("Claims") **including Claims for Pulte's own negligence** unless such Claims have been specifically determined by the trier of fact to be the sole negligence of Pulte. Contractor will defend Claims which may be brought or threatened against Pulte and will pay on behalf of Pulte any expenses incurred by reason of such Claims including, but not limited to, court costs, expert costs and reasonable attorney fees incurred in defending or investigating such Claims. Such payment on behalf of Pulte shall be in addition to any and all other legal remedies available to Pulte and shall not be considered Pulte's exclusive remedy.

In the event Pulte is required to mediate or arbitrate a claim with a homeowner arising out of or relating to the work performed under this Agreement, Pulte may, in its sole discretion, require Contractor to participate in the mediation and/or arbitration in accordance with the Federal Arbitration Act. The Construction Industry Arbitration Rules of the American Arbitration Association ("AAA") and the Supplementary Consumer/Residential Construction Industry Arbitration Rules of the AAA Rules shall apply. Any judgment rendered by the arbitrator may be confirmed, entered, and enforced in any court having jurisdiction and the Contractor shall be bound by that decision.

The provisions of this paragraph shall survive expiration or termination of this Agreement and/or completion of the Work of Contractor/Supplier and shall continue until such time it is determined by final judgment that the Claim against Pulte is fully and finally barred by the statute of limitations. Contractor indemnification and defense obligations shall not be limited by the amounts or types of insurance that Contractor is required to carry under this Agreement or that Contractor does in fact carry.

Contractor represents that it does carry and will continue to carry, with insurance companies acceptable to Pulte, the following insurance coverage continuously during the life of this Agreement (and in the case of products and completed operations coverage, for two (2) years after the expiration of this Agreement):

**Commercial General Liability Coverage.** Commercial general liability insurance on an Occurrence Form containing a per occurrence limit of at least $1,000,000 protecting against bodily injury, property damage and personal injury claims arising from the exposures 1) premises-operations (with an aggregate limit at least equal to the per occurrence limit); 2) products and completed operations including materials designed, furnished and/or modified in any way by Contractor (with a separate aggregate limit at least equal to the per occurrence limit); 3) independent subcontractors; 4) contractual liability risk covering the indemnify obligations set forth in this Agreement; and 5) where applicable, property damage resulting from explosion, collapse, or underground (x, c, u) exposures. The policy may not contain exclusions for residential construction; attached product or in California SB800 liability.

**Automobile Liability Coverage.** Automobile liability coverage insuring against bodily injury and/or property damage arising out of the operation. maintenance, use, loading or unloading of any auto including, owned, non-owned, hired and employee autos, with limits at least equal to the minimum required by the state In which work covered by this Agreement is performed.

**Workers' Compensation and Employers' Liability Coverage.** Worker's compensation insurance providing statutory benefits imposed by applicable state or federal law such that (a) Pulte will have no liability to Contractor or its employees, subcontractors and agents and (b) Contractor will satisfy all Worker's Compensation obligations imposed by state law. If Contractor has any employees who are subject to the rights and obligations of the Longshoremen and Harbor Workers Act. then the Worker's Compensation insurance must be broadened to provide such coverage.

In addition, Contractor agrees to carry Employer's liability coverage with limits of not less than:

| $100,000 | Each Accident |
| $500,000 | Aggregate Policy Limit for Disease |
| $100,000 | Each Employee |

Contractor shall add Pulte as an additional insured on the above general liability policy by having the insurance carrier issue an ISO-2010 Endorsement, Owners, Lessees or Contractors - Form B, Edition date 11/85, or its equivalent. Such endorsement must include completed operations coverage for the benefit of the additional insured. This extension shall



apply to the full extent of the actual limits of Contractor's coverage even if such actual limits exceed the minimum limits required by this Agreement. Pulte's additional insured status under the policy(ies) must be limited by amendatory language to the policy. To the extent umbrella or excess insurance is available above the minimum required limits states in this Agreement, the protection afforded Pulte in the umbrella or excess liability insurance shall be a broad or broader than the coverage present in the underlying insurance and in accordance with this Agreement. Each general liability, umbrella or excess policy shall specifically state that the insurance provided by the Contractor shall be considered primary, and insurance of Pulte shall be considered excess for purposes of responding to Claims.

Contractor shall evidence that such insurance is in force by furnishing Pulte with a Certificate of Insurance, or if requested by Pulte, certified copies of the policies. The Certificate shall accompany and become a part of this Agreement. Each Certificate of Insurance shall (1) contain an unqualified statement that the policy shall not be subject to cancellation, nonrenewable, adverse change or reduction of amounts of coverage without thirty (30) days prior written notice to Pulte, but in the event of non-payment of premium ten (10) days notification will be provided; (2) show Pulte as additional insured by either referencing or attaching the required endorsement; (3) indicate that Contractor's coverage is primary and Pulte's insurance is excess for any Claims; and (4) indicate that coverage applies in the state where operations are being performed; and (5) as to CGL coverage shall state "Policy includes contractual liability coverage insuring the agreement and obligations of the insured to indemnify Pulte and others to the extent set forth in the Subcontract Agreement between the insured and Pulte Homes Metro NY/NJ Division".

If Contractor should sublet any of the work to a third party, Contractor guarantees that such third party shall indemnify Pulte as set forth in this Agreement and shall carry insurance as set forth in the Agreement prior to permitting such third party to commence work. Contractor shall obtain a signed agreement from such third party indemnifying Pulte as set forth in this Agreement an agreeing to carry insurance as set forth above. In addition, Contractor shall require in its purchase orders that each supplier indemnify Contractor and Pulte from all losses arising from any materials or supplies included in such work.

Any attempt by Contractor to cancel or modify such insurance coverage, or any failure by Contractor to maintain such coverage, shall be a default under this Agreement and, upon such default, Pulte will have the right to terminate this Agreement and/or exercise any of its rights at law or equity. In addition to any other remedies, Pulte may, at its discretion, withhold payment of any sums due under this Agreement until Contractor provides the proof of insurance.

The amounts and types of insurance set forth above are minimums required by Pulte and shall not substitute for an independent determination by Contractor of the amounts and types of insurance which Contractor shall determine to be reasonably necessary to protect itself and its work. Pulte reserves the right to modify these provisions relating to indemnification and insurance, and Contractor agrees to be bound by such modifications 30 days after receipt of the modified provisions.

G. Contractor shall comply with all occupational safety and health standards promulgated by the Secretary of Labor under the Occupational Safety and Health Act of 1970 and all other applicable laws, ordinances, rules, regulations, and orders of any public authority having jurisdiction over the safety of persons or property or to protect them from damage, injury or loss. To the full extent permitted by law, Contractor hereby agrees to indemnify and keep harmless Pulte from and against any and all actions, claims, demands, judgments, liability, expenses, penalties and citations of whatsoever kind, character or description that may arise out of any claimed violation of said Act or regulations In connection with, incident to, resulting from or arising out of Contractor's work. Contractor further agrees that any amounts which have or may become due Contractor under this Agreement, may be retained by Pulte and applied toward any indemnification which is due Pulte pursuant to the terms of Section 11 of which become due Pulte from Contractor for any matter of which Pulte has notice, whether or not there is litigation, at the time such sum would otherwise become due Contractor under this Agreement. It is further understood and agreed that this provision is not in lieu of and shall not in any way impair or exclude Pulte's rights to be indemnified and held harmless by Contractor under any other agreement, any statute, or the common law, and all such rights shall be cumulative.

H. Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the work. Contractor shall take all reasonable precautions for the safety of, and shall provide all reasonable protection to prevent damage, injury or loss to:

    1. all employees on the work site and any and all other persons who may be affected thereby;

    2. all the work and all materials and equipment to be incorporated therein, whether in storage on or off the site, under the care, custody or control of Contractor or any of its sub-contractors; and

    3. other property at the site or adjacent thereto, including trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

I. Contractor shall erect and maintain, as required by existing conditions and progress of the work, all reasonable safeguards including posting danger signs and other warning against hazards, promulgating safety regulations and notifying owners and users of adjacent utilities. Contractor shall pay all fines incurred because of safety violations

Contractor shall fully comply with all applicable Federal, State, or local legislation relating to the employment of persons. Contractor agrees, in connection with the performance of work under this Agreement, not to discriminate against any employee or applicants for employment because of race, creed, color, sex, or national origin. The aforesaid provisions shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.

J. Contractor further agrees to post, in places available to employees and applicants for employment, notices required by law setting forth the provisions of this nondiscrimination clause and to state in all solicitations or advertisements for employees, placed by or on behalf of Contractor, that all qualified applicants will receive equal consideration for employment without regard to race, creed, color, sex or national origin.

6. CONDUCT OF CONTRACTOR

A. By acceptance of this Agreement, Contractor represents that it is an independent contractor and neither Contractor nor any employee, owner or investor of Contractor are employees of Pulte. Contractor agrees that it will indemnify and hold Pulte harmless and reimburse it for any expense or liability incurred as a result of any claims made against Pulte by Contractor's employees under any applicable Income Tax Withholding or Employment Compensation laws. Contractor shall stall times

Page 4
Pulte:     Date: 11/16/06    Pulte:    Date:_____
Contractor:                            Contractor: 

have complete charge and control of Contractor's employees engaged in the performance of the work but shall be accountable to Pulte for the completion of the work which shall be in compliance with this Agreement and to the satisfaction of Pulte.

B. Contractor agrees to give its personal attention to the work and shall at all times maintain a competent supervisor at the job site who will have full authority to act on any and all matters pertaining to the work to be performed under this Agreement and whose acts will be binding upon Contractor to the fullest extent. Should Pulte determine that Contractor's supervisor is not satisfactory for any reason whatsoever, then, and in that event, Pulte has the unqualified right to direct Contractor, in writing, to replace such supervisor within forty-eight (48) hours of receipt of the notice.

C. Contractor shall enforce strict discipline and good order among its employees and shall not employ any unfit person or anyone not skilled in the work assigned to him/her or any persons determined by Pulte, it is Pulte's sole discretion, to be unsuitable for working on the project, and Pulte shall, immediately upon notice from Pulte, remove any unfit person from the project. Contractor assumes full responsibility for its Sub-contractors working on the site and Contractor agrees that all sub-contractors working for it will abide by the terms of this Agreement.

D. No alcoholic beverages or illegal drugs of any kind are to be consumed by Contractors employees and/or agents while on the job site. Contractor agrees to impose and strictly enforce a regulations to this effect and to inform employees and/or agents that such a regulation will be strictly enforced. Any employee and/or agents found to have violated said regulation is to be replaced immediately.

E. Pulte conducts its business in such a manner as to comply with all, laws, statutes and regulations, civil and criminal, governing the jurisdiction in which the project is located and Contractor warrants that it complies with the laws, statutes and regulations and that should Pulte become aware of Contractor's failure to so comply with applicable laws, statutes or regulations then Pulte, in its sole discretion, may immediately terminate Contractor. Contractor further acknowledges its obligation to inform Pulte's president or vice-president of finance of any situation it becomes aware of in which anyone connected with this project fails to comply with the laws, statutes or regulations of the jurisdiction. Should Pulte become aware of a situation in which anyone connected with this project, be they another contractor or an individual in Pulte's employ, violates a law, statute or regulation, civil or criminal, and further discovers that Contractor was aware of the violation and failed to inform Pulte, as required by this paragraph, then Pulte may, in its sole discretion, immediately terminate Contractor.

7. ENVIRONMENTAL COMPLIANCE

Contractor agrees to comply with all applicable laws, regulations, orders and guidance administered by the U.S. Environmental Protection Agency, the New Jersey Department of Environmental Protection and any other local agency(s) with jurisdiction. The matters covered by this paragraph include, without limitation, discharge of wastes to air, water or land, solid waste disposal and management of "hazardous substances".

Contractor shall not cause or permit, and shall take every care to prevent any production, deposit, disposal or spill of hazardous substances during the performance of this Agreement. In the event that any hazardous wastes are generated on the work site by Contractor, its agents, employees, Contractors or invites, Contractor shall, at its sole cost, remove such waste daily and shall be solely responsible for transport, storage and disposal in accordance with the Resource Conservation and Recovery Act, Hazardous Materials Transportation Act and all other similar Federal, state and local laws and regulations as now or hereafter enacted or amended. Unused portions of hazardous substances shall not be stored on the work site but shall be removed daily by Contractor and properly handled in accordance with all applicable laws. The terms "hazardous substances" shall be as defined by the Superfund Act (Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended) and shall include any similar definition of a substance subject to similar control by state or local law, including petroleum and petroleum products.

Contractor acknowledges it has read and shall comply with all provisions of Pulte's written hazardous communication program. Contractor shall provide Pulte with appropriate Material Safety Data Sheets (M.S.D.S.) prior to bringing a hazardous chemical to the work site. In the event Contractor's work materials do not require an M.S.D.S. and no hazardous substances are to be used on the work site, Contractor shall so certify, in writing.

8. CONTRACTOR'S DEFAULTS

A. Should Contractor refuse or neglect to supply a sufficient number of properly skilled workers, or a sufficient quantity of materials of proper quality, or fail to make prompt payment to its sub-contractors for materials or labor, or fail, in any respect, to prosecute the work covered by this Agreement, with promptness and diligence, or fail In the performance of any of the provisions of this Agreement, or persistently disregards laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, Pulte may, at its sole option, immediately provide any such labor and materials and deduct the costs thereof from any money then due or thereafter to become due to Contractor under this Agreement, or any other agreement between the parties; and/or in addition, Pulte may, at its sole option, immediately terminate the employment of Contractor for the work, and shall have the right to enter upon the premises and take possession, for the purpose of completing the work included under this Agreement, of all drawings, materials, tools and appliances thereon, and may employ any other person or persons to finish the work and provide the materials therefore, and in case Pulte must act in accordance with this provision, Contractor shall not be entitled to receive any further payment under this or any other agreement between the parties until the work shall be wholly finished at which time, if the unpaid balance of the amount to be paid under this Agreement exceeds the expenses incurred by Pulte in finishing the work, such excess shall be paid by Pulte to Contractor; but if such expense shall exceed such unpaid balance, Pulte has the right to deduct such excess expense from any money owed Contractor by Pulte pursuant to any other agreement between the parties, and if there still remains an unpaid balance, then Contractor shall pay the difference to Pulte.

In the event Pulte does perform any work or services or enters into further or additional agreements because of any default of Contractor, Pulte shall be entitled to charge Contractor the cost thereof plus fifteen (1 5%) percent, representing Pulte's overhead expense, and Contractor hereby agrees to pay same. In the event it becomes necessary for Pulte to collect any deficiency from Contractor by legal action, Contractor agrees to reimburse Pulte for all of its legal and court expense in connection with such action, including attorney's fees at thirty (30%) percent of the amount in controversy.

B. Contractor agrees that should Pulte become aware of the situation where Contractor is delinquent in making payments to any of Contractor's suppliers, laborers or material men, Pulte will have the authority to issue checks made out directly to

Page 5
Pulte:                          Date: 11/16/06            Pulte:                      Date: _____
Contractor:                                              Contractor:

the affected supplier, laborer or material men until such time as the delinquency Is resolved and Pulte obtains lien waivers from the affected supplier, laborer or material men with respect to any affected property. This is In addition to, and not in lieu of, Pulte's right to terminate Contractor for failure to provide lien waivers. It is expressly understood that this provision does not alleviate Contractor of sole liability to pay its supplier, laborers or material men and that should Pulte issue checks pursuant to this provision, Pulte in no way assumes any direct liability towards Contractor 's supplier, laborers or material men.

Contractor waivers any rights to any payments from Pulte once Pulte acts in accordance with this paragraph, until Pulte has obtained fully executed lien waivers from all of Contractor's suppliers, laborers and material men on this project.

C. In the event Pulte incurs any legal expenses based on any act or omission by Contractor which can result in a mechanic's lien being filed by a supplier, laborer or material men of Contractor, said actual expenses shall constitute an offset to any money owed Contractor by Pulte regardless of whether said sums are owed based on work performed under this Agreement or any other agreement between the parties. If the balance owed Contractor by Pulte is less than the amount constituting an offset under this paragraph then Contractor shall pay the difference.

D. Should Contractor at any time, either prior to starting any work or after partial completion thereof, be adjudged insolvent, adjudicated a bankrupt, make a general assignment for the benefit of its creditors, or if a receiver is appointed on account of its insolvency, then Pulte has the absolute right to immediately terminate this Agreement and Contractor waives any right to any money owed hereunder, or under any other agreement between the parties, as an asset of Contractor to the extent Contractor is, or will be, indebted to Pulte and/or any suppliers, laborers, material men and/or subcontractors.

E. In the event Contractor breaches this Agreement or this Agreement is terminated for any reason other than those set forth in Section VIII, Pulte shall have the right to stop all payments to Contractor until such time as Pulte can accurately ascertain its damages resulting from said breach, at which time Pulte is authorized to deduct said damages from any money owed Contractor.

9. TERMINATION NOT FOR DEFAULT

A. Nothing contained herein shall constitute a guarantee to Contractor that they will perform all the work contemplated by this Agreement, Pulte expressly reserving the right to employ other contractors to perform the same or similar work contemplated under this Agreement, if, in Pulte's sole discretion, said additional contractors are necessary to comply with the progress schedule of Pulte. Contractor shall have no claim against Pulte should Pulte employ additional contractors. This paragraph is in addition to the other remedies provided Pulte in the event contractor fails to perform work in accordance with Pulte's schedule and/or supply sufficient laborers.

B. Notwithstanding any other provision of this Agreement, it is agreed by and between the parties hereto that the duration and amount of work to be performed hereunder is unspecified and that Pulte may terminate this Agreement for any reason or for no reason, in which event Contractor shall be fully paid for all work satisfactorily completed less the appropriate retainage and less any back-charges and/or credits pursuant to this Agreement and/or the laws of the State of New Jersey/Pennsylvania. Contractor specifically agrees that it will make no claim nor shall Pulte be liable for damages of any nature including but not limited to loss of profits, cost of materials ordered but not used, actual, consequential or incidental damages. Pulte may purchase specially fabricated material from Contractor at the price Contractor paid for the subject material, to the extent same is feasible, in Pulte's sole discretion.

10. GENERAL PROVISIONS

A. To the extent permitted by applicable law, Contractor hereby waives Its right to claim any and all liens against the real property for which work is being performed pursuant to this Agreement including, but not limited to, any statutory Mechanics Lien.

B. Pulte shall have the right to require Contractor to furnish bonds covering the faithful performance of this Agreement and the payment of all obligations arising hereunder in such form and amounts as Pulte may prescribe, and with such sureties as may be agreeable to the parties. If such bonds are stipulated in the bidding requirements, the premiums shall be paid by Contractor; if required subsequent to the submission of bids of the execution of this Agreement, the cost shall be reimbursed by Pulte.

C. All negotiations, proposals and agreements prior to the date of this Agreement are merged herein and superseded hereby, there being no agreement or understanding other than those written or specified herein. This Agreement shall be binding upon an inure to the benefit of the respective heirs, executors, administrators, successors and assigns of the parties hereto.

D. A waiver by Contractor of any breach or violation by Contractor of any provision hereof shall not constitute a waiver of any further or additional breach of such provision or of any other provision.

E. Should any part, term or provision of this Agreement be by a court decided to be unenforceable or in conflict with any application law of the State where made, the validity of the remaining portions or provisions shall not be affected thereby.

F. Contractor agrees to disclose to Pulte if it is engaged in any business other than that which is the purpose of this Agreement. Pulte may terminate this Agreement if, in its sole discretion, it deems such other business to be in conflict with or have an adverse impact on Contractor's ability to fulfill its obligations hereunder.

IN WITNESS WHEREOF, the parties have executed this Agreement this *16TH* day of *MAY*, 20 *06* .

CONTRACTOR:  UCS

By: _____

PULTE HOMES METRO NY/NJ DIVISION

By: _____

| Page 6 Pulte: Contractor: | *LMB* *UCS* | Date: *11/16/06* | Pulte: Contractor: | *(sig)* | Date:_____ |

# EXHIBIT 4

Patricia Hart McGlone, Esq.- 037891984
McGovern Legal Services, LLC
850 Carolier Lane
PO Box 1111
New Brunswick, New Jersey 08903-1111
(P) (732) 246-1221
(F) (732) 246-1872
Attorneys for Plaintiff

RIVER POINTE
HOMEOWNERS ASSOCIATION, INC.          LAW DIVISION
a non-profit New Jersey Corporation,          OCEAN COUNTY

                        Plaintiff,          DOCKET NO.:

v.

PULTE HOMES OF NJ, LIMITED
PARTNERSHIP, t/a River Pointe by
DelWebb,

PULTE HOME CORPORATION OF
THE DELAWARE VALLEY

DEL WEBB CORPORATION

PULTE GROUP, INC.          CIVIL ACTION

PULTE HOME CORPORATION

**CONTRACTORS**
ACIES GROUP
CUNTIS, INC.
NASSAU CONSTRUCTION COMPANY

**DEVELOPER APPOINTED TRUSTEES**
CHARLES FOREMAN
BARBARA JAQUETT
PATRICIA SKROCKI
RON HANKINS
JAMES MULLEN
RACHAEL RICHARDSON
MARY CHURCHILL
SEAN DORNEY
CRAIG COLLIN
JOHN EVANS

1

JOHN DOE DIRECTOR(S), OFFICER(S),                    **PLAINTIFF'S**
AGENT(S) OR EMPLOYEE(S) OF                                    **COMPLAINT AND JURY**
**DEMAND**
PULTE HOMES OF NJ, LIMITED
PARTNERSHIP, DEL WEBB CORPORATION,
PULTE GROUP, INC. and/or PULTE HOME
CORPORATION, fictitious parties;

JOHN DOE TRUSTEE(S)
OF RIVER POINTE HOMEOWNERS
ASSOCIATION, INC., fictitious parties;
JOHN DOE CONTRACTORS (1-200),
fictitious parties; JOHN DOE (1 - 100),
fictitious parties

Defendants,

Plaintiff, River Pointe Homeowners Association, Inc., (hereinafter referred to as the "Association"), with an address of 100 Retreat Drive, Manchester, New Jersey 08759 by way of Complaint says:

## PARTIES AND BACKGROUND

1.      The Association was established and exists by virtue of, among other things a Declaration of Restrictive and Protective Covenants with attached Certificate of Incorporation and By-Laws recorded in the Office of the Clerk of Ocean County on May 31, 2007 in Deed Book 13655, Page 1424, et. seq., as lawfully amended from time to time;

2.      The Association's Declaration of Restrictive and Protective Covenants, Certificate of Incorporation and By-Laws are hereinafter collectively referred to as the "Governing Documents";

3.  The Association is a New Jersey not for profit Corporation;

2

4.     The Association, its property and the lands and structures contained therein (the "Community"), were created, installed and/or constructed by a for-profit limited liability company known as Pulte Homes of NJ, Limited Partnership, a Michigan Limited Partnership and marketed under the name River Pointe by Del Webb and by a for-profit corporation known as Pulte Group, Inc, and by a for-profit corporation known as Pulte Home Corporation (hereinafter collectively referred to as the "Developer");

5.     The Community was initially created, installed and/or constructed by a for-profit limited

liability company known as Pulte Homes of NJ, Limited Partnership, a Michigan Limited Partnership.

6.     The Community was advertised, marketed and developed by use of the name "River Pointe by Del Webb" in brochures, websites and marketing materials offered to the public and prospective purchasers.

7.     Del Webb identified itself as the builder and provided warranties including a "build quality experience" along with Pulte Home Corporation to the homeowners for individual homes and the common property.

8.     River Pointe by Del Webb and Del Webb are also referred to herein as the "Developer".

9.     Pulte Group, Inc. is a public company based in Atlanta, Georgia and holds itself out to be one of Americas largest homebuilding companies with operations in approximately 50 markets throughout the country.

10.    Pulte Home Corporation is a subsidiary of Pulte Group, Inc.

3

11. Pulte Homes of NJ, Limited Partnership is a subsidiary of Pulte Group, Inc.

12. Pulte Home Corporation of the Delaware Valley is a General Partner in Pulte Homes of NJ, Limited Partnership and is a subsidiary of Pulte Group, Inc.

13. Del Webb Corporation is a subsidiary of Pulte Group, Inc.

14. Pulte Group Inc. engages in the homebuilding business, including acquisition and development of land primarily for residential purposes and the construction of housing on such land through its "brands" including Pulte homes and Del Webb.

15. Pulte Group Inc. includes the assets and liabilities of Pulte Home Corporation and Del Webb Corporation in its annual financial statement include with its annual report to shareholders.

16. Pulte Home Corporation and Del Webb Corporation advertise on the same website with Pulte Group, Inc.

17. The Pulte Group Inc. website actively markets and advertises homes for sale in the State of New Jersey.

18. The architectural plans for the community clubhouse was prepared for Pulte Northeast, 10600 Arrowhead Drive, Fairfax, Virginia, 22030, a division of Pulte Group, Inc.

19. The Community is constructed and located in the Township of Manchester, Ocean County, New Jersey;

20. The Community was constructed to be a planned retirement community and will consist of: 504 residential lots and dwellings together with a lot encompassing the sewer pump station, two lots containing detention basins and other common element improvements which include, but are not limited to the lands on which the residential homes are located, the

4

clubhouse and recreational amenities, an outdoor swimming pool, two outdoor tennis courts, one putting green, two bocce courts and two horse shoe pits, a security gate house and a parking area, sanitary sewer, storm sewer, landscaping, potable water system, the interior roadways, etc. (hereinafter collectively known as the "Association's Improvements");

21.     The Association maintains and manages the common elements of the Community;

22.     The common elements of the Community include, but are not limited to the grounds, recreational facilities and the interior roadways;

23.     The Community was supposed to have been created pursuant to and in conformance with the New Jersey Planned Real Estate Full Disclosure Act, N.J.S.A. §45:22A-21, et seq. (hereinafter, "PREDFDA");

24.     The Community was supposed to have been created pursuant to and in conformance with the Administrative Regulations promulgated pursuant to PREDFDA, N.J.A.C. §5:26-1.1, et seq. (hereinafter the "PRED Regs");

25.     The Community was supposed to have been created pursuant to and in conformance with the New Jersey Nonprofit Corporations Act, N.J.S.A. § 15a:1-1, et seq. (the "Nonprofit Act");

26.     The Community was supposed to have been created pursuant to and in conformance with the New Jersey Uniform Construction Code, N.J.A.C. § 5:23 et seq. (hereinafter the "Code");

**Developer Appointed Trustees**

27.     Defendant Charles Foreman was a developer-appointed Trustee that served on the Association's Board of Trustees.

5

28.     Defendant Barbara Jaquett was a developer-appointed Trustee that served on the Association's Board of Trustees.

29.     Defendant Patricia Skrocki was a developer-appointed Trustee that served on the Association's Board of Trustees.

30.     Defendant Ron Hankins was a developer appointed Trustee that served on the Association's Board of Trustees.

31.     Defendant James Mullen was a developer appointed Trustee that served on the Association's Board of Trustees.

32.     Defendant Rachael Richardson was a developer appointed Trustee that served on the Association's Board of Trustees.

33.     Defendant Mary Churchill was a developer appointed Trustee that served on the Association's Board of Trustees.

34.     Defendant Sean Dorney was a developer appointed Trustee that served on the Association's Board of Trustees.

35.     Defendant Craig Collin was a developer appointed Trustee that served on the Association's Board of Trustees.

36.     Defendant John Evans was a developer appointed Trustee that served on the Association's Board of Trustees.

37.     Defendants, John Doe Trustee(s) of River Pointe Homeowners Association, Inc. (1-100), with unknown addresses, are fictitious names intended to identify all trustees that served on the Association's Board of Trustees (the "Board") that were appointed by the Developer to the extent they are not named herein;

6

38.     Defendants, Charles Foreman, Barbara Jaquett, Patricia Skrocki, Ron Hankins, James Mullen, Rachael Richardson, Mary Churchill, Sean Dorney, Craig Collin, John Evans and John Doe Trustee(s) of River Pointe Homeowners Association, Inc. (1-100), are hereinafter collectively identified as the "Developer's Trustees";

39.     Defendants, John Doe Trustee(s), Officer(s), Agent(s) and/or Employee(s) of Pulte Homes of NJ, Limited Partnership, Pulte Home Corporation of the Delaware Valley, Del Webb Corporation, Pulte Group, Inc. and/or Pulte Home Corporation, are fictitious names intended to identify every partner, officer, director, agent, member and employee of the Developer who: may have been involved with the Developer; either directly and/or indirectly controlled the Developer; occupied a status similar, and/or performed a function similar, to a general partner, officer, and/or director of the Developer; or participated, in some fashion, in the creation, construction and/or installation of the Community and/or the operation and/or administration of the Association;

40.     Defendants John Doe Trustee(s), Officer(s), Agent(s) and/or Employee(s) of Pulte Homes of NJ, Limited Partnership, Pulte Home Corporation of the Delaware Valley, Del Webb Corporation, Pulte Group, Inc. and/or Pulte Home Corporation, are fictitious names that are also intended to identify those individuals who may be personally liable to the Association pursuant to New Jersey law;

**General Contractor and Construction Manager**

41.     Defendant Pulte Homes of NJ, Limited Partnership was the General Contractor and Construction Manager for the creation, installation and construction of the Association, its

7

property and the lands and structures contained therein (the "Community").

42.     Defendant Pulte Homes Corporation of the Delaware Valley was the General Contractor and Construction Manager for the creation, installation and construction of the Association, its property and the lands and structures contained therein ( the "Community").

43.     Defendant Del Webb Corporation was the General Contractor and Construction Manager for the creation, installation and construction of the Association, its property and the lands and structures contained therein (the "Community").

44.     Defendant Pulte Group, Inc. was the General Contractor and Construction Manager for the creation, installation and construction of the Association, its property and the lands and structures contained therein (the "Community").

45.     Defendant Pulte Home Corporation was the General Contractor and Construction Manager for the creation, installation and construction of the Association, its property and the lands and structures contained therein ( the "Community").

**Construction Contractors**

46.     Defendant, Acies Group, with an address of 222 Passaic Avenue, Fairfield, New Jersey 07004 was hired by the Developer and was the subcontractor responsible for constructing and installing the stucco, exterior trim, masonry stone veneer and performed other work on the buildings throughout the Community.

47.     Defendant, Cuntis, Inc., with an address of 20 Veterans Drive, South River, New Jersey 08882 was hired by the Developer and was the subcontractor responsible for constructing and installing the roofing on the buildings throughout the Community.

8

48.    Defendant, Nassau Construction Company, with an address of 925 Burlington Avenue, Delanco, New Jersey 08075 was hired by the Developer and was the subcontractor responsible for constructing and installing the framing, attics, sheathing, windows, doors and building wrap on the buildings throughout the Community.

49.    Defendant, JOHN DOE CONTRACTOR 1, was hired by the Developer and was the subcontractor responsible for constructing and installing the flashing and sealants on the buildings throughout the Community.

50.   Defendant, JOHN DOE CONTRACTOR 2 was hired by the Developer and was the subcontractor responsible for constructing and installing the building penetrations on the buildings throughout the Community.

51.    Defendant, JOHN DOE CONTRACTOR 3 was hired by the Developer and was the subcontractor responsible for constructing and installing the columns throughout the Community.

52.   Defendant, JOHN DOE CONTRACTOR 4 was hired by the Developer and was the subcontractor responsible for constructing and installing the roofs on the buildings throughout the Community.

53.   Defendant, JOHN DOE CONTRACTOR 5 was the subcontractor responsible for installing the weather resistant barrier (WRB) throughout the Community.

54.   Defendant, JOHN DOE CONTRACTOR 6 was hired by the Developer and was the subcontractor responsible for constructing and installing the attic spaces and access in the buildings throughout the Community.

9

55.    Defendant, JOHN DOE CONTRACTOR 7 was hired by the Developer and was the subcontractor responsible for constructing and installing the masonry stone veneer throughout the Community.

56.    Defendant JOHN DOE CONTRACTOR 8 was hired by the Developer and was the subcontractor responsible for installing the windows and doors throughout the Community.

57.    Defendant, JOHN DOE CONTRACTOR 9 was hired by the Developer and was the subcontractor responsible for installing the hard coat stucco cladding on the exterior of the buildings throughout the Community.

58.    Defendant, JOHN DOE CONTRACTOR 10 was hired by the Developer and was the subcontractor responsible for installing the exterior lighting throughout the Community.

59.    Defendant, JOHN DOE CONTRACTOR 11 was hired by the Developer and was the subcontractor responsible for installing and constructing kickout flashing at the roof and vertical wall intersections throughout the Community.

60.    Defendant, JOHN DOE CONTRACTOR 12 was hired by the Developer and was the subcontractor responsible for installing and constructing the kick out flashing on the buildings and roofs throughout the Community.

61.    Defendant, JOHN DOE CONTRACTOR 13 was hired by the Developer and was the subcontractor responsible for installing and constructing the concrete slabs and sidewalks throughout the Community.

62.    Defendant, JOHN DOE CONTRACTOR 14 was hired by the Developer and was the subcontractor responsible for installing and constructing the railings throughout the Community.

63.   Defendant, JOHN DOE CONTRACTOR 15 was hired by the Developer and was the subcontractor responsible for installing the tennis courts throughout the Community.

64.   Defendant, JOHN DOE CONTRACTOR 16 was hired by the Developer and was the subcontractor responsible for construction and installation of storm water drainage facilities throughout the Community.

65.   Defendant, JOHN DOE CONTRACTOR 17 was hired by the Developer and was the subcontractor responsible for construction and installation of the retaining walls throughout the Community.

66.   Defendant, JOHN DOE CONTRACTORS 20-100 were hired by the Developer and were the subcontractor(s) responsible for construction and installation of components that are identified as defective by Plaintiff herein and remain unidentified.

67.   Defendant, JOHN DOE CONTRACTORS 101-200 represent contractors hired by Defendant subcontractors who were responsible for construction and installation of components that are identified as defective by Plaintiff herein and remain unidentified.

68.   Defendants Pulte Homes of NJ, Limited Partnership, Pulte Home Corporation of the Delaware Valley, Del Webb Corporation, Pulte Group, Inc. and/or Pulte Home Corporation, shall hereinafter by identified collectively as General Contractor and Developer.

69.   Defendants Acies Group, Inc., Cuntis Inc., Nassau Construction Company, and JOHN DOES CONTRACTORS 1-200 shall hereinafter be identified collectively as the "Subcontractors".

70.   Defendants ABC Contractors are fictitious names intended to identify any and all individuals and/or entities that provided services and/or materials in connection with the

11

planning, design, development, construction and/or operation of the Association/Community.

71.   Defendants John Doe (1 – 100) are fictitious names intended to identify any and all other individuals or entities that may be responsible, or otherwise liable for any of the Association's damages, but have not yet been specifically identified.

72.   Defendants, John Doe Contractors (1-200), John Doe Trustee(s), Officer(s), Agent(s) and/or Employee(s) of Pulte Homes of NJ, Limited Partnership, Pulte Home Corporation of the Delaware Valley, Del Webb Corporation, Pulte Group, Inc. and/or Pulte Home Corporation, John Doe Trustee(s) of River Pointe Homeowners Association, Inc. (1-100); ABC Contractors, and; John Doe (1 – 100),  shall hereinafter be collectively identified as the "Doe Defendants".

73.   Any and all professionals, employees, agents, any general contractor and/or any sub-contractors, including the Subcontractors, that performed any work as part of the planning, development, operation, construction and/or installation of the Association's Improvements shall be hereafter collectively known as the "Developer's Agents".

74.   Defendants, John Doe (1 – 100) are fictitious names intended to identify any and all other individuals or entities who may be responsible, or otherwise liable for any of the Association's damages, but have not yet been specifically identified including but not limited to any and all professionals, employees, agents, any general contractor and/or any sub-contractors that performed any work as part of the planning, development, operation, construction and/or installation of the Association's Improvements.

75.   Defendants:  John Doe Trustee(s), Officer(s), Agent(s) and/or Employee(s) of Pulte Homes of NJ, Limited Partnership, Del Webb Corporation, Pulte Group, Inc., and/or Pulte

12

Home Corporation; John Doe Trustee(s) of the River Pointe Homeowners Association, Inc.; XYZ Contractors, and; John Doe (1 – 100) shall hereinafter be collectively identified as the "Doe Defendants";

76. The matters described in paragraphs 1 through 75 shall hereafter be collectively known as the "PARTIES AND BACKGROUND'.

## CONSTRUCTION DEFECTS

77. The Association's Improvements are defective.

78. The Association's Common Elements are defective.

79. The defects in the Association's Improvements and Common Elements include but are not limited to the following:

**EXTERIOR FAÇADE**

80. The Association's exterior façade on the clubhouse is defective.

**EXTERIOR FAÇADE – MASONRY STONE VENEER**

81. The Association's masonry stone veneer is defective.

82. The adhered masonry stone veneer or cultured stone veneer installed on the clubhouse exterior, chimney(ies) and on the walls located at the entrance to the Community is defective;

83. The Developer and Developer's Agents failed to install foundation weep screed on any of the masonry stone veneer in violation of the architectural plan requirements, manufacturer installation instructions and building code requirements including N.J.A.C. 5:23-3.6; N.J.A.C. 5:23-3.21 through reference to 2000 International Building Code, Section 1403.

84.     The Developer and Developer's Agents failed to provide the required clearance between the masonry stone veneer and the pavement or grade in violation of the manufacturer installation instructions and building code requirements including N.J.A.C. 5:23-3.21 through reference to 2000 International Building Code.

85.     The Developer and Developer's Agents failed to install appropriate kick out diverter flashing where the masonry stone veneer extends into contact with roof planes which violates N.J.A.C. 5:23-3.21 through reference to 2000 International Building Code and N.J.A.C. 5:23-3.6;

86.     The masonry stone veneer was installed in contact with asphalt shingles on the roof lacks appropriate weep screed and flashing in violation of the manufacturer installation instructions and building code requirements including N.J.A.C. 5:23-3.21 through reference to 2000 International Building Code and N.J.A.C. 5:23-3.6;

87.     The Developer and Developer's Agents failed to install the masonry stone veneer on the clubhouse, the chimney and the entrance walls in accordance with the manufacturer installation instructions industry standards and building code requirements including N.J.A.C. 5:23-3.6 and N.J.A.C. 5:23-3.21 through references to 2000 International Residential Code;

88.     The Developer and Developer's Agents failed to properly install mortar between the stones, as recommended by the manufacturer;

89.     The Developer and Developer's Agents failed to properly install the weather resistant barrier behind the masonry stone veneer;

90.     The defects in the clubhouse exterior, chimney(ies) and entrance walls are caused by

14

negligent design and planning, poor workmanship, improper supervision during construction and carelessness during installation and during remediation attempts.

91.     The defects in the masonry stone veneer are caused by poor and careless workmanship during original construction;

92.     The defects in the masonry stone veneer allowed, and continue to allow, substantial amounts of water to infiltrate behind the stone veneer and other exterior finishes;

93.     Substantial amounts of water has infiltrated, and continues to infiltrate behind the masonry stone veneer and other exterior finishes.

94.     The improperly installed weather resistant barrier behind the masonry stone veneer allows water to saturate the building sheathing and framing elements;

95.     The lack of weep screed and the inadequate clearance between the masonry stone veneer and the pavement or grade caused, and continues to cause water to remain trapped behind the stone veneer;

96.     The water trapped behind the adhered stone veneer and other exterior finishes has damaged, deteriorated, and continues to deteriorate the building sheathing, the framing elements and the adhered stone itself;

97     The water trapped behind the masonry stone veneer and other exterior finishes has damaged, deteriorated, and continues to deteriorate the interior of the clubhouse and other locations where masonry stone veneer was installed;

98.     The damage and deterioration of the building sheathing and the framing elements impairs the structural integrity of the clubhouse building, chimney and walls;

15

99.     The deterioration of the clubhouse building sheathing and the framing elements impairs the habitability of the clubhouse building;

100.     Upon information and belief, the water that infiltrates and accumulates into the buildings' interior also damages products or work performed by individuals other than the sub-contractors of Subcontractors who supplied the defective products, or performed the defective work.

101.     The defective masonry stone veneer violates industry standards, the manufacturer installation instructions, N.J.A.C. 5:23-3.6, N.J.A.C. 5:23-3.14 and N.J.A.C. 5:23-3.21 through references to 2000 International Building Code and is not in compliance with the architectural plans.

102.     The Developer's and Developer's Agents' failures violate industry standards, the manufacturer installation instructions, and the New Jersey Administrative Code, as previously referenced throughout this section;

**EXTERIOR FAÇADE – STUCCO**

103.     The Association's hard coat stucco cladding on the clubhouse exterior is defective.

104.     The Developer and Developer's Agents failed to install foundation weep screed at the base of the hard coat stucco in violation of the architectural plan requirements, manufacturer installation instructions and building code requirements including N.J.A.C. 5:23-3.6; N.J.A.C. 5:23-3.21 through reference to 2000 International Building Code, Chapter 25.

105.     The Developer and Developer's Agents failed to provide weather protection at all joints and meeting of dissimilar materials with the hard coat stucco in violation of the

16

manufacturer installation instructions and building code requirements including N.J.A.C. 5:23-3.21 through reference to 2000 International Building Code, Section 1403 and Chapter 25.

106.    The Developer and Developer's Agents failed to properly install the weather resistant barrier behind the hard coat stucco.

107.    The Developer and Developer's Agents failed to install proper control joints when installing the hard coat stucco.

108.    The Developer and Developer's Agents failed to install appropriate kick out diverter flashing where the hard coat stucco extends into contact with roof planes which violates N.J.A.C. 5:23-3.21 through reference to 2000 International Building Code, Section 1405.3 and Chapter 25 and N.J.A.C. 5:23-3.6;

109.    The Developer and Developer's Agents failed to install the hard coat stucco in accordance with the manufacturer installation instructions, architectural plans, industry standards and building code requirements including N.J.A.C. 5:23-3.6 and N.J.A.C. 5:23-3.21 through references to 2000 International Residential Code;

110.    The hard coat stucco on the clubhouse exterior is cracking and failing as a result of the improper installation.

111.    The defects in the hard coat stucco cladding on the clubhouse exterior are caused by negligent design and planning, poor workmanship, improper supervision during construction and carelessness during installation and during remediation attempts.

112.    The defects in the hard coat stucco cladding are caused by poor and careless workmanship during original construction;

17

113.     The defects in the hard coat stucco cladding allowed, and continue to allow, substantial amounts of water to infiltrate behind the stucco and other exterior finishes;

114.     Substantial amounts of water has infiltrated, and continues to infiltrate behind the stucco and other exterior finishes.

115.     The water trapped behind the stucco and other exterior finishes has damaged, deteriorated, and continues to deteriorate the building sheathing, the framing elements and the stucco itself;

116.     The water trapped behind the stucco and other exterior finishes has damaged, deteriorated, and continues to deteriorate the interior of the clubhouse and other locations where hard coat stucco was installed;

117.     The damage and deterioration of the building sheathing and the framing elements impairs the structural integrity of the clubhouse building;

118.     The deterioration of the clubhouse building sheathing and the framing elements impairs the habitability of the clubhouse building;

119.     Upon information and belief, the water that infiltrates and accumulates into the buildings' interior also damages products or work performed by individuals other than the sub-contractors of Subcontractors who supplied the defective products, or performed the defective work.

120.     The defective stucco violates industry standards, the manufacturer installation instructions, N.J.A.C. 5:23-3.6, N.J.A.C. 5:23-3.14 and N.J.A.C. 5:23-3.21 through references to 2000 International Building Code and is not in compliance with the architectural plans.

121.     The Developer's and Developer's Agents' failures violate industry standards, the

18

manufacturer installation instructions, and the New Jersey Administrative Code, as previously referenced throughout this section;

## EXTERIOR FAÇADE – WEATHERPROOFING

### Caulk at Dissimilar Materials

122.   There is caulking missing at various locations throughout the Community.

123.   There is caulking missing at the interface between masonry stone veneer and hard coat stucco at various locations on the clubhouse exterior.

124.   There is caulking missing at the interface between vertical flashing and masonry stone veneer at various locations throughout the Community.

125.   There is caulking missing at the interface between columns and girders at various locations throughout the Community.

126.   There is caulking missing at the interface between the cladding and light fixtures at various locations throughout the Community.

127.   There is caulking missing at the interface between the cladding and windows and door trim at various locations throughout the Community.

128.   There is also caulking missing at wall penetrations throughout the Community.

129.   There are numerous areas where caulk is missing at the interface between dissimilar materials in violation of industry standards, the manufacturer's specifications and installation instructions.

130.   Without having caulk at the interface of dissimilar materials, said building materials expand and contract at different rates, causing water infiltration.

19

131.     The buildings have not been provided with a weather-resistant exterior wall envelop in violation of Section 1403.2 of the 2000 IBC due to the defective installation.

132.     The defects in the caulking are caused by poor workmanship and carelessness during installation.

**Flashing**

133.     The flashing installed throughout the Community is defective.

134.     At various locations throughout the Community, the metal flashing material that should be installed in conjunction with the roofing or cladding material to create a watertight connection of any vertical or horizontal joints is defective or missing.

135.     At various locations throughout the Community, the Developer and Developer's Agents failed to install metal flashing material at joints.

136.     Flashing at the hard coat stucco and masonry stone veneer interface was installed short at various locations throughout the Community.

137.     Flashing at the windows and doors in the clubhouse was not installed or was improperly installed.

138.     Flashing was not installed around and under the building penetrations on the clubhouse exposing the building material below.

139.     Plumbing vent flashing on the roof of the clubhouse was improperly installed, secured and/or sealed.

140.     The drip caps over and around the windows and doors is either missing or defectively installed.

141.     The defective flashing allowed, and continues to allow, water to infiltrate into the

clubhouse buildings' interior.

142.    The water that infiltrates into the clubhouse buildings' interior damages the interior

of the structure(s).

143.    The water that infiltrates into the clubhouse buildings' interior has deteriorated, and

continues to deteriorate, the buildings and its interior.

144.    The defects in flashing are caused by poor workmanship and carelessness during

installation.

145.    The flashing defects violate industry standards, the manufacturer's specifications and

installation instructions.

146.    The defective flashing violates, among other things, N.J.A.C. 5:23-3.6 and Section

1403.2 of IBC 2000.

**ROOFING DEFECTS**

147.    The roofing on the clubhouse in the Community is defective.

148.    The roofing on the clubhouse was installed defectively.

149.    The roofs are defective because the Developer failed to satisfy the requirements of

Chapter 15 of the IBC and the standards set forth by the Asphalt Roofing Manufacturers

Association.

150.    There are numerous roof leaks resulting in interior moisture infiltration in the

Community Clubhouse causing damage to the roof itself, surrounding structures, interior

ceilings and walls.

151.    Roof coverings were not properly secured to the buildings or structure to resist wind

and rain.

21

152.    Roof coverings were not designed or installed in accordance with approved manufacturer's installation instructions such that the roof coverings shall serve to protect the building or structure.

153.    The drip edge was not provided on various rakes and eaves located throughout the Community.

154.    The plumbing vent flashing and roof penetrations were not properly installed or sealed.

155.    The asphalt shingles were improperly fastened to the roof with nail punctures on the shingles.

156.    The flashing was missing or not properly installed at intersections with the roof plane and parapet wall penetrations on the clubhouse roof.

157.    There are raised shingles at various locations on the clubhouse roof.

158.    The roof membrane was not properly installed leaving the underlying wood material exposed to the elements.

159.    The defective roofing allowed, and continues to allow water to infiltrate into the clubhouse building interior.

160.    The water that infiltrates into the clubhouse building interior damages the interior of the structure(s).

161.    The water that infiltrates into the clubhouse building interior has deteriorated, and continues to deteriorate the building and its interior.

162.    The defects in the roofing are caused by poor workmanship and carelessness during

installation.

163.     The roof defects violate industry standards, the manufacturer's specifications and installation instructions.

164.     The defective roofing violates, among other things, N.J.A.C. 5:23-3.14 and Chapter 15 of the IBC 2000.

**CLUBHOUSE GUARDRAIL**

165.     The guard rail on the rear deck of the clubhouse is defective.

166.     The guard rail on the rear deck of the clubhouse was improperly installed.

167.     The guard rail on the rear deck is loose and cannot satisfy the load as required by Chapter 16 of IBC 2000.

**CLUBHOUSE INTERIOR DEFECTS**

168.    The interior of the Community Clubhouse is defective;

169.    The defects in the interior of the Community Clubhouse include: Failure to install attic access in violation of IBC 2000 Section 1208.2 and the exterior doors are leaking.

170.    The defects in the clubhouse interior are caused by negligent design and planning, poor workmanship, improper supervision during construction and carelessness during installation and during remediation attempts.

171.    The interior clubhouse defects violate industry standards, New Jersey statutes and regulations, the manufacturer's specifications and installation instructions.

**RECREATIONAL FACILITES – TENNIS COURTS**

172.     There are two tennis courts in the Community.  Both are defective in that there are

23

cracks that have extended below the surface course, cracks at the entry gate and cracks at the base of the aluminum poles that support the perimeter chain link fence.

173.     The defects are caused by poor workmanship and carelessness during installation including but not limited to improper installation of the post footings, improper grading and finishing of the court's asphalt surface during construction and failure to comply with the design drawings and installation guidelines of the American Sports Builders Association.

**CONCRETE DEFECTS**

174.     At various locations throughout the Community the concrete sidewalks and patio slabs and walkways are defective;

175.     At various locations throughout the Community the concrete sidewalks violate N.J.A.C. 5:21-4.18;

176.     The defects consist of cracked sections of concrete sidewalks, cracked concrete slab in the gazebo and mismatched slabs on the patio and walkways.

177.     The defects in the concrete are caused by poor workmanship and carelessness during installation or repair by the Developer; including but not limited to:  inadequate or improperly compacted base material, utilization of a concrete mix with insufficient compressive strength or overfinishing during installation.

178.     The defects in the concrete sidewalks violate industry standards, the manufacturer's installation instructions and N.J.A.C. 5:21-4.8;

**DRAINAGE DEFECTS**

179.     At various locations throughout the Community, the drainage is defective.

180.     The drainage defects include a cracked and damaged drain pipe in wet pond "B"

24

and the lack of drainage for the retaining wall at the main entrance to the Community.

181.     The defective drainage violates, among other things, N.J.A.C. 5:21-7.3 and Chapter 16 of IBC 2000.

182.     The defects in the drainage are caused by poor workmanship, carelessness during installation and failure to comply with design and topography drawings;

183.     The defects in grading and drainage violate industry standards, the manufacturer's installation instructions and N.J.A.C. 5:23-3.6;

184.     The conditions described in PARTIES AND BACKGROUND, Paragraphs 77 through 183, shall hereinafter be collectively known as the "CONSTRUCTION DEFECT FACTS";

## FINANCING DEFECTS

185.     The Association is governed by PREDFDA, the PRED Regs, the Nonprofit Act and the Governing Documents;

186.     Pursuant to N.J.S.A. §45:22A-43, while the Developer and Developer'sTrustees controlled the Association, the Developer and Developer'sTrustees owed a duty to the Association to maintain, repair, replace, clean and sanitize the Common Elements;

187.     Pursuant to N.J.S.A. §45:22A-44(a) and N.J.A.C. §5:26-8.2(b),, which incorporates the Declaration of Restrictive and Protective Covenants and Bylaws by reference, while the Developer and Developer'sTrustees controlled the Association, the Developer and Developer'sTrustees owed a duty to the Association to discharge the Association's powers in a manner that protected and furthered the health, safety and general welfare of the residents of the community;

188.     Pursuant to <u>N.J.S.A.</u> §45:22-45, which incorporates the Declaration of Restrictive and Protective Covenants and Bylaws by reference, while the Developer and Developer'sTrustees controlled the Association, the Developer and Developer's Trustees owed a duty to the Association to cause the General and Limited Common elements to be maintained according to accepted standards and on behalf of the Association;

189.     Contrary to <u>N.J.S.A.</u> §45:22A-43, while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees failed to maintain, repair, replace, clean and sanitize the Common Elements;

190.     Contrary to <u>N.J.A.C.</u> §5:26-8.2(b) and <u>N.J.S.A.</u> §45:22A-44(a), which incorporates the Declaration of Restrictive and Protective Covenants and Bylaws by reference, while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees failed to discharge the Association's powers in a manner that protected and furthered the health, safety and general welfare of the residents of the community;

191.     Contrary to <u>N.J.S.A.</u> §45:22-45, which incorporates the Declaration of Restrictive and Protective Covenants and Bylaws by reference, while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees failed to cause the General and Limited Common elements to be maintained according to accepted standards and on behalf of the Association;

192 .     Pursuant to <u>N.J.S.A.</u> §45:22A-46(c), while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees owed a duty to the Association to assess and collect funds for common expenses and the payment thereof;

193.     Pursuant to <u>N.J.A.C.</u> §5:26-8.7(a), while the Developer and Developer's Trustees

controlled the Association, the Developer and Developer's Trustees owed a duty to the

Association to prepare and adopt an operating budget, prior to making an annual assessment,

which provided for any and all common expenses to be incurred during the year as well as

adequate reserves for repair and replacement of the common elements and facilities;

194.     Pursuant to N.J.A.C. §5:26-8.7(b) the Developer was prohibited against making any

contribution that artificially lowered the Association's budget;

195.     Pursuant to N.J.A.C. §5:26-8.7(b) the Developer was required to disclose, in the

public offering statement, that it was making contributions that artificially lowered the

Association's budget;

196.     Pursuant to N.J.A.C. §5:26-8.6 the Developer was required pay all of the expenses of

the common elements and facilities until such time as the Association has made a common

expense assessment and then the developer was required to pay assessments for common

expenses pursuant to N.J.A.C. §5:26-8.6(b).

197.     The Developer represented in the Governing Documents that:

   The Developer has reserved the right, but is not obligated, while in control of the
Association, to subsidize, in whole or in part, any deficit between the actual operating
expenses of the Association and the Annual Common Expenses Assessments assessed
against homes conveyed by the Developer.

198.     While the Developer and the Developer's Trustees controlled the Association,

they had a fiduciary responsibility to prepare and adopt an adequate budget

and to adequately compensate the Association for the benefit the homes derived, while under

construction, from the operating items, including reserves which were included in the

Association's annual budget.

27

199.   Contrary to N.J.A.C. §5:26-8.7(a) while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees failed to prepare and adopt an operating budget, prior to making an annual assessment, which provided for any and all common expenses to be incurred during the year as well as adequate reserves for repair and replacement of the common elements and facilities;

200.   Contrary to N.J.A.C. §5:26-8.7(b) the Developer made contributions that artificially lowered the Association's budget;

201.   Contrary to N.J.A.C. §5:26-8.7(b) the Developer failed to disclose in the public offering statement that it was making contributions that artificially lowered the Association's budget;

202.   Contrary to N.J.A.C. §5:26-8.6 the Developer failed to pay all of the expenses of the common elements and facilities until such time as the Association has made a common expense assessment and then the developer failed to pay assessments for common expenses pursuant to N.J.A.C. §5:26-8.6(b).

203.   The Developer and Developer's Trustees failed to prepare and adopt a budget that provided adequate reserve funding for repair and replacement of the common elements and facilities.

204.   The Developer and Developer's Trustees failed to prepare and adopt a budget that provided adequate deferred maintenance funding for repair and replacement of the common elements and facilities.

205.   The Developer and Developer's Trustees failed to prepare and adopt a budget that provided adequate operating funding for repair and replacement of the common elements and

facilities.

206.    The matters described in PARTIES AND BACKGROUND, Paragraphs 185 through

205,  shall hereinafter be collectively known as the "FINANCING DEFECT FACTS";

## DEVELOPER'S MISREPRESENTATIONS

207.    The Developer and the Developer's Trustees made material misrepresentations;

208.    The Association is governed by PREDFDA, the PRED Regs, the Nonprofit Act and

the Governing Documents;

209.    The Developer and the Developer's Trustees misrepresented that the Association

would exist as a separate and distinct legal entity and not merely as an arm of the Developer;

210.    The Developer and the Developer's Trustees misrepresented that the Association

would be operated by a board and officers made up of fiduciaries with duties of loyalty and

good faith to the Association and its membership and not to the Developer;

211.    The Developer and the Developer's Trustees misrepresented that Association funds

would be used to pay only the appropriate and proper expenses of the Association not those

expenses that are properly the Developer's expenses;

212.    The Developer and the Developer's Trustees misrepresented that the Developer would

comply with PREDFDA and all other applicable laws and standards with respect to the

creation, development, sale of units within, and operation of, the Association even though it

did, and intended to, fail to pay to the Association its proportionate share of the Association's

common expenses;

213.    The Developer and the Developer's Trustees misrepresented that, while it controlled

29

the Association and the Board, it would comply with PREDFDA and all other applicable laws and standards of conduct even though: (1) it did, and intended to, fail to collect from itself its proportionate share of the Association's common expenses from the Developer; (2) it created, adopted and distributed budgets, which generated a reserve deficiency and which led purchasers to believe that the assessments due from homeowners would be less than they should have been, less than was reasonably necessary to fund the Association and less than they really are; and, (3) failed to properly oversee the conduct of the Developer's Agents;

214 .   The Developer and the Developer's Trustees misrepresented in its Governing Documents that the Association Budget would reflect the estimated costs for the operation, repair, replacement and maintenance of the Common Property and operation of the Association.

215.   The Developer and the Developer's Trustees misrepresented in its Governing Documents that the Association would discharge its powers in a manner that protected and furthered the health, safety and general welfare of the community;

216.   The Developer and the Developer's Trustees misrepresented in its Governing Documents that nothing contained in the documents will serve to exculpate members of the Board appointed by the Sponsor from their fiduciary responsibilities.

217.   The Developer and the Developer's Trustees misrepresented in its Governing Documents that the budget includes the monthly reserve assessment  for the repair and replacement of Common Property.

218.   The Developer and the Developer's  Trustees misrepresented in its Governing Documents that reserves for replacement of Common Property and facilities will form a part

30

of, and be included in the budget.

219.    The developer and the Developer's Trustees misrepresented in its Governing Documents that any working capital contribution collected from purchasers at closing would be available to the Association for repair and replacement and/or deferred maintenance reserve, and/or working capital reserve.

220.    The Developer represented that the Community is in compliance with all applicable ordinances and governmental regulations.

221.    The Developer and the Developer's Trustees misrepresented that the Developer would promptly repair or correct any defect in construction, materials or workmanship in the Association's Improvements within a reasonable time after notification of the defect.

222.    The Developer represented in its Public Offering Statement that it has neither knowingly omitted any material fact and/or made any untrue statement of material fact.

223.    The Developer represented in its Public Offering statement that to the best of tis knowledge, information and belief the statements and representations contained herein are true and accurate.

224.    The Developer warranted in its Public Offering Statement that it would comply with the provisions of the New Jersey New Home Warranty and Builder's Registration Act (N.J.S.A. 46:3B-1 et. seq.) and that the Developer will enroll each Home, at or prior to closing, in an approved warranty security plan and shall pay all requisite fees/premiums for such coverage.

225.    The Developer failed to register as a New Home builder as required by N.J.S.A. 46:3B-1 et seq. and failed to provide an approved warranty plan.

226.    The Developer represented in its Public Offering Statement that any driveways, walkways, patios, retaining walls and fences constructed shall be free of substantial defects in material and workmanship...

227.    The Developer represented in its Public Offering Statement that all drainage is proper and adequate and that off site improvements, if any, will be free from defects ...

228.    The Developer represented in its Public Offering Statement all common facilities are fit for its intended use that the Developer shall repair or correct and will be free of construction defects....

229.    The Association did not exist as a separate and distinct legal entity from the Developer until such time as it was composed of a majority of the residents.

230.    The Association was used as an arm of the Developer;

231.    The Association was not operated by a board and officers made up of fiduciaries who honored their duties of loyalty and good faith to the Association and its membership;

232.    Instead, the Sponsor Trustees consisting of Developer-appointed Board and Officers were loyal to the Developer, acted in the best interests of the Developer and acted in bad faith toward the Association;

233.    The Sponsor Trustees Developer-appointed Board and Officers engaged in conduct resulting in improper benefit to themselves and the Developer;

234.    Association funds were not used to pay the appropriate and proper expenses of the Association;

235.    Association funds were used to pay expenses that are properly the Developer's expenses;

32

236.    The Developer failed to comply with PREDFDA and all other applicable laws and standards with respect to the creation, development, sale of units within, and operation of, the Association;

237.    The Developer failed to pay to the Association its proportionate share of the Association's common expenses;

238.    The Developer created, adopted and distributed budgets to Association members, which generated a reserve deficiency which led purchasers to believe that the assessments due from homeowners would be less than they should have been, less than was reasonably necessary to fund the Association and less than they really are;

239.    The Developer failed to properly oversee the conduct of the Developer's Agents;

240.    The Developer knew of defects in the buildings, Common Elements and facilities when it was selling units, which purchasers could not determine by a reasonable inspection;

241.    The Developer has not promptly repaired or corrected defects in construction, materials or workmanship in the Association's Improvements within a reasonable time after notification of the defect.

242.    The Developer misrepresented that the clubhouse was constructed in accordance with the plans and documents filed with the Township of Manchester when certificates of occupancy were issued, when in fact, the clubhouse was not constructed in accordance with the plans and documents submitted to the Township.

243.    The matters described in PARTIES AND BACKGROUND Paragraphs 207 through 242 shall hereinafter be collectively known as the "DEVELOPER'S

33

MISREPRESENTATIONS FACTS";

## DECEPTIVE ADVERTISING

244.    The Developer Defendants used patently false and misleading advertising materials to sell homes within the Community.

245.    The Developer misrepresented that the Association would exist as a separate and distinct legal entity and not merely as an arm of the Developer;

246.    The Developer misrepresented that the Association would be operated by a board and officers made up of fiduciaries with duties of loyalty and good faith to the Association and its membership and not to the Developer;

247.   The Developer misrepresented that Association funds would be used to pay only the appropriate and proper expenses of the Association not those expenses that are properly the Developer's expenses;

248.   The Developer misrepresented that the Developer would comply with PREDFDA and all other applicable laws and standards with respect to the creation, development, sale of units within, and operation of, the Association even though it did, and intended to, fail to pay to the Association its proportionate share of the Association's common expenses;

249.    The Developer misrepresented that, while it controlled the Association and the Board it would comply with PREDFDA and all other applicable laws and standards of conduct even though: (1) it did, and intended to, fail to collect from itself its proportionate share of the Association's common expenses from the Developer; (2) it created, adopted and distributed

budgets, which generated a reserve deficiency and which led purchasers to believe that the assessments due from homeowners would be less than they should have been, less than was reasonably necessary to fund the Association and less than they really are; (3) failed to post a fidelity bond or other guarantee in an amount equal to the annual budget and including accumulated reserves and, (4) failed to properly oversee the conduct of the Developer's Agents;

250.   The Developer misrepresented that the Association would discharge its powers in a manner that protected and furthered the health, safety and general welfare of the community;

251.   The Developer misrepresented that any working capital contribution collected from purchasers at closing would be used strictly for working capital;

252.   The Developer misrepresented that there were no known defects in the buildings in which it was selling units, nor in the Common Elements and facilities.

253.   The Developer and the Developer's Trustees misrepresented that the Developer would promptly repair or correct any defect in construction, materials or workmanship in the Association's Improvements within a reasonable time after notification of the defect;

254.   The Developer misrepresented material facts as set forth in Paragraphs 207 through 242 collectively known as the "DEVELOPER'S MISREPRESENTATIONS FACTS";

255.   The Association did not exist as a separate and distinct legal entity from the Developer;

256.   The Association was used as an arm of the Developer;

257.   The Association was not operated by a board and officers made up of fiduciaries who honored their duties of loyalty and good faith to the Association and its membership;

258.   Instead, the Developer's Trustees consisting of the Developer appointed Board and

Officers were loyal to the Developer, acted in the best interests of the Developer and acted in bad faith toward the Association;

259.   The Developer appointed Board and Officers engaged in conduct resulting in improper benefit to themselves and the Developer;

260.   Association funds were not used to pay the appropriate and proper expenses of the Association;

261.   Association funds were used to pay expenses that are properly the Developer's expenses;

262.   The Developer failed to comply with PREDFDA and all other applicable laws and standards with respect to the creation, development, sale of units within, and operation of, the Association;

263.   The Developer failed to pay to the Association its proportionate share of the Association's common expenses;

264.   The Developer failed to properly oversee the conduct of the Developer's Agents;

265.   The Developer knew of defects and restrictions in the buildings, Common Elements and facilities, areas located behind the homes, when it was selling units.

266.   The Developer has not promptly repaired or corrected defects in construction, materials or workmanship in the Association's Improvements within a reasonable time after notification of the defect;

267.   Through advertising and marketing materials, the Developer Defendants, their Principals and the Developer Trustees made numerous misrepresentations to the public

36

regarding the community and their experience and qualifications.

268.     Through advertising and marketing materials, the Developer Defendants, their Principals and the Developer Trustees misrepresented to the public that they were a licensed home builder.

269.     Through advertisement and marketing materials, including but not limited to the trade name used to market the Community, River Pointe by De Webb and the website www.delwebb.com, the Developer Defendants represented to the public that Del Webb is the builder/developer of the Community.

270.     Through advertising and marketing materials including but not limited to the website utilized to market the River Pointe Community, www.delwebb.com, the Developer Defendants represented that to potential homebuyers that they "would get the benefit of more than six decades of homebuilding experience" and "Over 65 years of experience go into building of every Del Webb home".

271.     Through advertising and marketing materials, the Developer Defendants represented that Del Webb would ensure that the construction in the Community would meet high construction standards and would be backed by a warranty you can rely on.

272.     Contrary to these multiple and continuous representations, none of the Developer Defendants were not registered as New Home Builders with the State of New Jersey as required by N.J.S.A. 46:3B-12.

273.     Contrary to these multiple and continuous representations, Pulte Homes of NJ, who issued the Public Offering Statement and obtained construction permits for building the Community has only been in existence since 2000.

37

274.    Contrary to these multiple and continuous representations, the construction in the Community did not meet the Del Webb Performance Standards.

275.    Upon information and belief the developer Defendants and their Principals controlled the marketing, advertising and sale of the Community.

276.    Upon information and belief the advertisements and marketing materials described above were developed and approved by the Developer Defendants and their Principals.

277.    Upon information and belief the Developer Defendants and their Principals agreed upon the nature and content of the advertisements and marketing materials described above.

278.    Upon information and belief the advertisements and marketing materials  were created, approved, placed and distributed to potential homebuyers by the Developer Defendants and their Principals.

279.    The matters described in PARTIES AND BACKGROUND Paragraphs 244 through 278 shall hereinafter be collectively known as the "DECEPTIVE ADVERTISING FACTS";

280.    PARTIES AND BACKGROUND Paragraphs 1 through 278 shall hereinafter be collectively known as the "PARTIES AND BACKGROUND FACTS";

## PIERCING THE CORPORATE VEIL-

281.    Plaintiff repeats and realleges the factual allegations contained in paragraphs 1 through 75, PARTIES AND BACKGROUND as if same were set forth fully herein at length.

282.    The Community was developer by Defendant Pulte Homes of NJ, a Limited partnership, t/a Del Webb according to the Public Offering statement issued to prospective purchasers.

38

283. The Community was marketed as River Pointe by Del Webb.

284. Del Webb is brand name utilized by Pulte Group, Inc.

285. In its Annual Report issued to its shareholders, Pulte Group, Inc. states that is one of America's largest homebuilding companies with operations in approximately 50 markets throughout the country.  Through its brand portfolio that includes Centex, Pulte Homes, Del Webb and DiVosta Homes and John Wieland Homes and Neighborhoods, the Company is one of the industry's most versatile homebuilders...

286.   Del Webb Corporation is identified as a subsidiary of Pulte Group Inc in its Annual Report.

287.   A New Home Limited Warranty and Performance Standards was available to home purchasers in the River Pointe by Del Webb Community.  The warranty booklet provided to purchasers states: "This section provides a general overview of the Pulte Group (Pulte Homes, Centex, Fox & Jacobs, and Divosta or Del Webb as applicable ) Home Protection Plan, which consists of the Limited Warranty and the Performance Standards (collectively referred to herein as the "Warranty") provided by Pulte Group ( Pulte Homes, Centex, Fox &J acobs, and Divosta or Del Webb as applicable ) through the building subsidiary identified in your purchase agreement for the home (the "Builder").  This provision indicates that Pulte Group is providing and will back the warranty thorough its subsidiary.

288.   A Builders Limited Warranty administered by Professional Warranty Service Corporation was also made available to home buyers, however the Builder is not identified.

289.   The Del Webb Build Quality Experience brochure that was provided to home buyers

39

and prospective home buyers in the River Pointe by De Webb Community, was issued by Pulte Home Corporation.

290.   Del Webb Corporation is an alter ego of Pulte Group, Inc.

291.   Pursuant to N.J.S.A. 45:22A-23, Del Webb Corporation is a Developer of the River Pointe by Del Webb Community.

292.   Pulte Group Inc. controls and dominates Del Webb Corporation.

293.   Pulte Group Inc. controlled the marketing and operations of Pulte Homes of NJ, a Limited Partnership, t/a Del Webb and Del Webb Corporation.

294.   The use of the name Pulte Homes of NJ t/a Del Webb and the marketing material including websites utilized to sell homes in the River Pointe Community led home buyers and prospective home buyers to believe that they were dealing with Del Webb Corporation and Pulte Group Inc.

295.   Upon information and belief, Pulte Homes of NJ t/a Del Webb and Del Webb Corporation had no separate existence from PulteGroup, Inc.

296.   Upon information and belief, Pulte Group Inc. disregarded the corporate form of Pulte Homes of NJ t/a Del Webb and Del Webb Corporation.

297.   Upon information and belief, Pulte Homes of NJ t/a Del Webb and Del Webb Corporation officers and directors were shared in common with Pulte Group, Inc.

298.   The PIERCINGCORPORATE VEIL FACTS shall also include any other conduct the Association identifies throughout the course of discovery, or ultimately proves at the time of trial demonstrating why the corporate form entity for these entities should be pierced and/or establishing that Pulte Homes of NJ t/a Del Webb and Del Webb Corporation are each an

40

alter ego of Pulte Group, Inc.

299.   The matters described in Paragraphs 281 through 298 shall hereinafter be collectively known as PIERCING CORPORATE VEIL FACTS.

300.   The matters described in Paragraphs 1 through 298 shall hereinafter be collectively known as "FACTS".

## COUNT 1 - NEGLIGENCE

301.   The PARTIES AND BACKGROUND FACTS are incorporated by reference as if fully set forth herein;

302.   The Developer had a duty to design, develop, construct, improve and/or budget for the Community and the Association's Improvements free of defects;

303.   Developer had a duty to design, develop, construct improve and/or budget for the Community and the Association's Improvements in accordance with the standards and/or requirements of the plans and/or specifications approved by the Township of  Manchester.

304.   Developer had a duty to design, develop, construct improve and/or budget for the Community and the Association's Improvements in accordance with the standards and/or requirements of the plans and/or specifications utilized by the Developer and/or the Developer's Agents (the "Specifications");

305.   Developer had a duty to design, develop, construct improve and/or budget for the Community and the Association's Improvements in accordance with the Governing Documents;

306.   Developer had a duty to design, develop, construct improve and/or budget for the Community and the Association's Improvements in accordance with New Jersey's Uniform

Construction Code (the "Code");

307.    Developer had a duty to design, develop, construct improve and/or budget for the Community and the Association's Improvements in accordance with all applicable state and local codes, regulations and ordinances, industry standards as well as all applicable standards of care (the "Standards");

308.    Developer, directly, or through its general contractor and/or sub-contractors had a duty to supervise the Developer's Agents that performed work in regards to the Association's Improvements;

309.    The Developer's Agents had a duty to design, develop, construct improve and/or budget for the Community and the Association's Improvements free of defects, in accordance with the Specifications, the Governing Documents, the Code and the Standards;

310.    Developer and the Developer's Agents failed to design, develop, construct improve and/or budget for the Association's Improvements free from defects, in accordance with the Specifications, the Governing Documents, the Code and the Standards;

311.    Developer and the Developer's Agents failed to design, develop, construct improve and/or budget for the Association's Improvements free from defects, in accordance with the Specifications, the Governing Documents, the Code and the Standards as described in the CONSTRUCTION DEFECT FACTS;

312.    Developer and the Developer's Agents failed to design, develop, construct improve and/or budget for the Association's Improvements free from defects, in accordance with the Specifications, the Governing Documents, the Code and the Standards as described in the FINANCING DEFECT FACTS;

313.   Developer failed to supervise the Developer's Agents to prevent the failings discussed above;

314.   Developer and the Developer's Agents failed to discover said defects and/or failed to remedy defects that they collectively and/or individually did discover;

315.   As a direct and proximate result of the breach of their legal duty by Developer and the Developer's Agents the Association sustained damages that have caused, and will in the future cause, the Association to expend substantial sums of money to complete, alter, correct, fix, cure, remedy, rectify, repair, replace, service and/or adjust the Association's Improvements;

316.   Pursuant to N.J.S.A. §45:22A-45(c), the Developer and the Developer'sTrustees are liable as fiduciaries to the unit owners for their acts and/or omissions;

317.   Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer'sTrustees are liable as fiduciaries to the owners for their acts and/or omissions;

318.   Pursuant to N.J.S.A. §45:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

319.   Pursuant to N.J.S.A. §45:22A-44, the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted directly by the unit owners individually;

**WHEREFORE**, the Association demands judgment against Developers, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the

43

alternative as follows:

    a.    Compensatory, consequential, incidental, and statutory damages;

    b.    Interest;

    c.    Attorney fees and costs; and

    d.    Such other relief as is equitable, appropriate and just.

## COUNT 2 - BREACH OF EXPRESS WARRANTY

320.   The PARTIES AND BACKGROUND FACTS and the allegations of Count 1 are incorporated by reference as if fully set forth herein;

321.   Developer made certain express warranties in the individual purchase agreements signed by the Association's members that the Association's Common Property and Improvements would be free from defects, conform to the Specifications, the Governing Documents, PREDFDA, the PRED Regs, the Code, all applicable state and local codes, regulations and ordinances, the Standards and be fit for their intended use;

322.   Developer made certain express warranties in the Public Offering Statement distributed to the Association's members that the Association's Common Property and Improvements would be free from defects, conform to the Specifications, the Governing Documents, PREDFDA, the PRED Regs, the Code, all applicable state and local codes, regulations and ordinances, the standards and/or requirements of the plans and/or specifications approved by the Township of Manchester, and the Standards and be fit for their intended use;

323.   The Developer warranted that all driveways, walkways, patios, retaining walls and fences located on the property shall be free from defects due to materials and workmanship;

324.   The Developer warranted that all drainage is proper and adequate;

325.    The Developer warranted that all off-site improvements are free from defects;

326.    The Developer warranted that all lots, parcels, units or interests are fit for their intended use;

327.    The Developer warranted that any lot, parcel, unit interest or common facility will substantially conform to the model, description or plans;

328.    The Developer warranted that the construction of all improvements to the common elements would be free from defects in workmanship or materials;

329.    The Developer warranted that the construction of all Common Property and improvements to the common elements were fit for their intended use;

330.    The Developer is obligated to promptly repair or correct any defect in construction, materials or workmanship in said improvements (within a reasonable time after notification of the defect);

331.    Developer's Agents made express warranties to the Developer (either directly or through another) that their work would be free from defects, conform to the Plans and Specifications, the Governing Documents, PREDFDA, the PRED Regs, the Code, all applicable state and local codes, regulations and ordinances, the standards and/or requirements of the plans and/or specifications approved by the Township of Manchester, and the Standards and be fit for their intended use;

332.    When the Developer made the warranties described herein, it was extremely likely that the Association and the individual unit owners would be seriously harmed as a result of the Developer's breach of these warranties;

333.    The Developer was fully aware of the reckless disregard of the likelihood that serious harm would befall the Association and the individual unit owners as a result of its breach of the warranties described herein;

334.    The Developer, upon learning that its breach of warranty was likely to cause harm to the Association and to individual unit owners, continued in its actions with disregard for the harm likely to result to the Association and to the individual units owners who relied upon the Developer's warranties;

335.    The Developer continued to breach the warranties it made throughout the construction and development of the Association's Improvements;

336.    The Developer benefited financially by breaching its warranties by, among other things, lowering its costs to construct and develop the Association's Improvements;

337.    The Association is a third-party beneficiary of all warranties made by the Developer's Agents to the Developer;

338.    The Association's Improvements are defective as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

339.    The Association's Improvements do not conform to the Specifications as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

340.    The Association's Improvements do not conform to the Governing Documents as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

341.    The Association's Improvements do not conform to PREDFDA as described in the

46

CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

342.    The Association's Improvements do not conform to the PRED Regs as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

343.    The Association's Improvements do not conform to the Code as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

344.    The Association's Improvements do not conform to all applicable state and local codes, regulations and ordinances as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

345.    The Association's Improvements do not conform to the standards and/or requirements of the plans and/or specifications approved by Township of Manchester as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

346.    The Association's Improvements do not conform to the Standards as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

347.    The Association's Improvements are not fit for their intended use as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

348.    Driveways, walkways, entryway stoops, decks, patios and retaining walls located on the property have defects due to materials and workmanship as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

349.    Drainage is improper and inadequate as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

350.    Lots, parcels, units or interests are not fit for their intended use as described in the

47

CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

351.    Lots, parcels, units or interests or common facilities do not substantially conform to the model, description or plans as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

352.    Improvements to the common elements have defects in workmanship or materials as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

353.    Improvements to the common elements are not fit for their intended use as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

354.    Work performed by the Developer's Agents is defective as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

355.    Work performed by the Developer's Agents does not conform to the Specifications as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

356.    Work performed by the Developer's Agents does not conform to the Governing Documents as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

357.    Work performed by the Developer's Agents does not conform to PREDFDA as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

358.    Work performed by the Developer's Agents does not conform to the PRED Regs as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT

FACTS;

359.    Work performed by the Developer's Agents does not conform to the Code as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

360.    Work performed by the Developer's Agents does not conform to all applicable state and local codes, regulations and ordinances as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

361.    Work performed by the Developer's Agents does not conform to the plans and/or specifications approved by Township of Manchester as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

362.    Work performed by the Developer's Agents does not conform to the Standards as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

363.    Work performed by the Developer's Agents is not fit for its intended use as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

364.    Despite receiving notice of the defects described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS the Developer failed to promptly repair or correct the defects in construction, materials or workmanship in said improvements within a reasonable time;

365.    Despite demand, the Developer and the Developer's Agents failed to remedy, rectify, repair or otherwise cure the defects described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

49

366.    As a direct and proximate result of the breach of the express warranties as described above, the Association sustained damages and has expended, and will in the future expend, substantial sums to complete, alter, correct, cure, fix, remedy, rectify, repair, construct, replace, service and/or adjust the Association's Improvements;

367.    Pursuant to N.J.S.A. §45:22A-45(c), the Developer and the Developer'sTrustees are liable as fiduciaries to the owners for their acts and/or omissions;

368.    Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer'sTrustees are liable as fiduciaries to the owners for their acts and/or omissions;

369.    Pursuant to N.J.S.A. §45:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

370.    Pursuant to N.J.S.A. §45:22A-44(d), the Association may assert the tort claims concerning the common elements and facilities of the development as if the claims were asserted directly by the unit owners individually;

**WHEREFORE**, the Association demands judgment against Developers,  the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

a.    Compensatory, consequential, incidental, statutory and punitive damages;

b.    Interest;

c.    Attorney fees and costs; and

d.    Such other relief as is equitable, appropriate and just.

## COUNT 3 - BREACH OF IMPLIED WARRANTY

371. The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 2 are incorporated by reference as if fully set forth herein;

372. The Developer and the Developer's Agents impliedly warranted to the Association and its members that the Association's Improvements would be free from defects, conform to the Specifications, the Governing Documents, PREDFDA, the PRED Regs, the Code, all applicable state and local codes, regulations and ordinances, the standards and/or requirements of the plans and/or specifications approved by The Township of Manchester, and the Standards and be fit for their intended use;

373. When the Developer made the warranties described herein, it was extremely likely that the Association and individual unit owners would be seriously harmed as a result of the Developer's breach of those warranties;

374. The Developer was fully aware of the reckless disregard of the likelihood that serious harm would befall the Association and individual unit owners as a result of its breach of the warranties described herein;

375. The Developer, upon learning that its breach of warranty was likely to cause harm to the Association and to individual unit owners, continued in its actions with disregard for the harm likely to result to the Association and to individual unit owners who relied upon the Developer's warranties;

376. The Developer continued to breach the warranties it made throughout the construction and development of the Association's Improvements;

377. The Developer benefited financially by breaching its warranties by, among other

things, lowering its costs to construct and develop the Association's Improvements;

378. The Association is a third-party beneficiary of all warranties implied via the Developer's Agents' performance for the Developer;

379. The Developer and the Developer's Agents failed to provide the Association's Improvements free from defects, in conformity with the Specifications, the Governing Documents, the Code, all applicable state and local codes, regulations and ordinances, the Standards and fit for their intended purposes;

380. The Association's Improvements are defective as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

381. The Association's Improvements do not conform to the Specifications as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

382. The Association's Improvements do not conform to the Governing Documents as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

383. The Association's Improvements do not conform to PREDFDA as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

384. The Association's Improvements do not conform to the PRED Regs as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

385. The Association's Improvements do not conform to the Code as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

386. The Association's Improvements do not conform to all applicable state and local codes, regulations and ordinances as described in the CONSTRUCTION DEFECT FACTS

and the FINANCING DEFECT FACTS;

387.   The Association's Improvements do not conform to the standards and/or requirements of the plans and/or specifications approved by Township of Manchester as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

388.   The Association's Improvements do not conform to the Standards as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

389.   The Association's Improvements are not fit for their intended uses as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

390.   Driveways, walkways, entryway stoops, decks, patios and retaining walls located on the property have defects due to materials and workmanship as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

391.   Drainage is improper and inadequate as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

392.   Lots, parcels, units or interests are not fit for their intended use as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

393.   Lots, parcels, units or interests or common facilities do not substantially conform to the model, description or plans as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

394.   Improvements to the common elements have defects in workmanship or materials as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

395.   Improvements to the common elements are not fit for their intended use as described in

the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

396.   Despite demand, the Developer and the Developer's Agents failed to remedy, rectify, repair, replace and cure their above-described failures;

397.   As a direct and proximate result of the breach of the implied warranties as described above, the Association sustained damages and has expended, and will in the future expend, substantial sums to complete, alter, correct, cure, fix, remedy, rectify, repair, construct, replace, service and/or adjust the Association's Improvements;

398.   Pursuant to N.J.S.A §45:22A-45(c), the Developer and the Developer's Trustees are liable as fiduciaries to the owners for their acts and/or omissions;

399.   Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the owners for their acts and/or omissions;

400.   Pursuant to N.J.S.A. §44:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as the claims were asserted by the unit owners individually;

**WHEREFORE**, the Association demands judgment against Developers , the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

a.   Compensatory, consequential, incidental, statutory and punitive damages;

b.   Interest;

c.   Attorney fees and costs; and

d.   Such other relief as is equitable, appropriate and just.

## COUNT 4 - STRICT LIABILITY

401.   The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1

through 3 are incorporated by reference as if fully set forth herein;

402.   The Association's Improvements are appurtenant to, or are, mass-produced homes;

403.   The Association's Improvements were improperly designed, developed, constructed

and/or were installed with defective materials as described in the CONSTRUCTION

DEFECT FACTS;

404.   The Association's Improvements are defective as described in the CONSTRUCTION

DEFECT FACTS;

405.   The defects are caused by unreasonable and/or poor  quality workmanship;

406.   The defects make the Association's Improvements not usable;

407.   The defects make the Association's Improvements not habitable;

408.   The defects make the Association's Improvements not fit for their intended purpose;

409.   The Association's Improvements, having not been designed, developed, constructed

and/or installed properly, constitute a hazardous and dangerous condition of which the

Developer and the Developer's Agents knew or should have known;

410.   Since the Association's Improvements constituted a hazardous and dangerous

condition caused by the improper design, development, construction and installation on the

Developer's part and/or on the Developer's Agents' part, the Developer and the Developer's

Agents are strictly liable in tort to the Association;

411.   When the Developer designed, developed and constructed the Association's

improvements, the buildings and the individual units, it was extremely likely that the

Association and individual unit owners would be seriously harmed as a result of the Developer's defective design, development and construction;

412.    The Developer was fully aware of the reckless disregard of the likelihood that serious harm would befall the Association and its unit owners as a result of its defective design, development and construction;

413.    The Developer, upon learning that its defective design, development and construction was likely to harm the Association and individual unit owners, continued in its actions with disregard for the harm likely to result to the parties rely upon the safety and adequacy of the Developer's defective design, development and construction of the Association's Improvements, buildings and the individual units;

414.    The Developer continued to design, develop and construct the Association's Improvements, buildings and the individual units after it became aware of the inherent defects in the design, development and construction of the Association's Improvements, buildings and the individual units;

415.    The Developer benefited financially by defectively designing, developing and constructing the Association's Improvements, buildings and the individual units by, among other things, lowering its costs to construct and develop the Association's Improvements, buildings and the individual units;

416.    The Association is a third-party beneficiary of all warranties implied via the Developer's Agents' performance for the Developer;

417.    As a direct and proximate result of the conduct described above, the Association

sustained damages and has expended, and will in the future expend, substantial sums to

complete, alter, correct, cure, fix, remedy, rectify, repair, construct, replace, service and/or

adjust the Association's Improvements;

418.    Pursuant to N.J.S.A. §45:22A-45(c), the Developer and the Developer's Trustees are

liable as fiduciaries to the owners for their acts and/or omissions;

419.    Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer's Trustees are

liable as fiduciaries to the owners for their acts and/or omissions;

420.    Pursuant to N.J.S.A. §45:22A-44(d), the Association may assert tort claims concerning

the common elements and facilities of the development as if the claims were asserted by the

unit owners individually;

**WHEREFORE**, the Association demands judgment against Developer, the Developer's

Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the

alternative as follows:

a.      Compensatory, consequential, incidental, statutory and punitive damages;

b.      Interest;

c.      Attorney fees and costs; and

d.      Such other relief as is equitable, appropriate and just.

## COUNT 5 - CONTRACT

421.    The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1

through 4 are incorporated by reference as if fully set forth herein;

422.    The Developer implicitly and/or explicitly contracted with the Association's

membership and/or with the Association to design, develop, construct, install and/or budget

for the Association's Improvements to be free from defects; in conformity with the Plans and

Specifications, the Governing Documents, PREDFDA, the PRED Regs, the Code, all

applicable state and local codes, regulations and ordinances, the standards and/or

requirements of the plans and/or specifications approved by Township of Manchester , and

the Standards; and be fit for their intended purposes;

423.    The Developer contracted with the Developer's Agents to meet those obligations;

424.    The Association is a third-party beneficiary of any contracts between the Developer

and the Developer's Agents in  regards to the Association's Improvements;

425.    Developer breached its contract with the Association by designing, developing,

constructing, installing and/or budgeting for the Association's Improvements with defects; as

described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT

FACTS;

426.    Developer breached its contract with the Association by designing, developing,

constructing, installing and/or budgeting for the Association's Improvements without

adhering to the Specifications as described in the CONSTRUCTION DEFECT FACTS and

the FINANCING DEFECT FACTS;

427.    Developer breached its contract with the Association by designing, developing,

constructing, installing and/or budgeting for the Association's Improvements without

adhering to the Governing Documents as described in the CONSTRUCTION DEFECT

FACTS and FINANCING DEFECT FACTS;

428.    Developer breached its contract with the Association by designing, developing,

58

constructing, installing and/or budgeting for the Association's Improvements without adhering to PREDFDA as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

429.   Developer breached its contract with the Association by designing, developing, constructing, installing and/or budgeting for the Association's Improvements without adhering to the PRED Regs as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

430.   Developer breached by its contract with the Association by designing, developing, constructing, installing and/or budgeting for the Association's Improvements without adhering to the Code as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

431.   Developer breached its contract with the Association by designing, developing, constructing, installing and/or budgeting for the Association's Improvements without adhering to all applicable state and local codes, regulations and ordinances as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

432.   Developer breached its contract with the Association by designing, developing, constructing, installing and/or budgeting for the Association's Improvements without adhering to the standards and/or requirements of the plans and/or specifications approved by Township of Manchester as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

433.   Developer breached its contract with the Association by designing, developing, constructing, installing and/or budgeting for the Association's Improvements without

adhering to the Standards as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

434.    Developer breached its contract with the Association by designing, developing, constructing, installing and/or budgeting for Association Improvements that are unfit for their intended purposes as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

435.    The Developer's Agents breached their contracts with the Developer by designing, developing, constructing, installing and/or budgeting for the Association's Improvements with defects as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

436.    The Developer's Agents breached their contracts with the Developer by designing, developing, constructing, installing and/or budgeting for the Association's Improvements without adhering to the Specifications as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

437.    The Developer's Agents breached their contracts with the Developer by designing, developing, constructing, installing and/or budgeting for the Association's Improvements without adhering to the Governing Documents as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

438.    The Developer's Agents breached their contracts with the Developer by designing, developing, constructing, installing and/or budgeting for the Association's Improvements without adhering to the Code as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

439.   The Developer's Agents breached their contracts with the Developer by designing, developing, constructing, installing and/or budgeting for the Association's Improvements without adhering to all applicable state and local codes, regulations and ordinances as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

440.   The Developer's Agents breached their contracts with the Developer by designing, developing, constructing, installing and/or budgeting for the Association's Improvements without adhering to the Standards as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

441.   The Developer's Agents breached their contracts with the Developer by designing, developing, constructing, installing and/or budgeting for Association Improvements that are unfit for their intended purposes as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

442.   When the Developer made the contracts described herein, it was extremely likely that the Association and individual unit owners would be seriously harmed as a result of the Developer's breach of those contracts;

443.   The Developer was fully aware of the reckless disregard of the likelihood that serious harm would befall the Association and individual unit owners as a result of its breach of the contracts described herein;

444.   The Developer, upon learning that its breaches of contract were likely to cause harm, continued in its actions with disregard for the harm likely to befall the Association and individual unit owners;

61

445.    The Developer continued to breach the contracts it made with the Association and the individual unit owners throughout the construction and development of the Association's Improvements;

446.    The Developer benefited financially by breaching its contracts with the Association and individual unit owners by, among other things, lowering its costs to construct and develop the Association's Improvements;

447.    The Association is a third-party beneficiary of all contracts implied via the Developer's Agents' performance for the Developer;

448.    As a result of the Developer's breaches, as well as the Developer's Agents' breaches, the Association has expended, and will in the future expend, substantial sums to complete, alter, correct, cure, fix, remedy, rectify, repair, construct, replace and/or adjust the Association's Improvements;

**WHEREFORE**, the Association demands judgment against Developer, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

a.      Compensatory, consequential, incidental, statutory and punitive damages;

b.      Interest;

c.      Attorney fees and costs; and

d.      Such other relief as is equitable, appropriate and just.

## COUNT 6 – FAILURE TO PAY FOR BENEFITS DERIVED

449.    The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 5 are hereby incorporated by reference as if fully set forth herein;

450.    The Association is governed by the PREDFDA, the PRED Regs, the Nonprofit Act

and the Governing Documents;

451.    The PRED Regs states in relevant part that once "the association has made a common

expense assessment, the assessment shall be assessed against the units individually owned and

under development in proportion to the benefit derived by the unit from items included in the

budget" N.J.A.C. §5:26-8.6(b);

452.    At all relevant times, the Developer owned units within the Association, both those

completed and in development;

453.    Pursuant to N.J.A.C. §5:26-8(B), the Developer is obligated to pay an assessment with

respect to its units owned and under development in proportion to the benefit derived by those

units from the items included in the Association's budget;


454.    Those monies due from the Developer under the PRED Regs constitute the common

expense assessments due from the Developer's units owned and in development, pursuant to

the Governing Documents;

455.    Pursuant to N.J.S.A. §45:22A-46, while the Developer and the Developer's Trustees

controlled the Association, the Developer and Developer's Trustees owed a duty to the

Association to assess and collect funds for common expenses and the payment thereof;

456.    Pursuant to N.J.S.A. §45:22A-44, while the Developer and the Developer's  Trustees

controlled the Association the Developer and the Developer'sTrustees owed a duty to the

Association to exercise the Association's powers and discharge the Association's functions in

a manner that protected and furthered or was not inconsistent with the health, safety and

general welfare of the residents of the community;

457.   While the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees failed to assess or collect sufficient funds from the Developer to contribute toward the Association's common expenses with respect to its units owned and under development in proportion to the benefit derived by those units from the items included in the Association's budget as required by N.J.A.C. §5:26-8.6(b);

458.   The Developer's and Developer's Trustees' failure to assess or collect sufficient funds from the Developer, as required by N.J.A.C. §5:26-8.6(b), breached the Developer's and Developer's Trustees' duty to the Association, pursuant to N.J.S.A. §45:22A-46, to assess and collect funds for common expenses and the payment thereof while the Developer and Developer's Trustees controlled the Association;

459.   The Developer's and Developer's Trustees' failure to assess or collect sufficient funds from the Developer, as required by N.J.A.C. §5:26-8.6(b), breached the Developer's and Developer's Trustees' duty to the Association, pursuant to N.J.S.A. §45:22A-44, to exercise the Association's powers and discharge the Association's functions in a manner that protected and furthered or was not inconsistent with the health, safety and general welfare of the residents of the community while the Developer and Developer's Trustees controlled the Association;

460.   The Developer and Developer's Trustees failure to assess or collect sufficient funds from the Developer, as required by N.J.A.C. §5:26-8.6(b), breached the Developer's and the Developer's Trustees' duty to the Association, pursuant to N.J.A.C. §5:26-8.2(b), to discharge the Association's powers in a manner that protected and furthered the health, safety

64

and general welfare of the residents of the community while the Developer and

Developer'sTrustees controlled the Association;

461.    When the Developer failed to assess, collect and pay those monies due under the

PRED Regs, it was extremely likely that the Association would be seriously harmed as a

result;

462.    The Developer was fully aware of the reckless disregard of the likelihood that serious

harm would befall the Association as a result of its failure to assess, collect and pay those

monies due under the PRED Regs;

463.    The Developer, upon learning that its failure to pay those monies due under

PREDFDA was likely to cause harm, continued in its actions with disregard for the harm

likely to result to the Association;

464.    The Developer continued to fail to assess, collect and pay those monies due under the

PRED Regs throughout the time that it owned units;

465.    The Developer benefited financially by failing to assess, collect and pay those monies

due under the PRED Regs by, among other things, lowering its costs while it was attempting

to sell units it owned;

466.    Despite demand, the Developer has failed and refused to pay common expense

assessments and/or fees due from it pursuant to the PRED Regs and/or pursuant to the

Governing Documents;

467.    Pursuant to N.J.S.A. §45:22A-46 and the Association's By-Laws, the Association

may levy and collect interest thereon, late fees and reasonable attorneys' fees on any moneys

duly owed to the Association including unpaid common expenses assessments.

65

468.   As a direct and proximate result of the conduct described above, the Association sustained damages;

469.   Pursuant to <u>N.J.S.A.</u> §45:22A-45(c), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts and/or omissions;

470.   Pursuant to <u>N.J.A.C.</u> §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the owners for their acts and/or omissions;

471.   Pursuant to <u>N.J.S.A.</u> §45:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

**WHEREFORE**, the Association demands judgment against Developers, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

    a.    Immediate payment of all monies due to the Association pursuant to the PRED Regs and/or the Governing Documents;

    b.    Compensatory, consequential, incidental, statutory and punitive damages;

    c.    Interest and/or late charges;

    d.    Attorney fees and costs; and

    e.    Such other relief as is equitable, appropriate and just.

## <u>COUNT 7 – FAILURE TO MEET RESERVE FUNDING REQUIREMENTS</u>

472.   The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 6 are hereby incorporated by reference as if fully set forth herein;

473.   The Association is governed by PREDFDA, the PRED Regs,  the Nonprofit Act and the Governing Documents;

474.   Pursuant to N.J.S.A. §45:22A-44, while the Developer and the Developer's Trustees controlled the Association the Developer and the Developer's Trustees owed a duty to the Association to exercise the Association's powers and discharge the Association's functions in a manner that protected and furthered or was not inconsistent with the health, safety and general welfare of the residents of the community;

475.   The Developer, the Developer's Trustees and the Developer's Agents failed to adequately budget for the Association's reserve funds;

476.   Pursuant to N.J.A.C. §5:26-8.7(a), while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees owed a duty to the Association to prepare and adopt an operating budget, prior to making an annual assessment, which provided for any and all common expenses to be incurred during the year as well as adequate reserves for repair and replacement of the common elements and facilities;

477.   Contrary to N.J.A.C. §5:26-8.7(a), while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees failed to prepare and adopt an operating budget, prior to making an annual assessment, which provided for any and all common expenses to be incurred during the year as well as adequate reserves for repair and replacement of the common elements and facilities;

478.   The Association will not, and does not, have adequate reserve funds because of the inadequate budget the Developer, the Developer's Trustees and the Developer's Agents prepared;

67

479.    The Developer, the Developer's Trustees and the Developer's Agents failed to meet the requirements under the PREDFA and the PRED Regs.

480.    When the Developer failed to adequately budget for reserve funding, it was extremely likely that the Association would be seriously harmed as a result;

481.    The Developer was fully aware of the reckless disregard of the likelihood that serious harm would arise from its failure to adequately budget for the Association's reserves as described herein;

**WHEREFORE**, the Association demands judgment against Developers, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

      a.    Immediate payment of all monies due to the Association pursuant to PREDFDA, the PRED Regs and/or the Governing Documents;

      b.    Compensatory, consequential, incidental, statutory and punitive damages;

      c.    Interest and/or late charges;

      d.    Attorney fees and costs; and

      e.    Such other relief as is equitable, appropriate and just.

## COUNT 8 - TRUSTEES' BREACH OF FIDUCIARY DUTY

482.    The Association is governed by the PREDFDA, the PRED Regs, the Nonprofit Act and the Governing Documents;

483.    The PARTIES AND BACKGROUND facts and the allegations of Counts 1 through 7 are incorporated herein by reference.

68

484.    While the Developer and the Developer's Trustees controlled the Association, the Developer and the Developer's Trustees were required to perform many services for the Association;

485.    Those services included, without limitation:

a. cause persons and contractors necessary to properly maintain the Association to be selected and supervised;

b. select and supervise persons and contractors necessary to repair, maintain or renovate the Common Elements of the Association;

c. maintain books, records and financial statements for the Association;

d. maintain records showing all receipts and expenditures relating to the Association;

e. handle all bills received by the Association;

f. collect all common expenses, charges, assessments and debts and take action as is necessary to collect same;

g. ensure that the Association and/or its common property were appropriately and properly maintained;

h. enforce obligations of the Unit Owners and do anything and everything necessary and proper for the sound management of the Association;

i. cooperate with the Association's accountant with regard to the Association's annual audit;

j. obtain annual audited financial statements for the Association;

k. maintain the Association's books and records including its minutes and give

notice to the members of meetings;

l. maintain records with respect to services, materials and expenses provided on ehalf of the Association;

m. notify the Association of any practice or activity which may constitute a violation of any ordinance, code or law;

486.   Pursuant to N.J.S.A. §45:22A-45(c ) and N.J.A.C. §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts or omissions;

487.   Pursuant to N.J.S.A. §15A:6-14, while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees were required to discharge their duties to the Association in good faith;

488.   Pursuant to N.J.S.A. §15A:6-14, while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees were required to discharge their duties to the Association with that degree of diligence, care and skill which ordinary, prudent persons would exercise under similar circumstances in like positions;

489.   Contrary to N.J.S.A. §45:22A-44(a), while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees failed to exercise the Association's powers and discharge the Association's functions in a manner that protected and furthered the health, safety and general welfare of the residents of the community;

490.   Contrary to N.J.A.C. §5:26-8.2(b), while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees failed to discharge the

70

Association powers in a manner that protected and furthered the health, safety and general welfare of the residents of the community;

491.    Pursuant to <u>N.J.S.A.</u> §15A:6-14, while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees failed to discharge their duties to the Association in good faith;

492.    Pursuant to <u>N.J.S.A.</u> §15A:6-14, while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees failed to discharge their duties to the Association with that degree of diligence, care and skill which ordinary, prudent persons would exercise under similar circumstances in like positions;

493.    The Developer and Developer's Trustees could not reasonably have believed that their conduct was in the best interests of the Association. <u>N.J.S.A.</u> §15A:3-4(c).

494.    The Developer and Developer's Trustees could not reasonably have believed that their conduct was not opposed to the best interests of the Association. <u>N.J.S.A.</u> §15A:3-4(c).

495.    The Developer and the Developer's Trustees , upon learning that its failure to adequately budget for the Association's reserves, deferred maintenance and operating budget was likely to cause harm, continued in its actions with disregard for the harm likely to result to the Association;

496.    The Developer continued to inadequately budget for reserves, deferred maintenance and operating budget throughout the construction and development of the Association's Improvements;

497.    The Developer benefited financially by failing to adequately budget for reserves by, among other things, lowering its costs to construct and develop the Association's

71

Improvements and by enticing purchasers who relied upon a deceptively low monthly

assessment, which is made up, in part, by funding for reserves;

498.    The Developer's Trustees were obligated, pursuant to the Governing Documents, to:

maintain the Community; keep a complete and accurate record of its affairs; and properly

manage the financial affairs of the Association, which included without limitation collecting

assessments from the Developer pursuant to PREDFDA, and expending Association funds

only for proper Association-related expenses;

499.    The Developer's Trustees were obligated pursuant to the Governing Documents to act

with fidelity toward the Association and its membership and in good faith and with

reasonable care;

500.    The Developer's Trustees failed to meet these obligations as is alleged in the

PARTIES AND BACKGROUND FACTS, more particularly the FINANCING DEFECT

FACTS, CONSTRUCTION DEFECTS FACTS, DEVELOPER'S MISREPRESENTATIONS

FACTS, and DECEPTIVE ADVERTISING FACTS, which are incorporated herein as if set

forth at length;

501.    When the Developer's Trustees breached their fiduciary duties to the Association and

its membership it was extremely likely that the Association and its members would be

seriously harmed as a result;

502.    The Developer's Trustees were fully aware of the reckless disregard of the likelihood

that serious harm would befall the Association and its members as a result of their breach of

fiduciary duties described herein;

503.    The Developer's Trustees, upon learning that their breach of their fiduciary duties was

likely to harm the Association and its members, continued in their actions with disregard for the harm likely to result;

504.    The Developer's Trustees continued to breach their fiduciary duties throughout their tenure on the Association's Board of Trustees;

505.    The Developer benefited financially by virtue of the Developer's Trustees' breach of their of their fiduciary duties;

506.    The Association and its membership have been damaged;

507.    The improper conduct by the Developer's Trustees is the direct and proximate cause of the damage to the Association and its membership;

508.    As a direct and proximate result of the conduct described above, the Association sustained damages;

509.    Pursuant to N.J.S.A. §45:22A-45(c), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts and/or omissions;

510.    Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the owners for their acts and/or omissions;

511.    Pursuant to N.J.S.A. §45:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

512.    Pursuant to N.J.S.A. §46:8B-16, the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted directly by the unit owners individually;

**WHEREFORE**, the Association demands judgment against Developers, the Developer's

73

Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

     a.    Immediate payment of all monies due to the Association pursuant to PREDFDA, the PRED Regs, and/or the Governing Documents;

     b.    Judgment in its favor pursuant to N.J.S.A. 2A:16-50, et seq., declaring the rights, remedies and/or obligations of the parties with respect to the Governing Documents and common law;

     c.    Adjudging that the Developer's Trustees violated the Governing Documents and/or common law by failing to properly keep the Association's books and records during the period the Developer's Trustees controlled the Association;

     d.    Compensatory, consequential, incidental, statutory and punitive damages;

     e.    Interest and/or late charges;

     f.    Attorney fees and costs; and

     g.    Such other relief as is equitable, appropriate and just.

## COUNT 9 - GROSS NEGLIGENCE

513.   The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 8 are hereby incorporated by reference as if fully set forth herein;

514.   Developer and the Developer's Agents had a duty to design, develop, construct, improve and/or budget for the Community and the Association's Improvements free from defects, in accordance with the Plans and Specifications, the Governing Documents, the

PREDFDA, the PRED Regs, the Code, all applicable state and local codes, regulations and ordinances, the standards and/or requirements of the plans and/or specifications approved by the Township of Manchester and the Standards;

515.    Developer, directly, or through its general contractor and/or sub-contractors, had a duty to supervise the Developer's Agents that performed work in regards to the Association's Improvements;

516.    As employees and/or principals of the Developer, and as members of the Association's Board and/or Officers of the Association, the Developer's Trustees had a duty to ensure that the Developer designed, developed, constructed and/or improved the Community and the Association's Improvements free of defects, in accordance with the Plans and Specifications, the Governing Documents, PREDFDA, the PRED Regs, the Code, all applicable state and local codes, regulations and ordinances, the standards and/or requirements of the plans and/or specifications approved by the Township of Manchester, and the Standards;

517.    The Developer, the Developer's Agents and the Developer's Trustees failed to design, develop, construct improve and/or budget for the Association's Improvements free from defects, in accordance with the Specifications, the Governing Documents, PREDFDA, the PRED Regs, the Code, all applicable state and local codes, regulations and ordinances, the standards and/or requirements of the plans and/or specifications approved by Township of Manchester , and the Standards as described in the CONSTRUCTION DEFECT FACTS and in the FINANCING DEFECT FACTS;

518.    Developer failed to supervise the Developer's Agents in order to prevent the failings described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT

75

FACTS and discussed above;

519.    The Developer's Trustees failed to supervise the Developer's Agents in order to prevent the failings described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS and discussed above;

520.    Developer, the Developer's Agents and the Developer's Trustees failed to discover the defects described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS and/or failed to remedy the defects described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS that they collectively and/or individually did discover;

521.    Developer, the Developer's Agents and the Developer's Trustees failed to design, develop, construct, improve and/or budget for the Association's Improvements free from defects, in accordance with the Specifications, as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

522.    Developer, the Developer's Agents and the Developer's Trustees failed to design, develop, construct, improve and/or budget for the Association's Improvements free from defects, in accordance with the Governing Documents, as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

523.    Developer, the Developer's Agents and the Developer's Trustees failed to design, develop, construct, improve and/or budget for the Association's Improvements free from defects, in accordance with PREDFDA, as described in the CONSTRUCTION DEFECT

FACTS and the FINANCING DEFECT FACTS despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

524.    Developer, the Developer's Agents and the Developer's Trustees failed to design, develop, construct, improve and/or budget for the Association's Improvements free from defects, in accordance with the PRED Regs, as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

525.    Developer, the Developer's Agents and the Developer's Trustees failed to design, develop, construct, improve and/or budget for the Association's Improvements free from defects, in accordance with the Code, as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

526.    Developer, the Developer's Agents and the Developer's Trustees failed to design, develop, construct, improve and/or budget for the Association's Improvements free from defects, in accordance with all applicable state and local codes, regulations and ordinances, as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

527.    Developer, the Developer's Agents and the Developer's Trustees failed to design, develop, construct, improve and/or budget for the Association's Improvements free from defects, in accordance with the standards and/or requirements of the plans and/or specifications approved by The Township of Manchester, as described in the

CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

528. Developer, the Developer's Agents and the Developer's Trustees failed to design, develop, construct, improve and/or budget for the Association's Improvements free from defects, in accordance with the Standards, as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

529. Developer, the Developer's Agents and the Developer's Trustees failed to discover said defects described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS and/or failed to remedy the defects described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS that they collectively and/or individually did discover despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

530. Developer failed to supervise the Developer's Agents in order to prevent the failings described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS as discussed above despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

531. The Developer's Trustees failed to supervise the Developer's Agents in order to prevent the failings described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS and discussed above despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

78

532.    As a direct and proximate result of the breach by the Developer, the Developer's Agents and the Developer's Trustees of their duties as set forth above, the Association sustained damages that have caused, and will in the future cause, the Association to expend substantial sums of money to complete, alter, correct, fix, cure, remedy, rectify, repair, replace, service and/or adjust the Association's Improvements;

533.    Pursuant to N.J.S.A. §45:22A-45(c) the Developer and the Developer's Trustees are liable as fiduciaries to the owners for their acts and/or omissions;

534.    Pursuant to N.J.A.C. §5:26-8.3(b) the Developer and the Developer's Trustees are liable as fiduciaries to the owners for their acts and/or omissions;

535.    Pursuant to N.J.S.A. §45:22A-44(d) the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

**WHEREFORE**, the Association demands judgment against Developers, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

a.      Compensatory, consequential, incidental, and statutory damages;

b.      Interest;

c.      Attorney fees and costs; and

d.      Such other relief as is equitable, appropriate and just.

## COUNT 10 - CONSUMER FRAUD

536.    The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 9 are hereby incorporated by reference as if fully set forth herein;

537.    The Developer, the Developer's Trustees and/or agents hired by the Developer's Trustees engaged in conduct to further the Developer's interests, which was done at the peril of the Association, its unit owners and its Board, as alleged in the PARTIES AND BACKGROUND FACTS, more particularly the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, which are incorporated herein as if set forth at length;

538.    The Developer, the Developer's Trustees and/or agents hired by the Developer's Trustees engaged in unlawful conduct in violation of the Consumer Fraud Act, NJSA 56:8-1 et. seq. when they failed to disclose this relevant information to the prospective purchasers;

539.    The Developer, the Developer's Trustees and/or agents hired by the Developer's Trustees engaged in unlawful conduct in violation of the Consumer Fraud Act, NJSA 56:8-1 et. seq. when they misrepresented this relevant information to the prospective purchasers;

540.    The Developer, the Developer's Trustees and/or agents hired by the Developer's Trustees engaged in unlawful conduct in violation of the Consumer Fraud Act, NJSA 56:8-1 et. seq. when they failed to comply with the PRED regulations;

541.    The practices the Developer, the Developer's Trustees and/or agents hired by the Developer's Trustees used were unlawful and constituted violations of the Consumer Fraud Act, NJSA 56:8-1 et. seq. as Defendants engaged in unconscionable commercial practices, deception, fraud, false pretenses, false promises and misrepresentations as alleged in the PARTIES AND BACKGROUND FACTS, more particularly the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, which are incorporated herein as if set forth at length;

542.   During its sale and advertisement of said real estate, the Developer, the Developer's Trustees and/or agents hired by the Developer's Trustees also knowingly concealed, suppressed and/or omitted these material facts with the intent that homeowners, the Association and the Board would rely upon them;

543.   Through their conduct, the Developer, the Developer's Trustees and/or agents hired by the Developer's Trustees furthered the Developer's, and their own personal interests at the expense of the Association;

544.   As a result of the Developer, the Developer's Trustees and/or agents hired by the Developer's Trustees aforementioned unlawful acts the Association and its membership have been damaged and have suffered an ascertainable loss;

545.   The unlawful conduct by the Developer, the Developer's Trustees and/or agents hired by the Developer's Trustees is the direct and proximate cause of the damage to the Association and its membership;

546.   Pursuant to N.J.S.A. §45:22A-45(c), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts and/or omissions;


547.   Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the owners for their acts and/or omissions;

548.   Pursuant to N.J.S.A. §45:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

**WHEREFORE**, the Association demands judgment against Developers, the Developer's

Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

a.      Compensatory, consequential, incidental, and statutory damages;

b.      Treble damages pursuant to N.J.S.A. 56:8-1 et. seq.;

c.      Interest;

d.      Court costs and attorney fees; and

e.      Such other relief as is equitable, appropriate and just.

## COUNT 11 - INTENTIONAL FRAUD

549.   The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 10 are hereby incorporated by reference as if fully set forth herein;

550.   In connection with its creation and construction of the Community and during its administration of the Association as the controller of the Board, the Developer and the Developer's Trustees made the material misrepresentations and/or omissions as alleged in the PARTIES AND BACKGROUND FACTS, more particularly the FINANCING DEFECT FACTS, DEVELOPER'S MIS REPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, which are incorporated herein as if set forth at length;

551.   The Developer and the Developer's Trustees intended that the false material misrepresentations and/or omissions would induce reliance on the part of purchasers, unit owners, the Association, the Board and any others to whom the misrepresentations were made;

552.   Those persons and/or entities to whom the Developer or the Developer's Trustees made misrepresentations and/or omissions reasonably relied thereon;

82

553.   When the Developer employed deception, fraud, false pretenses, false promises and misrepresentation as alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MIS REPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, in order to solicit sales of units, it was extremely likely that the Association, individual unit owners and purchasers would be seriously harmed as a result;

554.   The Developer was fully aware of the reckless disregard of the likelihood that serious harm would befall the Association, individual unit owners and purchasers as a result of its deceptive and fraudulent practices and misrepresentations described herein;

555.   The Developer, upon learning that its deceptive and fraudulent practices and misrepresentations were likely to harm the Association, individual unit owners and purchasers, continued in its actions with disregard for the harm likely to result therefrom;

556.   The Developer continued to employ deceptive and fraudulent practices and to propagate misrepresentations throughout the construction, development and sale of units within the Association;

557.   The Developer benefited financially by employing deceptive and fraudulent practices and by propagating misrepresentations by, among other things, enticing purchasers to buy units in the Association, in which improvements were developed and constructed in an inadequate manner and for which an inadequate budget had been created;

558.   The Developer's and the Developer's Trustees' misrepresentations damaged purchasers, homeowners, the Association and the Board;

559.   Pursuant to N.J.S.A. §45:22A-45(c), the Developer and the Developer's Trustees are

83

liable as fiduciaries to the unit owners for their acts and/or omissions;

560.    Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts and/or omissions;

561.    Pursuant to N.J.S.A. §45:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

**WHEREFORE**, the Association demands judgment against Developer, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

a.    Compensatory, consequential, incidental, statutory and punitive damages;

b.    Interest;

c.    The reasonable expense of litigation caused by the fraud; and

d.    Such other relief as is equitable, appropriate and just.

## COUNT 12 - NEGLIGENT FRAUD/MISREPRESENTATION

562.    The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 11 are hereby incorporated by reference as if fully set forth herein;

563.    In connection with its creation and construction of the Community and during its administration of the Association as the controller of the Board, the Developer and the Developer's Trustees negligently provided the false information and misrepresentations as are alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, which are incorporated herein as if set forth at length;

564.   The false information was negligently provided to reasonably foreseeable recipients including without limitation purchasers, unit owners, the Association and the Board as described above and elsewhere herein;

565.   Said purchasers, unit owners, the Association and the Board detrimentally relied upon that information;

566.   The reliance by said purchasers, homeowners, the Association and the Board was reasonable;

567.   The Developer's and the Developer's Trustees' misrepresentations in this regard proximately caused damage to purchasers, homeowners, the Association and the Board;

568.   Pursuant to N.J.S.A. §45:22A-45(c), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts and/or omissions;

569.   Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts and/or omissions;

570.   Pursuant to N.J.S.A. §45:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

**WHEREFORE**, the Association demands judgment against Developers, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

a.   Compensatory, consequential, incidental, statutory and punitive damages;

b.   Interest;

c.   Attorney fees and costs; and

85

d.      Such other relief as is equitable, appropriate and just.

## COUNT 13- FRAUDULENT CONCEALMENT BY FIDUCIARY

571.   The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 12 are hereby incorporated by reference as if fully set forth herein;

572.   The Developer's Trustees were parties to a fiduciary relationship with the Association;

573.   In the context of that fiduciary relationship, the Developer's Trustees intentionally concealed and failed to disclose known facts as alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, TRUSTEE BREACH OF FIDUCIARY DUTY FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, which are incorporated herein as if set forth at length;

574.   Purchasers, unit owners, the Association and the Board relied upon the Developer's Trustees in regards to the concealed and undisclosed facts to their detriment;

575.   Purchasers, unit owners, the Association and the Board reasonably relied on the concealed and undisclosed facts;

576.   When the Developer's Trustees intentionally concealed and failed to disclose known facts as alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, it was extremely likely that the Association, unit owners and the Board would be seriously harmed as a result;

577.   The Developer's Trustees were fully aware of the reckless disregard of the likelihood that serious harm would arise from their intentional concealment and failure to disclose

86

known facts as alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS;

578.   The Developer's Trustees, upon learning that their intentional concealment and failure to disclose known facts, as alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, was likely to cause harm, continued in their actions with disregard for the harm likely to befall the Association, unit owners and the Board;

579.   The Developer's Trustees continued to intentionally conceal and fail to disclose known facts, as alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, throughout their tenure on the Association's Board of Trustees;

580.   The Developer benefited financially by virtue of the Developer'sTrustees' intentional concealment and failure to disclose known facts as alleged in the PARTIES AND BACKGROUND FACTS, more particularly the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, by, among other things lowering its cost to construct and develop the Association's Improvements, lowering its cost by underfunding the Association's reserves and increasing its revenues by soliciting purchasers of units without making proper disclosures;

581.   The Developer and the Developer's Trustees actions in this regard proximately caused

damage to purchasers, homeowners, the Association and the Board;

582. Pursuant to N.J.S.A. §45:22A-45(c), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts and/or omissions;

583. Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for the acts and/or omissions;

584. Pursuant to N.J.S.A. §45:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

**WHEREFORE**, the Association demands judgment against Developers, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

a.       Compensatory, consequential, incidental, statutory and punitive damages;

b.       Interest;

c.       Attorney fees and costs; and

d.       Such other relief as is equitable, appropriate and just.

## COUNT 14 – VIOLATION OF NON-PROFIT CORPORATIONS ACT

585. The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 13 are hereby incorporated by reference as if fully set forth herein;

586. The Developer and the Developer's Trustees were obligated to comply with the Nonprofit Act in the context of their control of the Association and the Board;

587. The Nonprofit Act, §15A:5.24, requires an association and/or its board to keep books

and records and minutes of its proceedings, with same to be open to inspection by said association's membership;

588.   The Nonprofit Act, §15A:6-14, requires the Developer and the Developer's Trustees to discharge their duties in good faith and with that degree of diligence, care and skill which ordinary prudent persons would exercise under similar circumstances in like positions;

589.   The Association while controlled by the Developer and the Developer's Trustees failed to properly keep the Association's books and records as is alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, which are incorporated herein as if set forth at length;

590.   The Developer and Trustees and the Developer's Trustees did not discharge their duties in good faith or with the requisite degree of diligence and care by virtue of numerous acts and/or omissions, which include without limitation those acts and/or omissions as are alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, which are incorporated herein as if set forth at length;

591.   When the Developer's Trustees failed to discharge their duties in good faith or with the requisite degree of diligence and care by virtue of numerous acts and/or omissions, which include without limitation those acts and/or omissions as are alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, it was extremely likely that the Association, unit owners and the Board would be

seriously harmed as a result;

592.    The Developer's Trustees were fully aware of the reckless disregard of the likelihood

that serious harm would arise from their failure to discharge their duties in good faith or with

the requisite degree of diligence and care by virtue of numerous acts and/or omissions, which

include without limitation those acts and/or omissions as are alleged in the PARTIES AND

BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS,

DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING

FACTS;

593.    The Developer's Trustees, upon learning that their failure to discharge their duties in

good faith or with the requisite degree of diligence and care by virtue of numerous acts and/or

omissions, which include without limitation those acts and/or omissions as are alleged in the

PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT

FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE

ADVERTISING FACTS, was likely to cause harm, continued in their actions with disregard

for the harm likely to result to the Association, unit owners and the Board;

594.    The Developer's Trustees continued in their failure to discharge their duties in good

faith or with the requisite degree of diligence and care by virtue of numerous acts and/or

omissions, which include without limitation those acts and/or omissions as are alleged in the

PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT

FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE

ADVERTISING FACTS, throughout their tenure on the Association's Board of Trustees;

595.    The Developer benefited financially by virtue of the Developer's Trustees' failure to

90

discharge their duties in good faith or with the requisite degree of diligence and care by virtue

of numerous acts and/or omissions, which include without limitation those acts and/or

omissions as are alleged in the PARTIES AND BACKGROUND FACTS, more particularly

in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS,

and DECEPTIVE ADVERTISING FACTS;

596.   The Association and its membership have been damaged;

597.   The Developer's and the Developer's Trustees' actions in this regard proximately

caused damage to purchasers, unit owners, the Association and the Board;

598.   Pursuant to N.J.S.A. §45:22A-45(c), the Developer and the Developer's Trustees are

liable as fiduciaries to the unit owners for their acts and/or omissions;

599.   Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer's Trustees are

liable as fiduciaries to the unit owners for the acts and/or omissions;

600.   Pursuant to N.J.S.A. §45:22A-44(d), the Association may assert tort claims concerning

the common elements and facilities of the development as if the claims were asserted by the

unit owners individually;

**WHEREFORE**, the Association demands judgment against Developers, the Developer's

Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the

alternative as follows:

> a.   Judgment in its favor pursuant to N.J.S.A. 2A:16-50, et seq., declaring
>
> the rights, remedies and/or obligations of the parties with respect to the
>
> Nonprofit Act;
>
> b.   Adjudging that the Developer and the Developer's Trustees violated

91

the Nonprofit Act by failing to properly keep the Association's books and records;

c.     Compensatory, consequential, incidental, statutory and punitive damages;

d.     Interest;

e.     Attorney fees and costs; and

f.     Such other relief as is equitable, appropriate and just.

## COUNT 15 – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

601.   The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 14 are incorporated by reference as if fully set forth herein;

602.   The Developer implicitly and/or explicitly contracted with the Association and the unit owners to design, develop, construct, install and/or budget for the Association's Improvements to be free from defects; in conformity with the Specifications, the Governing Documents, PREDFDA, the PRED Regs, the Nonprofit Act, the Code, all applicable state and local codes, regulations and ordinances, the standards and/or requirements of the plans and/or specifications approved by Township of Manchester , and the Standards; and be fit for their intended purposes;

603.   The Developer contracted with the Developer's Agents to fulfill those obligations;

604.   The Association is a third-party beneficiary of any contracts between the Developer and the Developer's Agents in regards to the Association's Improvements;

605.   As alleged in the PARTIES AND BACKGROUND FACTS, and more particularly in

the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, the Developer acted in bad faith in order to deprive the Association of its rights and benefits under the contracts;

606. As alleged in the PARTIES AND BACKGROUND FACTS, and more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, the Developer and Developer's Trustees purposefully employed evasive practices in order to deny the Association and its members the bargain initially intended by the parties;

607. The Developer's and Developer's Trustees bad faith acts damaged the Association and unit owners;

608. When the Developer and Developer's Trustees acted in bad faith, which includes without limitation those acts and/or omissions as are alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, it was extremely likely that the Association and unit owners would be seriously harmed as a result;

609. The Developer and Sponsor Trustees were fully aware of the reckless disregard of the likelihood that serious harm would befall the Association and unit owners as a result of its bad faith acts, which include without limitation those acts and/or omissions as are alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS;

93

610.   The Developer and Developer's Trustees, upon learning that its bad faith acts, which include without limitation those acts and/or omissions as are alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, were likely to cause harm, continued in its actions with disregard for the harm likely to result to the Association and unit owners;

611.   The Developer and Developer's Trustees continued in its bad faith acts, which include without limitation those acts and/or omissions as are alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, throughout the development and construction of the Association's Improvements and throughout the time period when the Developer was selling units;

612.   The Developer benefited financially by virtue of its bad acts, which include without limitation those acts and/or omissions as are alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MIS REPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, by, among other things lowering its cost to construct and develop the Association's Improvements and by enticing purchasers of units to consummate additional sales;

613.   The Developer's and the Developer's Trustees' actions in this regard proximately caused damage to purchasers, unit owners, the Association and the Board;

614.   Pursuant to N.J.S.A. §45:22A-45(c), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts and/or omissions;

94

615.   Pursuant to <u>N.J.A.C.</u> §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for the acts and/or omissions;

616.   Pursuant to <u>N.J.S.A.</u> §45:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

**WHEREFORE**, the Association demands judgment against Developers, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

a.   Compensatory, consequential, incidental, statutory and punitive damages;

b.   Interest;

c.   Attorney fees and costs; and

d.   Such other relief as is equitable, appropriate and just.

## COUNT 16 – TORT – VICARIOUS LIABILITY

617.   The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 15 are incorporated by reference as if fully set forth herein;

618.   The Developer, the Developer's Trustees and the Developer's Agents committed torts against the Association, including, but not limited to:  Negligence; Breach of Express Warranty; Breach of Implied Warranty; Strict Liability; Breach of Contract; Violations of PREDFDA and the PRED Regs, including Failure to Pay for Benefits Derived and Failure to Meet Reserve Funding Requirements; Gross Negligence; Consumer Fraud; Breach of Fiduciary Duty; Intentional Fraud; Negligent Fraud; Fraudulent Concealment by a Fiduciary; Violations of the New Jersey Non-Profit Corporations Act; and Breach of Implied Covenant

95

of Good Faith and Fair Dealing;

619.    The Association and its membership have been damaged by the Developer's, the

Developer's Trustees' and the Developer's Agents' acts and/or omissions as is alleged in the

PARTIES AND BACKGROUND FACTS, which are incorporated herein as if set forth at

length;

620.    These acts and/or omissions were actuated by actual malice or accompanied by a

wanton and willful disregard of persons who foreseeably might be harmed by those acts

and/or omissions;

621.    The Developer, the Developer's Trustees, the Developer's Agents and the Doe

Defendants are vicariously liable for any punitive damages assessed against any employee

thereof as the Developer, the Developer's Trustees, the Developer's Agents or the Doe

Defendants specifically participated in or ratified the wrongful acts, as is alleged in the

PARTIES AND BACKGROUND FACTS, which are incorporated herein as if set forth at

length, and which were of such high authority as to be fairly considered executive in

character;

622.    For the reasons set forth in the PIERCING THE CORPORATE VEIL FACTS, and

elsewhere herein, Pulte Home Corporation of the Delaware Valley, Del Webb Corporation,

Pulte Group, Inc and Pulte Home Corporation  should be held liable to the Association in

addition to Defendant  Pulte Homes of NJ, Limited Partnership, t/a River Pointe by Del

Webb.

**WHEREFORE**, the Association demands judgment against the Developers, the Developer's

Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the

96

alternative as follows:

a.  Compensatory, consequential, incidental, statutory and punitive damages;

b.  Interest;

c.  Attorney fees and costs; and

d.  Such other relief as is equitable, appropriate and just.

McGovern Legal Services, LLC
Attorneys for Plaintiff, River Pointe
Homeowners Association, Inc.

Date: ___September 1, 2017___          By: ___*Patricia Hart McGlone*___
                                       PATRICIA HART  MCGLONE , ESQ.

## DEMAND FOR JURY TRIAL

The Association hereby demands a trial by jury.

McGovern Legal Services, LLC
Attorneys for Plaintiff, River Pointe
Homeowners Association, Inc.

Date: ___September 1, 2017___          By: ___*Patricia Hart McGlone*___
                                       PATRICIA HART MCGLONE, ESQ.

97

## CERTIFICATION

Pursuant to Rule 4:5-1, the undersigned certifies that, at the time of the filing of this Complaint, the matter in controversy is not subject to any other pending actions and/or Arbitration proceeding and that no other parties should be joined.  However it is contemplated that there may be additional claims and/or actions brought by Plaintiff against the Developer Defendants and/or the Contractor Defendants and any additional parties that have not yet been identified for any additional construction defects that are identified in the remainder of the Community that is still being evaluated and/or under construction. I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

McGovern Legal Services, LLC
Attorneys for Plaintiff, River Pointe
Homeowners Association, Inc.

Dated:   September 1, 2017             By:   *Patricia Hart McGlone*
                                              PATRICIA  HART  MCGLONE, ESQ.

# EXHIBIT 5

Patricia Hart McGlone, Esq. - 037891984
Damon M. Kress, Esq. - 033782004
McGovern Legal Services, LLC
850 Carolier Lane
North Brunswick, New Jersey 08902
(P) (732) 246-1221
(F) (732) 246-1872
<u>Attorneys for Plaintiff</u>

| | |
|---|---|
| RIVER POINTE HOMEOWNERS ASSOCIATION, INC. a non-profit New Jersey Corporation, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION OCEAN COUNTY |
| Plaintiff, | DOCKET NO.: OCN-L-2491-17 |
| v. | |
| PULTE HOMES OF NJ, LIMITED PARTNERSHIP, t/a River Pointe by DelWebb; PULTE HOME CORPORATION OF THE DELAWARE VALLEY; DEL WEBB CORPORATION; PULTE GROUP, INC.; PULTE HOME CORPORATION | CIVIL ACTION **PLAINTIFF'S FIRST AMENDED COMPLAINT** |

**CONTRACTORS:**
ACIES GROUP;
CUNTIS, INC.;
NASSAU CONSTRUCTION COMPANY;

**DEVELOPER APPOINTED TRUSTEES:**
CHARLES FOREMAN;
BARBARA JAQUETT;
PATRICIA SKROCKI;
RON HANKINS;
JAMES MULLEN;
RACHAEL RICHARDSON;
MARY CHURCHILL;
SEAN DORNEY;
CRAIG COLLIN;
JOHN EVANS;


JOHN DOE DIRECTOR(S), OFFICER(S),
AGENT(S) OR EMPLOYEE(S) OF
PULTE HOMES OF NJ, LIMITED

1

PARTNERSHIP, DEL WEBB CORPORATION,
PULTE GROUP, INC. and/or PULTE HOME
CORPORATION, fictitious parties;

JOHN DOE TRUSTEE(S) OF RIVER POINTE
HOMEOWNERS ASSOCIATION, INC.,
fictitious parties; JOHN DOE
CONTRACTORS (1-200), fictitious parties, and;
JOHN DOE (1 - 100), fictitious parties,

Defendants.

---

Plaintiff, River Pointe Homeowners Association, Inc., (hereinafter referred to as the "Association"), with an address of 100 Retreat Drive, Manchester, New Jersey 08759 by way of First Amended Complaint says:

**PARTIES AND BACKGROUND**

1. The Association was established and exists by virtue of, among other things a Declaration of Restrictive and Protective Covenants with attached Certificate of Incorporation and By-Laws recorded in the Office of the Clerk of Ocean County on May 31, 2007 in Deed Book 13655, Page 1424, et. seq., as lawfully amended from time to time;

2. The Association's Declaration of Restrictive and Protective Covenants, Certificate of Incorporation and By-Laws are hereinafter collectively referred to as the "Governing Documents";

3. The Association is a New Jersey not for profit Corporation;

4. The Association, its property and the lands and structures contained therein (the "Community"), were created, installed and/or constructed by a for-profit limited partnership known as Pulte Homes of NJ, Limited Partnership, a Michigan Limited Partnership and marketed under the name River Pointe by Del Webb, and by a for-profit corporation known as

2

Pulte Home Corporation of the Delaware Valley, and by a for-profit corporation known as

Pulte Group, Inc, and by a for-profit corporation known as the Del Webb Corporation, and by

a for-profit corporation known as Pulte Home Corporation (hereinafter collectively referred to

as the "Developer");

5.      The Community was initially created, installed and/or constructed by a for-profit

limited partnership known as Pulte Homes of NJ, Limited Partnership, a Michigan Limited

Partnership.

6.      The Community was advertised, marketed and developed by use of the name "River

Pointe by Del Webb" in brochures, websites and marketing materials offered to the public and

prospective purchasers.

7.      Del Webb Corporation identified itself as the builder and provided warranties

including a "build quality experience" along with Pulte Home Corporation to the homeowners

for individual homes and the common property.

8.      River Pointe by Del Webb and Del Webb Corporation are also referred to herein as the

"Developer".

9.      Pulte Group, Inc. is a public company based in Atlanta, Georgia and holds itself out to

be one of Americas largest homebuilding companies with operations in approximately 50

markets throughout the country.

10.     Pulte Home Corporation is a subsidiary of Pulte Group, Inc.

11.     Pulte Homes of NJ, Limited Partnership is a subsidiary of Pulte Group, Inc.

12.     Pulte Home Corporation of the Delaware Valley is a General Partner in Pulte Homes

of NJ, Limited Partnership and is a subsidiary of Pulte Group, Inc.

13.     Del Webb Corporation is a subsidiary of Pulte Group, Inc.

3

14. Pulte Group, Inc. engages in the homebuilding business, including acquisition and development of land primarily for residential purposes and the construction of housing on such land through its "brands" including Pulte Homes and Del Webb.

15. Pulte Group, Inc. includes the assets and liabilities of Pulte Home Corporation and Del Webb Corporation in its annual financial statement included with its annual report to shareholders.

16. Pulte Home Corporation and Del Webb Corporation advertise on the same website with Pulte Group, Inc.

17. The Pulte Group, Inc. website actively markets and advertises homes for sale in the State of New Jersey.

18. The architectural plans for the Community clubhouse were prepared for Pulte Northeast, 10600 Arrowhead Drive, Fairfax, Virginia, 22030, a division of Pulte Group, Inc.

19. The Community is constructed and located in the Township of Manchester, Ocean County, New Jersey;

20. The Community was constructed to be a planned retirement community and will consist of: 504 residential lots and dwellings together with a lot encompassing the sewer pump station, two lots containing detention basins and other common element improvements which include, but are not limited to the lands on which the residential homes are located, the clubhouse and recreational amenities, an outdoor swimming pool, two outdoor tennis courts, one putting green, two bocce courts and two horse shoe pits, a security gate house and a parking area, sanitary sewer, storm sewer, landscaping, potable water system, the interior roadways, etc. (hereinafter collectively known as the "Association's Improvements");

21. The Association maintains and manages the common elements of the Community;

4

22.     The common elements of the Community include, but are not limited to the grounds, recreational facilities and the interior roadways;

23.     The Community was supposed to have been created pursuant to and in conformance with the New Jersey Planned Real Estate Full Disclosure Act, <u>N.J.S.A.</u> §45:22A-21, <u>et seq.</u> (hereinafter, "PREDFDA");

24.     The Community was supposed to have been created pursuant to and in conformance with the Administrative Regulations promulgated pursuant to PREDFDA, <u>N.J.A.C.</u> §5:26-1.1, <u>et seq.</u> (hereinafter the "PRED Regs");

25.     The Community was supposed to have been created pursuant to and in conformance with the New Jersey Nonprofit Corporations Act, <u>N.J.S.A.</u> § 15a:1-1, <u>et seq.</u> (the "Nonprofit Act");

26.     The Community was supposed to have been created pursuant to and in conformance with the New Jersey Uniform Construction Code, <u>N.J.A.C.</u> § 5:23 <u>et seq.</u> (hereinafter the "Code");

**<u>Developer Appointed Trustees</u>**

27.     Defendant Charles Foreman was a developer-appointed Trustee that served on the Association's Board of Trustees.

28.     Defendant Barbara Jaquett was a developer-appointed Trustee that served on the Association's Board of Trustees.

29.     Defendant Patricia Skrocki was a developer-appointed Trustee that served on the Association's Board of Trustees.

30.     Defendant Ron Hankins was a developer appointed Trustee that served on the Association's Board of Trustees.

5

31.     Defendant James Mullen was a developer appointed Trustee that served on the Association's Board of Trustees.

32.     Defendant Rachael Richardson was a developer appointed Trustee that served on the Association's Board of Trustees.

33.     Defendant Mary Churchill was a developer appointed Trustee that served on the Association's Board of Trustees.

34.     Defendant Sean Dorney was a developer appointed Trustee that served on the Association's Board of Trustees.

35.     Defendant Craig Collin was a developer appointed Trustee that served on the Association's Board of Trustees.

36.     Defendant John Evans was a developer appointed Trustee that served on the Association's Board of Trustees.

37.     Defendants, John Doe Trustee(s) of River Pointe Homeowners Association, Inc. (1-100), with unknown addresses, are fictitious names intended to identify all trustees that served on the Association's Board of Trustees (the "Board") that were appointed by the Developer to the extent they are not named herein;

38.     Defendants, Charles Foreman, Barbara Jaquett, Patricia Skrocki, Ron Hankins, James Mullen, Rachael Richardson, Mary Churchill, Sean Dorney, Craig Collin, John Evans and John Doe Trustee(s) of River Pointe Homeowners Association, Inc. (1-100), are hereinafter collectively identified as the "Developer's Trustees";

39.     Defendants, John Doe Trustee(s), Officer(s), Agent(s) and/or Employee(s) of Pulte Homes of NJ, Limited Partnership, Pulte Home Corporation of the Delaware Valley, Del Webb Corporation, Pulte Group, Inc. and/or Pulte Home Corporation, are fictitious names

6

intended to identify every partner, officer, director, agent, member and employee of the Developer who: may have been involved with the Developer; either directly and/or indirectly controlled the Developer; occupied a status similar, and/or performed a function similar, to a general partner, officer, and/or director of the Developer; or participated, in some fashion, in the creation, construction and/or installation of the Community and/or the operation and/or administration of the Association;

40.     Defendants John Doe Trustee(s), Officer(s), Agent(s) and/or Employee(s) of Pulte Homes of NJ, Limited Partnership, Pulte Home Corporation of the Delaware Valley, Del Webb Corporation, Pulte Group, Inc. and/or Pulte Home Corporation, are fictitious names that are also intended to identify those individuals who may be personally liable to the Association pursuant to New Jersey law;

**General Contractor and Construction Manager**

41.     Defendant Pulte Homes of NJ, Limited Partnership was the General Contractor and Construction Manager for the creation, installation and construction of the Association, its property and the lands and structures contained therein (the "Community").

42.     Defendant Pulte Homes Corporation of the Delaware Valley was the General Contractor and Construction Manager for the creation, installation and construction of the Association, its property and the lands and structures contained therein (the "Community").

43.     Defendant Del Webb Corporation was the General Contractor and Construction Manager for the creation, installation and construction of the Association, its property and the lands and structures contained therein (the "Community").

44.     Defendant Pulte Group, Inc. was the General Contractor and Construction Manager for the creation, installation and construction of the Association, its property and the lands and

structures contained therein (the "Community").

45.　　Defendant Pulte Home Corporation was the General Contractor and Construction

Manager for the creation, installation and construction of the Association, its property and the

lands and structures contained therein (the "Community").

**Construction Contractors**

46.　　Defendant, Acies Group, with an address of 222 Passaic Avenue, Fairfield, New

Jersey 07004 was hired by the Developer and was the subcontractor responsible for

constructing and installing the stucco, exterior trim, masonry stone veneer and performed

other work on the buildings throughout the Community.

47.　　Defendant, Cuntis, Inc., with an address of 20 Veterans Drive, South River, New

Jersey 08882 was hired by the Developer and was the subcontractor responsible for

constructing and installing the roofing on the buildings throughout the Community.

48.　　Defendant, Nassau Construction Company, with an address of 925 Burlington

Avenue, Delanco, New Jersey 08075 was hired by the Developer and was the subcontractor

responsible for constructing and installing the framing, attics, sheathing, windows, doors and

building wrap on the buildings throughout the Community.

49.　　Defendant, JOHN DOE CONTRACTOR 1, was hired by the Developer and was the

subcontractor responsible for constructing and installing the flashing and sealants on the

buildings throughout the Community.

50.　　Defendant, JOHN DOE CONTRACTOR 2 was hired by the Developer and was the

subcontractor responsible for constructing and installing the building penetrations on the

buildings throughout the Community.

51.　　Defendant, JOHN DOE CONTRACTOR 3 was hired by the Developer and was the

subcontractor responsible for constructing and installing the columns throughout the Community.

52.     Defendant, JOHN DOE CONTRACTOR 4 was hired by the Developer and was the subcontractor responsible for constructing and installing the roofs on the buildings throughout the Community.

53.     Defendant, JOHN DOE CONTRACTOR 5 was the subcontractor responsible for installing the weather resistant barrier (WRB) throughout the Community.

54.     Defendant, JOHN DOE CONTRACTOR 6 was hired by the Developer and was the subcontractor responsible for constructing and installing the attic spaces and access in the buildings throughout the Community.

55.     Defendant, JOHN DOE CONTRACTOR 7 was hired by the Developer and was the subcontractor responsible for constructing and installing the masonry stone veneer throughout the Community.

56.     Defendant JOHN DOE CONTRACTOR 8 was hired by the Developer and was the subcontractor responsible for installing the windows and doors throughout the Community.

57.     Defendant, JOHN DOE CONTRACTOR 9 was hired by the Developer and was the subcontractor responsible for installing the hard coat stucco cladding on the exterior of the buildings throughout the Community.

58.     Defendant, JOHN DOE CONTRACTOR 10 was hired by the Developer and was the subcontractor responsible for installing the exterior lighting throughout the Community.

59.     Defendant, JOHN DOE CONTRACTOR 11 was hired by the Developer and was the subcontractor responsible for installing and constructing kickout flashing at the roof and vertical wall intersections throughout the Community.

60.    Defendant, JOHN DOE CONTRACTOR 12 was hired by the Developer and was the subcontractor responsible for installing and constructing the kick out flashing on the buildings and roofs throughout the Community.

61.    Defendant, JOHN DOE CONTRACTOR 13 was hired by the Developer and was the subcontractor responsible for installing and constructing the concrete slabs and sidewalks throughout the Community.

62.    Defendant, JOHN DOE CONTRACTOR 14 was hired by the Developer and was the subcontractor responsible for installing and constructing the railings throughout the Community.

63.    Defendant, JOHN DOE CONTRACTOR 15 was hired by the Developer and was the subcontractor responsible for installing the tennis courts throughout the Community.

64.    Defendant, JOHN DOE CONTRACTOR 16 was hired by the Developer and was the subcontractor responsible for construction and installation of storm water drainage facilities throughout the Community.

65.    Defendant, JOHN DOE CONTRACTOR 17 was hired by the Developer and was the subcontractor responsible for construction and installation of the retaining walls throughout the Community.

66.    Defendant, JOHN DOE CONTRACTORS 18-100 were hired by the Developer and were the subcontractor(s) responsible for construction and installation of components that are identified as defective by Plaintiff herein and remain unidentified.

67.    Defendant, JOHN DOE CONTRACTORS 101-200 represent contractors hired by Defendant subcontractors who were responsible for construction and installation of components that are identified as defective by Plaintiff herein and remain unidentified.

10

68.  Defendants Pulte Homes of NJ, Limited Partnership, Pulte Home Corporation of the Delaware Valley, Del Webb Corporation, Pulte Group, Inc. and/or Pulte Home Corporation, shall hereinafter by identified collectively as "General Contractor" and "Developer".

69.  Defendants Acies Group, Inc., Cuntis Inc., Nassau Construction Company, and JOHN DOES CONTRACTORS 1-200 shall hereinafter be identified collectively as the "Subcontractors".

70.  Defendants ABC Contractors are fictitious names intended to identify any and all individuals and/or entities that provided services and/or materials in connection with the planning, design, development, construction and/or operation of the Association/Community.

71.  Defendants, John Doe (1 – 100) are fictitious names intended to identify any and all other individuals or entities who may be responsible, or otherwise liable for any of the Association's damages, but have not yet been specifically identified including but not limited to any and all professionals, employees, agents, any general contractor and/or any sub-contractors that performed any work as part of the planning, development, operation, construction and/or installation of the Association's Improvements.

72.  Defendants, John Doe Contractors (1-200); John Doe Trustee(s), Officer(s), Agent(s) and/or Employee(s) of Pulte Homes of NJ, Limited Partnership, Pulte Home Corporation of the Delaware Valley, Del Webb Corporation, Pulte Group, Inc. and/or Pulte Home Corporation; John Doe Trustee(s) of River Pointe Homeowners Association, Inc. (1-100); ABC Contractors, and; John Doe (1 – 100),  shall hereinafter be collectively identified as the "Doe Defendants".

73.  Any and all professionals, employees, agents, any general contractor and/or any sub-contractors, including the Subcontractors, that performed any work as part of the planning,

11

development, operation, construction and/or installation of the Association's Improvements shall be hereafter collectively known as the "Developer's Agents".

74.    The matters described in Paragraphs 1 through 73 shall hereafter be collectively known as the "PARTIES AND BACKGROUND".

<b><u>CONSTRUCTION DEFECTS</u></b>

75.    The Association's Improvements are defective.

76.    The Association's Common Elements are defective.

77.    The defects in the Association's Improvements and Common Elements include but are not limited to the following:

**EXTERIOR FAÇADE**

78.    The Association's exterior façade on the Clubhouse, the Guardhouse, and the Gatehouse is defective.

<b>EXTERIOR FAÇADE – MASONRY STONE VENEER</b>

79.    The Association's masonry stone veneer is defective.

80.    The adhered masonry stone veneer or cultured stone veneer installed on the Clubhouse, the Guardhouse, and the Gatehouse and on the walls located at the entrance to the Community is defective;

81.    The Developer and the Developer's Agents failed to install foundation weep screed on any of the masonry stone veneer in violation of the architectural plan requirements, manufacturer installation instructions and building code requirements including N.J.A.C. 5:23-3.6 and N.J.A.C. 5:23-3.21 through reference to 2000 International Building Code, Section 1403.

82.    The Developer and Developer's Agents failed to provide the required clearance

12

between the masonry stone veneer and the pavement or grade in violation of the manufacturer installation instructions and building code requirements including N.J.A.C. 5:23-3.21 through reference to 2000 International Building Code.

83.   The Developer and Developer's Agents failed to install appropriate kick-out diverter flashing where the masonry stone veneer extends into contact with roof planes which violates N.J.A.C. 5:23-3.21 through reference to 2000 International Building Code and N.J.A.C. 5:23-3.6;

84.   The masonry stone veneer that was installed in contact with asphalt shingles on the roof lacks appropriate weep screed and flashing in violation of the manufacturer installation instructions and building code requirements including N.J.A.C. 5:23-3.21 through reference to 2000 International Building Code and N.J.A.C. 5:23-3.6;

85.   The Developer and Developer's Agents failed to install the masonry stone veneer on the Clubhouse, the Guardhouse, and the Gatehouse and the entrance walls in accordance with the manufacturer installation instructions, industry standards, and building code requirements including N.J.A.C. 5:23-3.6 and N.J.A.C. 5:23-3.21 through references to 2000 International Building Code;

86.   The Developer and Developer's Agents failed to properly install mortar between the stones, as recommended by the manufacturer;

87.   The Developer and Developer's Agents failed to properly install the weather resistant barrier behind the masonry stone veneer;

88.   The defects in the Clubhouse, the Guardhouse, and the Gatehouse and the entrance walls are caused by negligent design and planning, poor workmanship, improper supervision during construction and carelessness during installation and during remediation attempts.

89.    The defects in the masonry stone veneer are caused by poor and careless workmanship during original construction;

90.    The defects in the masonry stone veneer allowed, and continue to allow, substantial amounts of water to infiltrate behind the stone veneer and other exterior finishes;

91.    Substantial amounts of water has infiltrated and continues to infiltrate behind the masonry stone veneer and other exterior finishes.

92.    The improperly installed weather resistant barrier behind the masonry stone veneer allows water to saturate the building sheathing and framing elements;

93.    The lack of weep screed and the inadequate clearance between the masonry stone veneer and the pavement or grade caused, and continues to cause water to remain trapped behind the stone veneer;

94.    The water trapped behind the adhered stone veneer and other exterior finishes has damaged, deteriorated, and continues to deteriorate the building sheathing, the framing elements and the adhered stone itself;

95.    The water trapped behind the masonry stone veneer and other exterior finishes has damaged, deteriorated, and continues to deteriorate the interior of the clubhouse and other locations where masonry stone veneer was installed;

96.    The damage and deterioration of the building sheathing and the framing elements impairs the structural integrity of the Clubhouse, the Guardhouse, and the Gatehouse and the entrance walls;

97.    The deterioration of the Clubhouse, the Guardhouse, and the Gatehouse building sheathing and the framing elements impairs the habitability of the Clubhouse, the Guardhouse, and the Gatehouse;

14

98.     Upon information and belief, the water that infiltrates and accumulates into the buildings' interior also damages products or work performed by individuals other than the sub-contractors of Subcontractors who supplied the defective products or performed the defective work.

99.     The defective masonry stone veneer violates industry standards, the manufacturer installation instructions, N.J.A.C. 5:23-3.6, N.J.A.C. 5:23-3.14 and N.J.A.C. 5:23-3.21 through references to 2000 International Building Code and is not in compliance with the architectural plans.

100.    The Developer's and Developer's Agents' failures violate industry standards, the manufacturer installation instructions, and the New Jersey Administrative Code, as previously referenced throughout this section;

101.    The defects in the installation of the manufactured stone veneer shall also include any other defects revealed throughout the course of discovery or ultimately proven at the time of trial;

102.    Correction of the facade defects on the Clubhouse, the Guardhouse, the Gatehouse, and the walls at the entrance to the Community will cost the Association at least $680,000.00, constituting damage to the Association caused by defects in original construction.

**EXTERIOR FAÇADE – STUCCO**

103.    The Association's hard coat stucco cladding on the exterior of the Clubhouse, the Guardhouse, and the Gatehouse is defective.

104.    The Developer and Developer's Agents failed to install foundation weep screed at the base of the hard coat stucco in violation of the architectural plan requirements, manufacturer installation instructions and building code requirements including N.J.A.C. 5:23-3.6; N.J.A.C.

15

5:23-3.21 through reference to 2000 International Building Code, Chapter 25.

105.     The Developer and Developer's Agents failed to provide weather protection at all joints and meetings of dissimilar materials with the hard coat stucco in violation of the manufacturer installation instructions and building code requirements including N.J.A.C. 5:23-3.21 through reference to 2000 International Building Code, Section 1403 and Chapter 25.

106.     The Developer and Developer's Agents failed to properly install the weather resistant barrier behind the hard coat stucco.

107.     The Developer and Developer's Agents failed to install proper control joints when installing the hard coat stucco.

108.     The Developer and Developer's Agents failed to install appropriate kick-out diverter flashing where the hard coat stucco extends into contact with roof planes which violates N.J.A.C. 5:23-3.21 through reference to 2000 International Building Code, Section 1405.3 and Chapter 25 and N.J.A.C. 5:23-3.6;

109.     The Developer and Developer's Agents failed to install the hard coat stucco in accordance with the manufacturer installation instructions, architectural plans, industry standards and building code requirements including N.J.A.C. 5:23-3.6 and N.J.A.C. 5:23-3.21 through references to 2000 International Building Code;

110.     The hard coat stucco on the clubhouse exterior is cracking and failing as a result of the improper installation.

111.     The defects in the hard coat stucco cladding on the Clubhouse, the Guardhouse, and the Gatehouse are caused by negligent design and planning, poor workmanship, improper supervision during construction and carelessness during installation and during remediation

16

attempts.

112. The defects in the hard coat stucco cladding are caused by poor and careless workmanship during original construction;

113. The defects in the hard coat stucco cladding allowed, and continue to allow, substantial amounts of water to infiltrate behind the stucco and other exterior finishes;

114. Substantial amounts of water has infiltrated and continues to infiltrate behind the stucco and other exterior finishes.

115. The water trapped behind the stucco and other exterior finishes has damaged, deteriorated, and continues to deteriorate the building sheathing, the framing elements and the stucco itself;

116. The water trapped behind the stucco and other exterior finishes has damaged, deteriorated, and continues to deteriorate the interior of the Clubhouse, the Guardhouse, and the Gatehouse and other locations where hard coat stucco was installed;

117. The damage and deterioration of the building sheathing and the framing elements impairs the structural integrity of the Clubhouse, the Guardhouse, and the Gatehouse buildings;

118. The deterioration of the Clubhouse, the Guardhouse, and the Gatehouse building sheathing and the framing elements impairs the habitability of the Clubhouse, the Guardhouse, and the Gatehouse buildings;

119. Upon information and belief, the water that infiltrates and accumulates into the buildings' interior also damages products or work performed by individuals other than the sub-contractors of Subcontractors who supplied the defective products or performed the defective work.

17

120.     The defective stucco violates industry standards, the manufacturer installation instructions, <u>N.J.A.C.</u> 5:23-3.6, <u>N.J.A.C.</u> 5:23-3.14 and <u>N.J.A.C.</u> 5:23-3.21 through references to 2000 International Building Code and is not in compliance with the architectural plans.

121.     The Developer's and Developer's Agents' failures violate industry standards, the manufacturer installation instructions, and the New Jersey Administrative Code, as previously referenced throughout this section;

122.     The defects in the installation of the stucco shall also include any other defects revealed throughout the course of discovery or ultimately proven at the time of trial;

123.     Correction of the facade defects on the Clubhouse, the Guardhouse, the Gatehouse, and the walls at the entrance to the Community will cost the Association at least $680,000.00, constituting damage to the Association caused by defects in original construction.

### EXTERIOR FAÇADE – WEATHERPROOFING

#### Caulk at Dissimilar Materials

124.     There is caulking missing at various locations throughout the Community.

125.     There is caulking missing at the interface between masonry stone veneer and hard coat stucco at various locations on the Clubhouse, the Guardhouse, and the Gatehouse.

126.     There is caulking missing at the interface between vertical flashing and masonry stone veneer at various locations throughout the Community.

127.     There is caulking missing at the interface between columns and girders at various locations throughout the Community.

128.     There is caulking missing at the interface between the cladding and light fixtures at various locations throughout the Community.

129.     There is caulking missing at the interface between the cladding and window and door

18

trim at various locations throughout the Community.

130.    There is also caulking missing at wall penetrations throughout the Community.

131.    There are numerous areas where caulk is missing at the interface between dissimilar materials in violation of industry standards, the manufacturer's specifications and installation instructions.

132.    Building materials expand and contract at different rates.  Failing to install the appropriate caulk at the interface of dissimilar materials causes water infiltration.

133.    The buildings have not been provided with a weather-resistant exterior wall envelop in violation of  Section 1403.2 of the 2000 International Building Code due to the defective installation.

134.    The defects in the caulking are caused by poor workmanship and carelessness during installation.

135.    The defects in the installation of caulk at dissimilar materials shall also include any other defects revealed throughout the course of discovery or ultimately proven at the time of trial;

136.    Correction of the facade defects on the Clubhouse, the Guardhouse, the Gatehouse, and the walls at the entrance to the Community will cost the Association at least $680,000.00, constituting damage to the Association caused by defects in original construction.

### Flashing

137.    The flashing installed throughout the Community is defective.

138.    At various locations throughout the Community, the metal flashing material that should be installed in conjunction with the roofing or cladding materials to create a watertight connection of any vertical or horizontal joints is defective or missing.

19

139.   At various locations throughout the Community, the Developer and Developer's Agents failed to install metal flashing material at joints.

140.   Flashing at the hard coat stucco and masonry stone veneer interface was installed short at various locations throughout the Community.

141.   Flashing at the windows, doors and the PVC cladding on the Clubhouse, the Guardhouse, and the Gatehouse was not installed or was improperly installed.

142.   Flashing was not installed around and under the building penetrations on the Clubhouse, the Guardhouse, and the Gatehouse exposing the building material below.

143.   Plumbing vent flashing on the roof of the Clubhouse was improperly installed, secured and/or sealed.

144.   The drip caps over and around the windows and doors on the Clubhouse, the Guardhouse, and the Gatehouse is either missing or defectively installed.

145.   The defective flashing on the Clubhouse, the Guardhouse, and the Gatehouse allowed, and continues to allow, water to infiltrate into the buildings' interior.

146.   The water that infiltrates into the Clubhouse, the Guardhouse, and the Gatehouse damages the interior of the structures.

147.   The water that infiltrates into the Clubhouse, the Guardhouse, and the Gatehouse has deteriorated, and continues to deteriorate, the buildings and its interior.

148.   The defects in flashing are caused by poor workmanship and carelessness during installation.

149.   The flashing defects violate industry standards, the manufacturer's specifications and installation instructions.

150.   The defective flashing violates, among other things, N.J.A.C. 5:23-3.6 and Section

20

1403.2 of IBC 2000.

151.    The defects in the installation of the flashing shall also include any other defects revealed throughout the course of discovery or ultimately proven at the time of trial;

152.    Correction of the facade defects on the Clubhouse, the Guardhouse, the Gatehouse, and the walls at the entrance to the Community will cost the Association at least $680,000.00, constituting damage to the Association caused by defects in original construction.

**ROOFING DEFECTS**

153.    The roofing on the Clubhouse in the Community is defective.

154.    The roofing on the Clubhouse was installed defectively.

155.    The roofs on the Clubhouse are defective because the Developer failed to satisfy the requirements of Chapter 15 of the IBC and the standards set forth by the Asphalt Roofing Manufacturers Association.

156.    There are numerous roof leaks resulting in interior moisture infiltration in the Clubhouse causing damage to the roof itself, surrounding structures, interior insulation, interior ceilings and walls.

157.    Roof coverings were not properly secured to the buildings or structure to resist wind and rain.

158.    Roof coverings were not designed or installed in accordance with approved manufacturer's installation instructions such that the roof coverings shall serve to protect the building or structure.

159.    The drip edge was not provided on various rakes and eaves located throughout the Community.

160.    The plumbing vent flashing and roof penetrations were not properly installed or

sealed.

161.    The asphalt shingles were improperly fastened to the roof with nail punctures on the shingles.

162.    The asphalt shingles were repeatedly punctured with staples.

163.    The flashing was missing or not properly installed at intersections with the roof plane and parapet wall penetrations on the clubhouse roof.

164.    There are raised shingles at various locations on the clubhouse roof.

165.    The roof membrane was not properly installed leaving the underlying wood material exposed to the elements.

166.    There is inadequate ventilation of the attic space over the roof through the roof causing moisture damage in the attic space above the indoor pool and spa;

167.    The defective roofing allowed and continues to allow water to infiltrate into the Clubhouse building interior.

168.    The water that infiltrates into the Clubhouse building interior damages the interior of the structure(s).

169.    The water that infiltrates into the Clubhouse building interior has deteriorated and continues to deteriorate the building and its interior.

170.    The defects in the roofing are caused by poor workmanship and carelessness during installation.

171.    The roof defects violate industry standards, the manufacturer's specifications and installation instructions.

172.    The defective roofing violates, among other things, N.J.A.C. 5:23-3.14 and Chapter 15 of the IBC 2000.

173.    The defects in the installation of the roofing shall also include any other defects revealed throughout the course of discovery or ultimately proven at the time of trial;

174.    Correction of the roofing defects on the Clubhouse will cost the Association at least $800.00, constituting damage to the Association caused by defects in original construction.

**CLUBHOUSE REAR BALCONY GUARDRAIL**

175.    The guardrail on the rear balcony of the clubhouse is defective.

176.    The guardrail on the rear balcony of the clubhouse was improperly installed.

177.    The guardrail on the rear balcony is loose and cannot satisfy the load as required by Chapter 16 of IBC 2000.

178.    The defects in the installation of the guardrail on the rear balcony shall also include any other defects revealed throughout the course of discovery or ultimately proven at the time of trial;

179.    Correction of the rear balcony guardrail defects on the Clubhouse will cost the Association at least $3,000.00, constituting damage to the Association caused by defects in original construction.

**CLUBHOUSE INTERIOR DEFECTS**

180.    The interior of the Clubhouse is defective;

181.    The defects in the interior of the Clubhouse include: the failure to install attic access in violation of IBC 2000 Section 1208.2; the inadequacy of the ventilation of the attic space above the interior pool and spa, and; the exterior windows and doors are leaking.

182.    The defects in the Clubhouse interior are caused by negligent design and planning, poor workmanship, improper supervision during construction and carelessness during installation and during remediation attempts.

23

183.    The interior clubhouse defects violate industry standards, New Jersey statutes and regulations, the manufacturer's specifications and installation instructions;

184.    The defects in the interior of the Clubhouse shall also include any other defects revealed throughout the course of discovery or ultimately proven at the time of trial;

185.    Correction of the interior defects in the Clubhouse will cost the Association at least $850.00, constituting damage to the Association caused by defects in original construction.

**RECREATIONAL FACILITIES – TENNIS COURTS**

186.    There are two tennis courts in the Community.

187.    Both tennis courts are defective in that there are cracks that have extended below the surface course, cracks at the entry gate and cracks at the base of the poles supporting the perimeter chain link fence.

188.    The defects are caused by poor workmanship and carelessness during installation including but not limited to improper installation of the post footings, improper grading and finishing of the court's asphalt surface during construction and failure to comply with the design drawings and installation guidelines of the American Sports Builders Association.

189.    The defects in the tennis courts shall also include any other defects revealed throughout the course of discovery or ultimately proven at the time of trial;

**CONCRETE DEFECTS**

190.    At various locations throughout the Community the concrete sidewalks and patio slabs and walkways are defective;

191.    At various locations throughout the Community the concrete sidewalks violate N.J.A.C. 5:21-4.18;

192.    The defects consist of cracked sections of concrete sidewalks, a cracked concrete slab

24

in the gazebo and mismatched slabs on the patio and walkways.

193.    The defects in the concrete are caused by poor workmanship and carelessness during installation or repair by the Developer; including but not limited to inadequate or improperly compacted base material, utilization of a concrete mix with insufficient compressive strength or overfinishing during installation.

194.    The defects in the concrete sidewalks violate industry standards, the manufacturer's installation instructions and N.J.A.C. 5:21-4.8;

195.    The defects in the concrete installed throughout the Community shall also include any other defects revealed throughout the course of discovery or ultimately proven at the time of trial;

196.    Correction of the concrete defects throughout the Community will cost the Association at least $19,000.00, constituting damage to the Association caused by defects in original construction.

**DRAINAGE DEFECTS**

197.    At various locations throughout the Community, the drainage is defective.

198.    The drainage defects include a cracked and damaged drainpipe in wet pond "B", the lack of drainage for certain retaining wall(s) within the Community and compromised underground stormwater drainage pipes which are causing sinkholes throughout the Community.

199.    The defective drainage violates, among other things, N.J.A.C. 5:21-7.3 and Chapter 16 of IBC 2000.

200.    The defects in the drainage are caused by poor workmanship, carelessness during installation and failure to comply with design and topography drawings;

25

201. The defects in grading and drainage violate industry standards, the manufacturer's installation instructions and N.J.A.C. 5:23-3.6;

202. The defects in the grading and drainage throughout the Community shall also include any other defects revealed throughout the course of discovery or ultimately proven at the time of trial;

203. Correction of the drainage defects throughout the Community will cost the Association at least $400,000.00, constituting damage to the Association caused by defects in original construction.

**UNDERGROUND DOWNSPOUT COLLECTION PIPE DEFECTS**

204. The underground piping collecting and managing stormwater runoff from the gutters and downspouts throughout the Community is defective.

205. The underground piping collecting and managing stormwater runoff from the gutters and downspouts throughout the Community is defective because the Developer and the Developer's Agents failed to install cleanouts on the underground piping connecting all of the roof leaders throughout the Community.

206. The Developer's and the Developer's Agents' failure to install cleanouts on the underground piping connecting all of the roof leaders throughout the Community is a construction defect because it violates the building code.

207. The Developer's and the Developer's Agents' failure to install cleanouts on the underground piping connecting all of the roof leaders throughout the Community is a construction defect because it violates the applicable manufacturers installation instructions.

208. The Developer's and the Developer's Agents' failure to install cleanouts on the underground piping connecting all of the roof leaders throughout the Community is a construction defect because it violates the applicable industry standards.

209. The Developer's and the Developer's Agents' failure to install cleanouts on the underground piping connecting all of the roof leaders throughout the Community was caused by poor workmanship, carelessness during installation and failure to comply with design and topographic drawings;

210. The Association is damaged by the Developer's and the Developer's Agents' failure to install cleanouts on the underground piping connecting all of the roof leaders throughout the Community in the amount it will cost the Association to correct these defects and any other damage caused by these defects.

211. The defects in the installation of the underground piping connecting all of the roof leaders throughout the Community shall also include any other defects revealed throughout the course of discovery or ultimately proven at the time of trial;

212. Correction of the underground piping connecting all of the roof leaders throughout the Community defects will cost the Association at least $600,000.00, constituting damage to the Association caused by defects in original construction.

**LANDSCAPING DEFECTS**

213. Landscaping throughout the Community is defective.

214. Landscaping throughout the Community is defective because the Developer and the Developer's Agents improperly installed or failed to install the landscaping in various locations throughout the Community.

27

215.    The improperly installed or uninstalled landscaping throughout the Community is a construction defect because it violates the plans and specifications for the Community.

216.    The improperly installed or uninstalled landscaping throughout the Community is a construction defect because it violates the applicable industry standards;

217.    The Developer's and the Developer's Agents' failure to install the landscaping properly, or omission of the landscaping was caused by poor workmanship, carelessness during installation and failure to comply with design drawings;

218.    The Association is damaged by the Developer's and the Developer's Agents' failure to install the landscaping properly, or omission of the landscaping in the amount it will cost the Association to correct these defects and any other damage caused by these defects.

219.    The defects in the installation of the landscaping shall also include any other defects revealed throughout the course of discovery or ultimately proven at the time of trial;

220.    Correction of the landscaping defects throughout the Community will cost the Association at least $46,000.00, constituting damage to the Association caused by defects in original construction.

221.    The conditions described in PARTIES AND BACKGROUND, Paragraphs 75 through 220, shall hereinafter be collectively known as the "CONSTRUCTION DEFECT FACTS";

222.    The "CONSTRUCTION DEFECT FACTS" shall also include any other defects in the construction of the Community that are revealed throughout the course of discovery or ultimately proven at the time of trial;

## **FINANCING DEFECTS**

223.    The Association is governed by PREDFDA, the PRED Regs, the Nonprofit Act and the Governing Documents;

224.     Pursuant to <u>N.J.S.A.</u> §45:22A-43, while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees owed a duty to the Association to maintain, repair, replace, clean and sanitize the Common Elements;

225.     Pursuant to <u>N.J.S.A.</u> §45:22A-44(a) and <u>N.J.A.C.</u> §5:26-8.2(b), which incorporates the Declaration of Restrictive and Protective Covenants and Bylaws by reference, while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees owed a duty to the Association to discharge the Association's powers in a manner that protected and furthered the health, safety and general welfare of the residents of the Community;

226.     Pursuant to <u>N.J.S.A.</u> §45:22-45, which incorporates the Declaration of Restrictive and Protective Covenants and Bylaws by reference, while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees owed a duty to the Association to cause the General and Limited Common elements to be maintained according to accepted standards and on behalf of the Association;

227.     Contrary to <u>N.J.S.A.</u> §45:22A-43, while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees failed to maintain, repair, replace, clean and sanitize the Common Elements;

228.     Contrary to <u>N.J.A.C.</u> §5:26-8.2(b) and <u>N.J.S.A.</u> §45:22A-44(a), which incorporates the Declaration of Restrictive and Protective Covenants and Bylaws by reference, while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees failed to discharge the Association's powers in a manner that protected and furthered the health, safety and general welfare of the residents of the Community;

229.     Contrary to <u>N.J.S.A.</u> §45:22A-45, which incorporates the Declaration of Restrictive

29

and Protective Covenants and Bylaws by reference, while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees failed to cause the General and Limited Common elements to be maintained according to accepted standards and on behalf of the Association;

230.    Pursuant to N.J.S.A. §45:22A-46(c), while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees owed a duty to the Association to assess and collect funds for common expenses and the payment thereof;

231.    Pursuant to N.J.A.C. §5:26-8.7(a), while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees owed a duty to the Association to prepare and adopt an operating budget, prior to making an annual assessment, which provided for any and all common expenses to be incurred during the year as well as adequate reserves for repair and replacement of the common elements and facilities;

232.    Pursuant to N.J.A.C. §5:26-8.7(b) the Developer was prohibited against making any contribution that artificially lowered the Association's budget;

233.    Pursuant to N.J.A.C. §5:26-8.7(b) the Developer was required to disclose, in the public offering statement, that it was making contributions that artificially lowered the Association's budget;

234.    Pursuant to N.J.A.C. §5:26-8.6 the Developer was required pay all of the expenses of the common elements and facilities until such time as the Association has made a common expense assessment and then the developer was required to pay assessments for common expenses pursuant to N.J.A.C. §5:26-8.6(b).

235.    The Developer represented in the Governing Documents that:

The Developer has reserved the right, but is not obligated, while in control of the

Association, to subsidize, in whole or in part, any deficit between the actual operating expenses of the Association and the Annual Common Expenses Assessments assessed against homes conveyed by the Developer.

236.    While the Developer and the Developer's Trustees controlled the Association, they had a fiduciary responsibility to prepare and adopt an adequate budget and to adequately compensate the Association for the benefit the homes derived, while under construction, from the operating items, including reserves which were included in the Association's annual budget.

237.    Contrary to N.J.A.C. §5:26-8.7(a) while the Developer and Developer's Trustees controlled the Association, the Developer and Developer's Trustees failed to prepare and adopt an operating budget, prior to making an annual assessment, which provided for any and all common expenses to be incurred during the year as well as adequate reserves for repair and replacement of the common elements and facilities;

238.    Contrary to N.J.A.C. §5:26-8.7(b) the Developer made contributions that artificially lowered the Association's budget;

239.    Contrary to N.J.A.C. §5:26-8.7(b) the Developer failed to disclose in the public offering statement that it was making contributions that artificially lowered the Association's budget;

240.    Contrary to N.J.A.C. §5:26-8.6 the Developer failed to pay all of the expenses of the common elements and facilities until such time as the Association has made a common expense assessment and then the developer failed to pay assessments for common expenses pursuant to N.J.A.C. §5:26-8.6(b).

241.    The Developer and Developer's Trustees failed to prepare and adopt a budget that provided adequate reserve funding for repair and replacement of the common elements and

31

facilities.

242.    The Developer and Developer's Trustees failed to prepare and adopt a budget that provided adequate deferred maintenance funding for repair and replacement of the common elements and facilities.

243.    The Developer and Developer's Trustees failed to prepare and adopt a budget that provided adequate operating funding for repair and replacement of the common elements and facilities.

244.    The matters described in PARTIES AND BACKGROUND, Paragraphs 223 through 243, shall hereinafter be collectively known as the "FINANCING DEFECT FACTS";

245.    The "FINANCING DEFECT FACTS" shall also include any other defects in the financing of the Community that are revealed throughout the course of discovery or ultimately proven at the time of trial;

### DEVELOPER'S MISREPRESENTATIONS

246.    The Developer and the Developer's Trustees made material misrepresentations;

247.    The Association is governed by PREDFDA, the PRED Regs, the Nonprofit Act and the Governing Documents;

248.    The Developer and the Developer's Trustees misrepresented that the Association would exist as a separate and distinct legal entity and not merely as an arm of the Developer;

249.    The Developer and the Developer's Trustees misrepresented that the Association would be operated by a board and officers made up of fiduciaries with duties of loyalty and good faith to the Association and its membership and not to the Developer;

250.    The Developer and the Developer's Trustees misrepresented that Association funds would be used to pay only the appropriate and proper expenses of the Association not those

expenses that are properly the Developer's expenses;

251.    The Developer and the Developer's Trustees misrepresented that the Developer would comply with PREDFDA and all other applicable laws and standards with respect to the creation, development, sale of units within, and operation of, the Association even though it did, and intended to, fail to pay to the Association its proportionate share of the Association's common expenses;

252.    The Developer and the Developer's Trustees misrepresented that, while it controlled the Association and the Board, it would comply with PREDFDA and all other applicable laws and standards of conduct even though:  (1) it did, and intended to, fail to collect from itself its proportionate share of the Association's common expenses from the Developer; (2) it created, adopted and distributed budgets, which generated a reserve deficiency and which led purchasers to believe that the assessments due from homeowners would be less than they should have been, less than was reasonably necessary to fund the Association and less than they really are; and, (3) failed to properly oversee the conduct of the Developer's Agents;

253.    The Developer and the Developer's Trustees misrepresented in its Governing Documents that the Association Budget would reflect the estimated costs for the operation, repair, replacement and maintenance of the Common Property and operation of the Association.

254.    The Developer and the Developer's Trustees misrepresented in its Governing Documents that the Association would discharge its powers in a manner that protected and furthered the health, safety and general welfare of the Community;

255.    The Developer and the Developer's Trustees misrepresented in its Governing Documents that nothing contained in the documents will serve to exculpate members of the

Board appointed by the Sponsor from their fiduciary responsibilities.

256.    The Developer and the Developer's Trustees misrepresented in its Governing Documents that the budget includes the monthly reserve assessment  for the repair and replacement of Common Property.

257.    The Developer and the Developer's Trustees misrepresented in its Governing Documents that reserves for replacement of Common Property and facilities will form a part of and be included in the budget.

258.    The developer and the Developer's Trustees misrepresented in its Governing Documents that any working capital contribution collected from purchasers at closing would be available to the Association for repair and replacement and/or deferred maintenance reserve, and/or working capital reserve.

259.    The Developer represented that the Community is in compliance with all applicable ordinances and governmental regulations.

260.    The Developer and the Developer's Trustees misrepresented that the Developer would promptly repair or correct any defect in construction, materials or workmanship in the Association's Improvements within a reasonable time after notification of the defect.

261.    The Developer represented in its Public Offering Statement that it has neither knowingly omitted any material fact and/or made any untrue statement of material fact.

262.    The Developer represented in its Public Offering statement that to the best of its knowledge, information and belief the statements and representations contained in the Public Offering Statement are true and accurate.

263.    The Developer warranted in its Public Offering Statement that it would comply with the provisions of the New Jersey New Home Warranty and Builder's Registration Act

34

(<u>N.J.S.A.</u> 46:3B-1 <u>et</u>. <u>seq</u>.) and that the Developer will enroll each Home, at or prior to closing, in an approved warranty security plan and shall pay all requisite fees/premiums for such coverage.

264.    The Developer failed to register as a New Home Builder as required by <u>N.J.S.A.</u> 46:3B-1 <u>et</u> <u>seq</u>. and failed to provide an approved warranty plan.

265.    The Developer represented in its Public Offering Statement that any driveways, walkways, patios, retaining walls and fences constructed shall be free of substantial defects in material and workmanship.

266.    The Developer represented in its Public Offering Statement that all drainage is proper and adequate and that off-site improvements, if any, will be free from defects.

267.    The Developer represented in its Public Offering Statement that all common facilities are fit for its intended use, will be free of construction defects, and that the Developer shall repair or correct any defects after notification of the defect.

268.    The Association did not exist as a separate and distinct legal entity from the Developer until such time as it was composed of a majority of the residents.

269.    The Association was used as an arm of the Developer;

270.    The Association was not operated by a board and officers made up of fiduciaries who honored their duties of loyalty and good faith to the Association and its membership;

271.    Instead, the Sponsor Trustees consisting of a Developer-appointed Board and Officers were loyal to the Developer, acted in the best interests of the Developer and acted in bad faith toward the Association;

272.    The Developer-appointed Board and Officers engaged in conduct resulting in improper benefit to themselves and the Developer;

35

273.     Association funds were not used to pay the appropriate and proper expenses of the Association;

274.     Association funds were used to pay expenses that are properly the Developer's expenses;

275.     The Developer failed to comply with PREDFDA and all other applicable laws and standards with respect to the creation, development, sale of units within, and operation of, the Association;

276.     The Developer failed to pay to the Association its proportionate share of the Association's common expenses;

277.     The Developer created, adopted and distributed budgets to Association members, which generated a reserve deficiency which led purchasers to believe that the assessments due from homeowners would be less than they should have been, less than was reasonably necessary to fund the Association and less than they really are;

278.     The Developer failed to properly oversee the conduct of the Developer's Agents;

279.     The Developer knew of defects in the buildings, Common Elements and facilities when it was selling units, which purchasers could not determine by a reasonable inspection;

280.     The Developer has not promptly repaired or corrected defects in construction, materials or workmanship in the Association's Improvements within a reasonable time after notification of the defect.

281.     The Developer misrepresented that the clubhouse was constructed in accordance with the plans and documents filed with the Township of Manchester when certificates of occupancy were issued, when in fact, the clubhouse was not constructed in accordance with the plans and documents submitted to the Township.

36

282. The matters described in PARTIES AND BACKGROUND Paragraphs 246 through 281 shall hereinafter be collectively known as the "DEVELOPER'S MISREPRESENTATIONS FACTS";

283. The DEVELOPER'S MISREPRESENTATIONS FACTS shall also include any other facts demonstrating how Developer made misrepresentations in conjunction the development, marketing, advertising or sale of the homes throughout the Community that may be revealed throughout the course of discovery or ultimately proven at the time of trial;

## DECEPTIVE ADVERTISING

284. The Developer Defendants used patently false and misleading advertising materials to sell homes within the Community.

285. The Developer misrepresented that the Association would exist as a separate and distinct legal entity and not merely as an arm of the Developer;

286. The Developer misrepresented that the Association would be operated by a board and officers made up of fiduciaries with duties of loyalty and good faith to the Association and its membership and not to the Developer;

287. The Developer misrepresented that Association funds would be used to pay only the appropriate and proper expenses of the Association not those expenses that are properly the Developer's expenses;

288. The Developer misrepresented that the Developer would comply with PREDFDA and all other applicable laws and standards with respect to the creation, development, sale of units within, and operation of, the Association even though it did, and intended to, fail to pay to the Association its proportionate share of the Association's common expenses;

289. The Developer misrepresented that, while it controlled the Association and the Board

37

it would comply with PREDFDA and all other applicable laws and standards of conduct even though: (1) it did, and intended to, fail to collect from itself its proportionate share of the Association's common expenses from the Developer; (2) it created, adopted and distributed budgets, which generated a reserve deficiency and which led purchasers to believe that the assessments due from homeowners would be less than they should have been, less than was reasonably necessary to fund the Association and less than they really are; (3) failed to post a fidelity bond or other guarantee in an amount equal to the annual budget and including accumulated reserves and, (4) failed to properly oversee the conduct of the Developer's Agents;

290.    The Developer misrepresented that the Association would discharge its powers in a manner that protected and furthered the health, safety and general welfare of the Community;

291.    The Developer misrepresented that any working capital contribution collected from purchasers at closing would be used strictly for working capital;

292.    The Developer misrepresented that there were no known defects in the buildings in which it was selling units, nor in the Common Elements and facilities.

293.    The Developer and the Developer's Trustees misrepresented that the Developer would promptly repair or correct any defect in construction, materials or workmanship in the Association's Improvements within a reasonable time after notification of the defect;

294.    The Developer misrepresented material facts as set forth in the "DEVELOPER'S MISREPRESENTATIONS FACTS";

295.    The Association did not exist as a separate and distinct legal entity from the Developer;

296.    The Association was used as an arm of the Developer;

38

297.    The Association was not operated by a board and officers made up of fiduciaries who honored their duties of loyalty and good faith to the Association and its membership;

298.    Instead, the Developer's Trustees consisting of the Developer appointed Board and Officers were loyal to the Developer, acted in the best interests of the Developer and acted in bad faith toward the Association;

299.    The Developer appointed Board and Officers engaged in conduct resulting in improper benefit to themselves and the Developer;

300.    Association funds were not used to pay the appropriate and proper expenses of the Association;

301.    Association funds were used to pay expenses that are properly the Developer's expenses;

302.    The Developer failed to comply with PREDFDA and all other applicable laws and standards with respect to the creation, development, sale of units within, and operation of, the Association;

303.    The Developer failed to pay to the Association its proportionate share of the Association's common expenses;

304.    The Developer failed to properly oversee the conduct of the Developer's Agents;

305.    The Developer knew of defects and deficiencies in the buildings, the Common Elements and Facilities, and areas located behind the homes, when it was selling units.

306.    The Developer has not promptly repaired or corrected defects in construction, materials or workmanship in the Association's Improvements within a reasonable time after notification of the defect;

307.    Through advertising and marketing materials, the Developer Defendants, their

Principals and the Developer Trustees made numerous misrepresentations to the public regarding the Community and their experience and qualifications.

308. Through advertising and marketing materials, the Developer Defendants, their Principals and the Developer Trustees misrepresented to the public that they were a licensed home builder.

309. Through advertisement and marketing materials, including but not limited to the trade name used to market the Community, River Pointe by De Webb and the website www.delwebb.com, the Developer Defendants represented to the public that Del Webb is the builder/developer of the Community.

310. Through advertising and marketing materials including but not limited to the website utilized to market the River Pointe Community, www.delwebb.com, the Developer Defendants represented to potential homebuyers that they "would get the benefit of more than six decades of homebuilding experience" and "Over 65 years of experience go into building of every Del Webb home".

311. Through advertising and marketing materials, the Developer Defendants represented that Del Webb would ensure that the construction in the Community would meet high construction standards and would be backed by a warranty you can rely on.

312. Contrary to these multiple and continuous representations, none of the Developer Defendants registered as New Home Builders with the State of New Jersey as required by N.J.S.A. 46:3B-12.

313. Contrary to these multiple and continuous representations, Pulte Homes of NJ, who issued the Public Offering Statement and obtained construction permits for building the Community has only been in existence since 2000.

314. Contrary to these multiple and continuous representations, the construction in the Community did not meet the Del Webb Performance Standards.

315. Upon information and belief, the developer Defendants and their Principals controlled the marketing, advertising and sale of the Community.

316. Upon information and belief, the advertisements and marketing materials described above were developed and approved by the Developer Defendants and their Principals.

317. Upon information and belief, the Developer Defendants and their Principals agreed upon the nature and content of the advertisements and marketing materials described above.

318. Upon information and belief, the advertisements and marketing materials were created, approved, placed and distributed to potential homebuyers by the Developer Defendants and their Principals.

319. The matters described in PARTIES AND BACKGROUND Paragraphs 284 through 318 shall hereinafter be collectively known as the "DECEPTIVE ADVERTISING FACTS";

320. The DECEPTIVE ADVERTISING FACTS shall also include any other facts demonstrating how the Developer distributed or published deceptive advertising in conjunction the development, marketing, advertising or sale of the homes throughout the Community that may be revealed throughout the course of discovery or ultimately proven at the time of trial.

321. PARTIES AND BACKGROUND Paragraphs 1 through 320 shall hereinafter be collectively known as the "PARTIES AND BACKGROUND FACTS";

## PIERCING THE CORPORATE VEIL

322. Plaintiff repeats and realleges the factual allegations contained in the PARTIES AND BACKGROUND FACTS as if same were set forth fully herein at length.

41

323.    The Community was developed by Defendant Pulte Homes of NJ, Limited

Partnership, t/a Del Webb according to the Public Offering Statement issued to prospective

purchasers.

324.    The Community was marketed as River Pointe by Del Webb.

325.    Del Webb is brand name utilized by Pulte Group, Inc.

326.    In its Annual Report issued to its shareholders, Pulte Group, Inc. states that it is one of

America's largest homebuilding companies with operations in approximately 50 markets

throughout the country.

327.    Pulte Group, Inc. claims that through its brand portfolio that includes Centex, Pulte

Homes, Del Webb and DiVosta Homes and John Wieland Homes and Neighborhoods, Pulte

Group, Inc. is one of the industry's most versatile homebuilders.

328.    Del Webb Corporation is identified as a subsidiary of Pulte Group, Inc. in its Annual

Report.

329.    A New Home Limited Warranty and Performance Standards was available to home

purchasers in the River Pointe by Del Webb Community.  The warranty booklet provided to

purchasers states: "This section provides a general overview of the Pulte Group (Pulte

Homes, Centex, Fox & Jacobs, and Divosta or Del Webb as applicable ) Home Protection

Plan, which consists of the Limited Warranty and the Performance Standards (collectively

referred to herein as the "Warranty") provided by Pulte Group (Pulte Homes, Centex, Fox &

Jacobs, and Divosta or Del Webb as applicable) through the building subsidiary identified in

your purchase agreement for the home (the "Builder").  This provision indicates that Pulte

Group, Inc. is providing and will back the warranty thorough its subsidiary.

330.    A Builders Limited Warranty administered by Professional Warranty Service

Corporation was also made available to home buyers, however the Builder is not identified.

331.    The Del Webb Build Quality Experience brochure that was provided to home buyers and prospective home buyers in the River Pointe by De Webb Community, was issued by Pulte Home Corporation.

332.    Del Webb Corporation is an alter ego of Pulte Group, Inc.

333.    Pursuant to N.J.S.A. 45:22A-23, Del Webb Corporation is a Developer of the River Pointe by Del Webb Community.

334.    Pulte Group, Inc. controls and dominates Del Webb Corporation.

335.    Pulte Group, Inc. controlled the marketing and operations of Pulte Homes of NJ, a Limited Partnership, t/a Del Webb and Del Webb Corporation.

336.    The use of the name Pulte Homes of NJ t/a Del Webb and the marketing material including websites utilized to sell homes in the River Pointe Community led home buyers and prospective home buyers to believe that they were dealing with Del Webb Corporation and Pulte Group, Inc.

337.    Pulte Homes of NJ t/a Del Webb and Del Webb Corporation had no separate existence from Pulte Group, Inc.

338.    Pulte Group, Inc. disregarded the corporate form of Pulte Homes of NJ t/a Del Webb and Del Webb Corporation.

339.    Pulte Homes of NJ t/a Del Webb and Del Webb Corporation's officers and directors were shared in common with Pulte Group, Inc.

340.    The matters described in Paragraphs 322 through 339 shall hereinafter be collectively known as the "PIERCING CORPORATE VEIL FACTS".

341.    The PIERCING CORPORATE VEIL FACTS shall also include any other conduct the

Association identifies throughout the course of discovery, or ultimately proves at the time of trial demonstrating why the corporate form for these entities should be pierced and/or establishing that Pulte Homes of NJ t/a Del Webb and Del Webb Corporation are each an alter ego of Pulte Group, Inc.

342.     The matters described in Paragraphs 1 through 341 shall hereinafter be collectively known as the "FACTS".

## COUNT 1 - NEGLIGENCE

343.     The PARTIES AND BACKGROUND FACTS are incorporated by reference as if fully set forth herein;

344.     The Developer had a duty to design, develop, construct, improve and/or budget for the Community and the Association's Improvements free of defects;

345.     The Developer had a duty to design, develop, construct improve and/or budget for the Community and the Association's Improvements in accordance with the standards and/or requirements of the plans and/or specifications approved by the Township of Manchester.

346.     The Developer had a duty to design, develop, construct improve and/or budget for the Community and the Association's Improvements in accordance with the standards and/or requirements of the plans and/or specifications utilized by the Developer and/or the Developer's Agents (the "Specifications");

347.     The Developer had a duty to design, develop, construct improve and/or budget for the Community and the Association's Improvements in accordance with the Governing Documents;

348.     The Developer had a duty to design, develop, construct improve and/or budget for the Community and the Association's Improvements in accordance with New Jersey's Uniform

44

Construction Code (the "Code");

349.    The Developer had a duty to design, develop, construct improve and/or budget for the Community and the Association's Improvements in accordance with all applicable state and local codes, regulations and ordinances, industry standards as well as all applicable standards of care (the "Standards");

350.    The Developer, directly, or through its general contractor and/or sub-contractors had a duty to supervise the Developer's Agents that performed work in regard to the Association's Improvements;

351.    The Developer's Agents had a duty to design, develop, construct improve and/or budget for the Community and the Association's Improvements free of defects, in accordance with the Specifications, the Governing Documents, the Code and the Standards;

352.    The Developer and the Developer's Agents failed to design, develop, construct improve and/or budget for the Association's Improvements free from defects, in accordance with the Specifications, the Governing Documents, the Code and the Standards;

353.    The Developer and the Developer's Agents failed to design, develop, construct improve and/or budget for the Association's Improvements free from defects, in accordance with the Specifications, the Governing Documents, the Code and the Standards as described in the CONSTRUCTION DEFECT FACTS;

354.    The Developer and the Developer's Agents failed to design, develop, construct improve and/or budget for the Association's Improvements free from defects, in accordance with the Specifications, the Governing Documents, the Code and the Standards as described in the FINANCING DEFECT FACTS;

355.    The Developer failed to supervise the Developer's Agents to prevent the failings

discussed above;

356. The Developer and the Developer's Agents failed to discover said defects and/or failed to remedy defects that they collectively and/or individually did discover;

357. As a direct and proximate result of the breach of their legal duty by Developer and the Developer's Agents the Association sustained damages that have caused, and will in the future cause, the Association to expend substantial sums of money to complete, alter, correct, fix, cure, remedy, rectify, repair, replace, service and/or adjust the Association's Improvements;

358. Pursuant to <u>N.J.S.A.</u> §45:22A-45(c), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts and/or omissions;

359. Pursuant to <u>N.J.A.C.</u> §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the owners for their acts and/or omissions;

360. Pursuant to <u>N.J.S.A.</u> §45:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

361. Pursuant to <u>N.J.S.A.</u> §45:22A-44, the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted directly by the unit owners individually;

**WHEREFORE**, the Association demands judgment against Developers, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

    a.    Compensatory, consequential, incidental, and statutory damages;

    b.    Interest;

      c.      Attorney fees and costs; and

      d.      Such other relief as is equitable, appropriate and just.

**COUNT 2 - BREACH OF EXPRESS WARRANTY**

362.    The PARTIES AND BACKGROUND FACTS and the allegations of Count 1 are incorporated by reference as if fully set forth herein;

363.    The Developer made certain express warranties in the individual purchase agreements signed by the Association's members that the Association's Common Property and Improvements would be free from defects, conform to the Specifications, the Governing Documents, PREDFDA, the PRED Regs, the Code, all applicable state and local codes, regulations and ordinances, the Standards and be fit for their intended use;

364.    The Developer made certain express warranties in the Public Offering Statement distributed to the Association's members that the Association's Common Property and Improvements would be free from defects, conform to the Specifications, the Governing Documents, PREDFDA, the PRED Regs, the Code, all applicable state and local codes, regulations and ordinances, the standards and/or requirements of the plans and/or specifications approved by the Township of Manchester, and the Standards and be fit for their intended use;

365.    The Developer warranted that all driveways, walkways, patios, retaining walls and fences located on the property shall be free from defects due to materials and workmanship;

366.    The Developer warranted that all drainage is proper and adequate;

367.    The Developer warranted that all off-site improvements are free from defects;

368.    The Developer warranted that all lots, parcels, units or interests are fit for their intended use;

47

369. The Developer warranted that any lot, parcel, unit or interest or common facility will substantially conform to the model, description or plans;

370. The Developer warranted that the construction of all improvements to the common elements would be free from defects in workmanship or materials;

371. The Developer warranted that the construction of all Common Property and improvements to the common elements were fit for their intended use;

372. The Developer is obligated to promptly repair or correct any defect in construction, materials or workmanship in said improvements (within a reasonable time after notification of the defect);

373. The Developer's Agents made express warranties to the Developer (either directly or through another) that their work would be free from defects, conform to the Plans and Specifications, the Governing Documents, PREDFDA, the PRED Regs, the Code, all applicable state and local codes, regulations and ordinances, the standards and/or requirements of the plans and/or specifications approved by the Township of Manchester, and the Standards and be fit for their intended use;

374. When the Developer made the warranties described herein, it was extremely likely that the Association and the individual unit owners would be seriously harmed as a result of the Developer's breach of these warranties;

375. The Developer was fully aware of the reckless disregard of the likelihood that serious harm would befall the Association and the individual unit owners as a result of its breach of the warranties described herein;

376. The Developer, upon learning that its breach of warranty was likely to cause harm to the Association and to individual unit owners, continued in its actions with disregard for the

48

harm likely to result to the Association and to the individual units owners who relied upon the Developer's warranties;

377.    The Developer continued to breach the warranties it made throughout the construction and development of the Association's Improvements;

378.    The Developer benefited financially by breaching its warranties by, among other things, lowering its costs to construct and develop the Association's Improvements;

379.    The Association is a third-party beneficiary of all warranties made by the Developer's Agents to the Developer;

380.    The Association's Improvements are defective as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

381.    The Association's Improvements do not conform to the Specifications as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

382.    The Association's Improvements do not conform to the Governing Documents as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

383.    The Association's Improvements do not conform to PREDFDA as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

384.    The Association's Improvements do not conform to the PRED Regs as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

385.    The Association's Improvements do not conform to the Code as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

386.    The Association's Improvements do not conform to all applicable state and local codes, regulations and ordinances as described in the CONSTRUCTION DEFECT FACTS

and the FINANCING DEFECT FACTS;

387.   The Association's Improvements do not conform to the standards and/or requirements of the plans and/or specifications approved by Township of Manchester as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

388.   The Association's Improvements do not conform to the Standards as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

389.   The Association's Improvements are not fit for their intended use as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

390.   Driveways, walkways, entryway stoops, decks, patios and retaining walls located on the property have defects due to materials and workmanship as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

391.   Drainage is improper and inadequate as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

392.   Lots, parcels, units or interests are not fit for their intended use as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

393.   Lots, parcels, units or interests or common facilities do not substantially conform to the model, description or plans as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

394.   Improvements to the common elements have defects in workmanship or materials as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

395.   Improvements to the common elements are not fit for their intended use as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

396.    Work performed by the Developer's Agents is defective as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

397.    Work performed by the Developer's Agents does not conform to the Specifications as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

398.    Work performed by the Developer's Agents does not conform to the Governing Documents as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

399.    Work performed by the Developer's Agents does not conform to PREDFDA as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

400.    Work performed by the Developer's Agents does not conform to the PRED Regs as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

401.    Work performed by the Developer's Agents does not conform to the Code as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

402.    Work performed by the Developer's Agents does not conform to all applicable state and local codes, regulations and ordinances as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

403.    Work performed by the Developer's Agents does not conform to the plans and/or specifications approved by Township of Manchester as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

51

404. Work performed by the Developer's Agents does not conform to the Standards as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

405. Work performed by the Developer's Agents is not fit for its intended use as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

406. Despite receiving notice of the defects described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS the Developer failed to promptly repair or correct the defects in construction, materials or workmanship in said improvements within a reasonable time;

407. Despite demand, the Developer and the Developer's Agents failed to remedy, rectify, repair or otherwise cure the defects described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

408. As a direct and proximate result of the breach of the express warranties as described above, the Association sustained damages and has expended, and will in the future expend, substantial sums to complete, alter, correct, cure, fix, remedy, rectify, repair, construct, replace, service and/or adjust the Association's Improvements;

409. Pursuant to N.J.S.A. §45:22A-45(c), the Developer and the Developer's Trustees are liable as fiduciaries to the owners for their acts and/or omissions;

410. Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the owners for their acts and/or omissions;

411. Pursuant to N.J.S.A. §45:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

52

412.    Pursuant to <u>N.J.S.A.</u> §45:22A-44(d), the Association may assert the tort claims concerning the common elements and facilities of the development as if the claims were asserted directly by the unit owners individually;

**WHEREFORE**, the Association demands judgment against the Developers, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

     a.       Compensatory, consequential, incidental, statutory and punitive damages;

     b.       Interest;

     c.       Attorney fees and costs; and

     d.       Such other relief as is equitable, appropriate and just.

## <u>COUNT 3 - BREACH OF IMPLIED WARRANTY</u>

413.    The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 2 are incorporated by reference as if fully set forth herein;

414.    The Developer and the Developer's Agents impliedly warranted to the Association and its members that the Association's Improvements would be free from defects, conform to the Specifications, the Governing Documents, PREDFDA, the PRED Regs, the Code, all applicable state and local codes, regulations and ordinances, the standards and/or requirements of the plans and/or specifications approved by the Township of Manchester, and the Standards and be fit for their intended use;

415.    When the Developer made the warranties described herein, it was extremely likely that the Association and individual unit owners would be seriously harmed as a result of the Developer's breach of those warranties;

416.    The Developer was fully aware of the reckless disregard of the likelihood that serious

harm would befall the Association and individual unit owners as a result of its breach of the warranties described herein;

417. The Developer, upon learning that its breach of warranty was likely to cause harm to the Association and to individual unit owners, continued in its actions with disregard for the harm likely to result to the Association and to individual unit owners who relied upon the Developer's warranties;

418. The Developer continued to breach the warranties it made throughout the construction and development of the Association's Improvements;

419. The Developer benefited financially by breaching its warranties by, among other things, lowering its costs to construct and develop the Association's Improvements;

420. The Association is a third-party beneficiary of all warranties implied via the Developer's Agents' performance for the Developer;

421. The Developer and the Developer's Agents failed to provide the Association's Improvements free from defects, in conformity with the Specifications, the Governing Documents, the Code, all applicable state and local codes, regulations and ordinances, the Standards and fit for their intended purposes;

422. The Association's Improvements are defective as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

423. The Association's Improvements do not conform to the Specifications as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

424. The Association's Improvements do not conform to the Governing Documents as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

425.   The Association's Improvements do not conform to PREDFDA as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

426.   The Association's Improvements do not conform to the PRED Regs as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

427.   The Association's Improvements do not conform to the Code as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

428.   The Association's Improvements do not conform to all applicable state and local codes, regulations and ordinances as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

429.   The Association's Improvements do not conform to the standards and/or requirements of the plans and/or specifications approved by Township of Manchester as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

430.   The Association's Improvements do not conform to the Standards as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

431.   The Association's Improvements are not fit for their intended uses as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

432.   Driveways, walkways, entryway stoops, decks, patios and retaining walls located on the property have defects due to materials and workmanship as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

433.   Drainage is improper and inadequate as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

434.   Lots, parcels, units or interests are not fit for their intended use as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

55

435.    Lots, parcels, units or interests or common facilities do not substantially conform to the model, description or plans as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

436.    Improvements to the common elements have defects in workmanship or materials as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

437.    Improvements to the common elements are not fit for their intended use as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

438.    Despite demand, the Developer and the Developer's Agents failed to remedy, rectify, repair, replace or cure their above-described failures;

439.    As a direct and proximate result of the breach of the implied warranties as described above, the Association sustained damages and has expended, and will in the future expend, substantial sums to complete, alter, correct, cure, fix, remedy, rectify, repair, construct, replace, service and/or adjust the Association's Improvements;

440.    Pursuant to N.J.S.A §45:22A-45(c), the Developer and the Developer's Trustees are liable as fiduciaries to the owners for their acts and/or omissions;

441.    Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the owners for their acts and/or omissions;

442.    Pursuant to N.J.S.A. §44:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

**WHEREFORE**, the Association demands judgment against the Developers, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the

alternative as follows:

    a.      Compensatory, consequential, incidental, statutory and punitive damages;

    b.      Interest;

    c.      Attorney fees and costs; and

    d.      Such other relief as is equitable, appropriate and just.

<h2 style="text-align:center;"><u>COUNT 4 - STRICT LIABILITY</u></h2>

443.    The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 3 are incorporated by reference as if fully set forth herein;

444.    The Association's Improvements are appurtenant to, or are, mass-produced homes;

445.    The Association's Improvements were improperly designed, developed, constructed and/or were installed with defective materials as described in the CONSTRUCTION DEFECT FACTS;

446.    The Association's Improvements are defective as described in the CONSTRUCTION DEFECT FACTS;

447.    The defects are caused by unreasonable and/or poor-quality workmanship;

448.    The defects make the Association's Improvements not usable;

449.    The defects make the Association's Improvements not habitable;

450.    The defects make the Association's Improvements not fit for their intended purpose;

451.    The Association's Improvements, having not been designed, developed, constructed and/or installed properly, constitute a hazardous and dangerous condition of which the Developer and the Developer's Agents knew or should have known;

452.    Since the Association's Improvements constituted a hazardous and dangerous condition caused by the improper design, development, construction and installation on the Developer's part and/or on the Developer's Agents' part, the Developer and the Developer's Agents are strictly liable in tort to the Association;

453.    When the Developer designed, developed and constructed the Association's improvements, the buildings and the individual units, it was extremely likely that the Association and individual unit owners would be seriously harmed as a result of the Developer's defective design, development and construction;

454.    The Developer was fully aware of the reckless disregard of the likelihood that serious harm would befall the Association and its unit owners as a result of its defective design, development and construction;

455.    The Developer, upon learning that its defective design, development and construction was likely to harm the Association and individual unit owners, continued in its actions with disregard for the harm likely to result to the parties relying upon the safety and adequacy of the Developer's defective design, development and construction of the Association's Improvements, buildings and the individual units;

456.    The Developer continued to design, develop and construct the Association's Improvements, buildings and the individual units after it became aware of the inherent defects in the design, development and construction of the Association's Improvements, buildings and the individual units;

457.     The Developer benefited financially by defectively designing, developing and constructing the Association's Improvements, buildings and the individual units by, among other things, lowering its costs to construct and develop the Association's Improvements, buildings and the individual units;

458.     The Association is a third-party beneficiary of all warranties implied via the Developer's Agents' performance for the Developer;

459.     As a direct and proximate result of the conduct described above, the Association sustained damages and has expended, and will in the future expend, substantial sums to complete, alter, correct, cure, fix, remedy, rectify, repair, construct, replace, service and/or adjust the Association's Improvements;

460.     Pursuant to N.J.S.A. §45:22A-45(c), the Developer and the Developer's Trustees are liable as fiduciaries to the owners for their acts and/or omissions;

461.     Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the owners for their acts and/or omissions;

462.     Pursuant to N.J.S.A. §45:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

**WHEREFORE**, the Association demands judgment against the Developer, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

> a.     Compensatory, consequential, incidental, statutory and punitive damages;
>
> b.     Interest;
>
> c.     Attorney fees and costs; and

     d.     Such other relief as is equitable, appropriate and just.

## **COUNT 5 - CONTRACT**

463.    The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 4 are incorporated by reference as if fully set forth herein;

464.    The Developer implicitly and/or explicitly contracted with the Association's membership and/or with the Association to design, develop, construct, install and/or budget for the Association's Improvements to be free from defects; in conformity with the Plans and Specifications, the Governing Documents, PREDFDA, the PRED Regs, the Code, all applicable state and local codes, regulations and ordinances, the standards and/or requirements of the plans and/or specifications approved by Township of Manchester, and the Standards; and be fit for their intended purposes;

465.    The Developer contracted with the Developer's Agents to meet those obligations;

466.    The Association is a third-party beneficiary of any contracts between the Developer and the Developer's Agents in  regards to the Association's Improvements;

467.    The Developer breached its contract with the Association by designing, developing, constructing, installing and/or budgeting for the Association's Improvements with defects; as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

468.    The Developer breached its contract with the Association by designing, developing, constructing, installing and/or budgeting for the Association's Improvements without adhering to the Specifications as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

469.    The Developer breached its contract with the Association by designing, developing,

constructing, installing and/or budgeting for the Association's Improvements without

adhering to the Governing Documents as described in the CONSTRUCTION DEFECT

FACTS and FINANCING DEFECT FACTS;

470.    The Developer breached its contract with the Association by designing, developing,

constructing, installing and/or budgeting for the Association's Improvements without

adhering to PREDFDA as described in the CONSTRUCTION DEFECT FACTS and the

FINANCING DEFECT FACTS;

471.    The Developer breached its contract with the Association by designing, developing,

constructing, installing and/or budgeting for the Association's Improvements without

adhering to the PRED Regs as described in the CONSTRUCTION DEFECT FACTS and the

FINANCING DEFECT FACTS;

472.    The Developer breached by its contract with the Association by designing, developing,

constructing, installing and/or budgeting for the Association's Improvements without

adhering to the Code as described in the CONSTRUCTION DEFECT FACTS and the

FINANCING DEFECT FACTS;

473.    The Developer breached its contract with the Association by designing, developing,

constructing, installing and/or budgeting for the Association's Improvements without

adhering to all applicable state and local codes, regulations and ordinances as described in the

CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

474.    The Developer breached its contract with the Association by designing, developing,

constructing, installing and/or budgeting for the Association's Improvements without

adhering to the standards and/or requirements of the plans and/or specifications approved by

Township of Manchester as described in the CONSTRUCTION DEFECT FACTS and the

FINANCING DEFECT FACTS;

475.    The Developer breached its contract with the Association by designing, developing, constructing, installing and/or budgeting for the Association's Improvements without adhering to the Standards as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

476.    The Developer breached its contract with the Association by designing, developing, constructing, installing and/or budgeting for Association Improvements that are unfit for their intended purposes as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

477.    The Developer's Agents breached their contracts with the Developer by designing, developing, constructing, installing and/or budgeting for the Association's Improvements with defects as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

478.    The Developer's Agents breached their contracts with the Developer by designing, developing, constructing, installing and/or budgeting for the Association's Improvements without adhering to the Specifications as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

479.    The Developer's Agents breached their contracts with the Developer by designing, developing, constructing, installing and/or budgeting for the Association's Improvements without adhering to the Governing Documents as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

480.    The Developer's Agents breached their contracts with the Developer by designing, developing, constructing, installing and/or budgeting for the Association's Improvements

without adhering to the Code as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

481.     The Developer's Agents breached their contracts with the Developer by designing, developing, constructing, installing and/or budgeting for the Association's Improvements without adhering to all applicable state and local codes, regulations and ordinances as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

482.     The Developer's Agents breached their contracts with the Developer by designing, developing, constructing, installing and/or budgeting for the Association's Improvements without adhering to the Standards as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

483.     The Developer's Agents breached their contracts with the Developer by designing, developing, constructing, installing and/or budgeting for Association Improvements that are unfit for their intended purposes as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

484.     When the Developer made the contracts described herein, it was extremely likely that the Association and individual unit owners would be seriously harmed as a result of the Developer's breach of those contracts;

485.     The Developer was fully aware of the reckless disregard of the likelihood that serious harm would befall the Association and individual unit owners as a result of its breach of the contracts described herein;

486.     The Developer, upon learning that its breaches of contract were likely to cause harm, continued in its actions with disregard for the harm likely to befall the Association and

individual unit owners;

487.    The Developer continued to breach the contracts it made with the Association and the individual unit owners throughout the construction and development of the Association's Improvements;

488.    The Developer benefited financially by breaching its contracts with the Association and individual unit owners by, among other things, lowering its costs to construct and develop the Association's Improvements;

489.    The Association is a third-party beneficiary of all contracts implied via the Developer's Agents' performance for the Developer;

490.    As a result of the Developer's breaches, as well as the Developer's Agents' breaches, the Association has expended, and will in the future expend, substantial sums to complete, alter, correct, cure, fix, remedy, rectify, repair, construct, replace and/or adjust the Association's Improvements;

**WHEREFORE**, the Association demands judgment against Developer, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

 a.    Compensatory, consequential, incidental, statutory and punitive damages;

 b.    Interest;

 c.    Attorney fees and costs; and

 d.    Such other relief as is equitable, appropriate and just.

### COUNT 6 – FAILURE TO PAY FOR BENEFITS DERIVED

491.    The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 5 are hereby incorporated by reference as if fully set forth herein;

492.  The Association is governed by PREDFDA, the PRED Regs, the Nonprofit Act and the Governing Documents;

493.  The PRED Regs state in relevant part that once "the association has made a common expense assessment; the assessment shall be assessed against the units individually owned and under development in proportion to the benefit derived by the unit from items included in the budget" N.J.A.C. §5:26-8.6(b);

494.  At all relevant times, the Developer owned units within the Association, both those completed and in development;

495.  Pursuant to N.J.A.C. §5:26-8(B), the Developer is obligated to pay an assessment with respect to its units owned and under development in proportion to the benefit derived by those units from the items included in the Association's budget;

496.  Those monies due from the Developer under the PRED Regs constitute the common expense assessments due from the Developer's units owned and in development, pursuant to the Governing Documents;

497.  Pursuant to N.J.S.A. §45:22A-46, while the Developer and the Developer's Trustees controlled the Association, the Developer and Developer's Trustees owed a duty to the Association to assess and collect funds for common expenses and the payment thereof;

498.  Pursuant to N.J.S.A. §45:22A-44, while the Developer and the Developer's Trustees controlled the Association the Developer and the Developer's Trustees owed a duty to the Association to exercise the Association's powers and discharge the Association's functions in a manner that protected and furthered or was not inconsistent with the health, safety and general welfare of the residents of the Community;

499.  While the Developer and the Developer's Trustees controlled the Association, the

65

Developer and the Developer's Trustees failed to assess or collect sufficient funds from the Developer to contribute toward the Association's common expenses with respect to its units owned and under development in proportion to the benefit derived by those units from the items included in the Association's budget as required by N.J.A.C. §5:26-8.6(b);

500.     The Developer's and the Developer's Trustees' failure to assess or collect sufficient funds from the Developer, as required by N.J.A.C. §5:26-8.6(b), breached the Developer's and the Developer's Trustees' duty to the Association, pursuant to N.J.S.A. §45:22A-46, to assess and collect funds for common expenses and the payment thereof while the Developer and the Developer's Trustees controlled the Association;

501.     The Developer's and the Developer's Trustees' failure to assess or collect sufficient funds from the Developer, as required by N.J.A.C. §5:26-8.6(b), breached the Developer's and the Developer's Trustees' duty to the Association, pursuant to N.J.S.A. §45:22A-44, to exercise the Association's powers and discharge the Association's functions in a manner that protected and furthered or was not inconsistent with the health, safety and general welfare of the residents of the Community while the Developer and the Developer's Trustees controlled the Association;

502.     The Developer and the Developer's Trustees' failure to assess or collect sufficient funds from the Developer, as required by N.J.A.C. §5:26-8.6(b), breached the Developer's and the Developer's Trustees' duty to the Association, pursuant to N.J.A.C. §5:26-8.2(b), to discharge the Association's powers in a manner that protected and furthered the health, safety and general welfare of the residents of the Community while the Developer and the Developer's Trustees controlled the Association;

503.     When the Developer failed to assess, collect and pay those monies due under the

66

PRED Regs, it was extremely likely that the Association would be seriously harmed as a result;

504.    The Developer was fully aware of the reckless disregard of the likelihood that serious harm would befall the Association as a result of its failure to assess, collect and pay those monies due under the PRED Regs;

505.    The Developer, upon learning that its failure to pay those monies due under PREDFDA was likely to cause harm, continued in its actions with disregard for the harm likely to result to the Association;

506.    The Developer continued to fail to assess, collect and pay those monies due under the PRED Regs throughout the time that it owned units;

507.    The Developer benefited financially by failing to assess, collect and pay those monies due under the PRED Regs by, among other things, lowering its costs while it was attempting to sell units it owned;

508.    Despite demand, the Developer has failed and refused to pay common expense assessments and/or fees due from it pursuant to the PRED Regs and/or pursuant to the Governing Documents;

509.    Pursuant to N.J.S.A. §45:22A-46 and the Association's By-Laws, the Association may levy and collect interest thereon, late fees and reasonable attorneys' fees on any moneys duly owed to the Association including unpaid common expenses assessments.

510.    As a direct and proximate result of the conduct described above, the Association sustained damages;

511.    Pursuant to N.J.S.A. §45:22A-45(c), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts and/or omissions;

512.   Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the owners for their acts and/or omissions;

513.   Pursuant to N.J.S.A. §45:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

**WHEREFORE**, the Association demands judgment against the Developers, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

    a.      Immediate payment of all monies due to the Association pursuant to the PRED Regs and/or the Governing Documents;

    b.      Compensatory, consequential, incidental, statutory and punitive damages;

    c.      Interest and/or late charges;

    d.      Attorney fees and costs; and

    e.      Such other relief as is equitable, appropriate and just.

## COUNT 7 – FAILURE TO MEET RESERVE FUNDING REQUIREMENTS

514.   The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 6 are hereby incorporated by reference as if fully set forth herein;

515.   The Association is governed by PREDFDA, the PRED Regs,  the Nonprofit Act and the Governing Documents;

516.   Pursuant to N.J.S.A. §45:22A-44, while the Developer and the Developer's Trustees controlled the Association the Developer and the Developer's Trustees owed a duty to the Association to exercise the Association's powers and discharge the Association's functions in a manner that protected and furthered or was not inconsistent with the health, safety and

general welfare of the residents of the Community;

517. The Developer, the Developer's Trustees and the Developer's Agents failed to adequately budget for the Association's reserve funds;

518. Pursuant to N.J.A.C. §5:26-8.7(a), while the Developer and the Developer's Trustees controlled the Association, the Developer and the Developer's Trustees owed a duty to the Association to prepare and adopt an operating budget, prior to making an annual assessment, which provided for any and all common expenses to be incurred during the year as well as adequate reserves for repair and replacement of the common elements and facilities;

519. Contrary to N.J.A.C. §5:26-8.7(a), while the Developer and the Developer's Trustees controlled the Association, the Developer and the Developer's Trustees failed to prepare and adopt an operating budget, prior to making an annual assessment, which provided for any and all common expenses to be incurred during the year as well as adequate reserves for repair and replacement of the common elements and facilities;

520. The Association will not, and does not, have adequate reserve funds because of the inadequate budget the Developer, the Developer's Trustees and the Developer's Agents prepared;

521. The Developer, the Developer's Trustees and the Developer's Agents failed to meet the requirements under PREDFDA and the PRED Regs.

522. When the Developer failed to adequately budget for reserve funding, it was extremely likely that the Association would be seriously harmed as a result;

523. The Developer was fully aware of the reckless disregard of the likelihood that serious harm would arise from its failure to adequately budget for the Association's reserves as described herein;

69

**WHEREFORE**, the Association demands judgment against Developers, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

     a.     Immediate payment of all monies due to the Association pursuant to PREDFDA, the PRED Regs and/or the Governing Documents;

     b.     Compensatory, consequential, incidental, statutory and punitive damages;

     c.     Interest and/or late charges;

     d.     Attorney fees and costs; and

     e.     Such other relief as is equitable, appropriate and just.

### COUNT 8 - TRUSTEES' BREACH OF FIDUCIARY DUTY

524.    The PARTIES AND BACKGROUND facts and the allegations of Counts 1 through 7 are incorporated herein by reference.

525.    The Association is governed by PREDFDA, the PRED Regs, the Nonprofit Act and the Governing Documents;

526.    While the Developer and the Developer's Trustees controlled the Association, the Developer and the Developer's Trustees were required to perform many services for the Association;

527.    Those services included, without limitation:

     a.     cause persons and contractors necessary to properly maintain the Association to be selected and supervised;

     b.     select and supervise persons and contractors necessary to repair, maintain or renovate the Common Elements of the Association;

     c.     maintain books, records and financial statements for the Association;

70

    d.       maintain records showing all receipts and expenditures relating to the Association;

    e.       handle all bills received by the Association;

    f.       collect all common expenses, charges, assessments and debts and take action as is necessary to collect same;

    g.       ensure that the Association and/or its common property were appropriately and properly maintained;

    h.       enforce obligations of the Unit Owners and do anything and everything necessary and proper for the sound management of the Association;

    i.       cooperate with the Association's accountant with regard to the Association's annual audit;

    j.       obtain annual audited financial statements for the Association;

    k.       maintain the Association's books and records including its minutes and give notice to the members of meetings;

    l.       maintain records with respect to services, materials and expenses provided on behalf of the Association;

    m.      notify the Association of any practice or activity which may constitute a violation of any ordinance, code or law;

528.    Pursuant to <u>N.J.S.A.</u> §45:22A-45(c) and <u>N.J.A.C.</u> §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts or omissions;

529.    Pursuant to <u>N.J.S.A.</u> §15A:6-14, while the Developer and the Developer's Trustees controlled the Association, the Developer and the Developer's Trustees were required to discharge their duties to the Association in good faith;

530. Pursuant to N.J.S.A. §15A:6-14, while the Developer and the Developer's Trustees controlled the Association, the Developer and the Developer's Trustees were required to discharge their duties to the Association with that degree of diligence, care and skill which ordinary, prudent persons would exercise under similar circumstances in like positions;

531. Contrary to N.J.S.A. §45:22A-44(a), while the Developer and the Developer's Trustees controlled the Association, the Developer and the Developer's Trustees failed to exercise the Association's powers and discharge the Association's functions in a manner that protected and furthered the health, safety and general welfare of the residents of the Community;

532. Contrary to N.J.A.C. §5:26-8.2(b), while the Developer and the Developer's Trustees controlled the Association, the Developer and the Developer's Trustees failed to discharge the Association powers in a manner that protected and furthered the health, safety and general welfare of the residents of the Community;

533. Pursuant to N.J.S.A. §15A:6-14, while the Developer and the Developer's Trustees controlled the Association, the Developer and the Developer's Trustees failed to discharge their duties to the Association in good faith;

534. Pursuant to N.J.S.A. §15A:6-14, while the Developer and the Developer's Trustees controlled the Association, the Developer and the Developer's Trustees failed to discharge their duties to the Association with that degree of diligence, care and skill which ordinary, prudent persons would exercise under similar circumstances in like positions;

535. The Developer and the Developer's Trustees could not reasonably have believed that their conduct was in the best interests of the Association. N.J.S.A. §15A:3-4(c).

536. The Developer and the Developer's Trustees could not reasonably have believed that

their conduct was not opposed to the best interests of the Association. N.J.S.A. §15A:3-4(c).

537.    The Developer and the Developer's Trustees, upon learning that its failure to adequately budget for the Association's reserves, deferred maintenance and operating budget was likely to cause harm, continued in its actions with disregard for the harm likely to result to the Association;

538.    The Developer continued to inadequately budget for reserves, deferred maintenance and the operating budget throughout the construction and development of the Association's Improvements;

539.    The Developer benefited financially by failing to adequately budget for reserves by, among other things, lowering its costs to construct and develop the Association's Improvements and by enticing purchasers who relied upon a deceptively low monthly assessment, which is made up, in part, by funding for reserves;

540.    The Developer's Trustees were obligated, pursuant to the Governing Documents, to: maintain the Community; keep a complete and accurate record of its affairs; and properly manage the financial affairs of the Association, which included without limitation collecting assessments from the Developer pursuant to PREDFDA, and expending Association funds only for proper Association-related expenses;

541.    The Developer's Trustees were obligated pursuant to the Governing Documents to act with fidelity toward the Association and its membership and in good faith and with reasonable care;

542.    The Developer's Trustees failed to meet these obligations as is alleged in the PARTIES AND BACKGROUND FACTS, more particularly the FINANCING DEFECT FACTS, CONSTRUCTION DEFECTS FACTS, DEVELOPER'S

73

MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, which are incorporated herein as if set forth at length;

543.    When the Developer's Trustees breached their fiduciary duties to the Association and its membership it was extremely likely that the Association and its members would be seriously harmed as a result;

544.    The Developer's Trustees were fully aware of the reckless disregard of the likelihood that serious harm would befall the Association and its members as a result of their breach of fiduciary duties described herein;

545.    The Developer's Trustees, upon learning that their breach of their fiduciary duties was likely to harm the Association and its members, continued in their actions with disregard for the harm likely to result;

546.    The Developer's Trustees continued to breach their fiduciary duties throughout their tenure on the Association's Board of Trustees;

547.    The Developer benefited financially by virtue of the Developer's Trustees' breach of their fiduciary duties;

548.    The Association and its membership have been damaged;

549.    The improper conduct by the Developer's Trustees is the direct and proximate cause of the damage to the Association and its membership;

550.    As a direct and proximate result of the conduct described above, the Association sustained damages;

551.    Pursuant to N.J.S.A. §45:22A-45(c), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts and/or omissions;

552.    Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer's Trustees are

74

liable as fiduciaries to the owners for their acts and/or omissions;

553.    Pursuant to N.J.S.A. §45:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

554.    Pursuant to N.J.S.A. §46:8B-16, the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted directly by the unit owners individually;

**WHEREFORE**, the Association demands judgment against the Developers, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

a.    Immediate payment of all monies due to the Association pursuant to PREDFDA, the PRED Regs, and/or the Governing Documents;

b.    Judgment in its favor pursuant to N.J.S.A. 2A:16-50, et seq., declaring the rights,  remedies and/or obligations of the parties with respect to the Governing Documents and common law;

c.    Adjudging that the Developer's Trustees violated the Governing Documents and/or common law by failing to properly keep the Association's books and records during the period the Developer's Trustees controlled the Association;

d.    Compensatory, consequential, incidental, statutory and punitive damages;

e.    Interest and/or late charges;

f.    Attorney fees and costs; and

g.    Such other relief as is equitable, appropriate and just.

## COUNT 9 - GROSS NEGLIGENCE

555. The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 8 are hereby incorporated by reference as if fully set forth herein;

556. The Developer and the Developer's Agents had a duty to design, develop, construct, improve and/or budget for the Community and the Association's Improvements free from defects, in accordance with the Plans and Specifications, the Governing Documents, PREDFDA, the PRED Regs, the Code, all applicable state and local codes, regulations and ordinances, the standards and/or requirements of the plans and/or specifications approved by the Township of Manchester and the Standards;

557. Developer, directly, or through its general contractor and/or sub-contractors, had a duty to supervise the Developer's Agents that performed work in regards to the Association's Improvements;

558. As employees and/or principals of the Developer, and as members of the Association's Board and/or Officers of the Association, the Developer's Trustees had a duty to ensure that the Developer designed, developed, constructed and/or improved the Community and the Association's Improvements free of defects, in accordance with the Plans and Specifications, the Governing Documents, PREDFDA, the PRED Regs, the Code, all applicable state and local codes, regulations and ordinances, the standards and/or requirements of the plans and/or specifications approved by the Township of Manchester, and the Standards;

559. The Developer, the Developer's Agents and the Developer's Trustees failed to design, develop, construct improve and/or budget for the Association's Improvements free from defects, in accordance with the Specifications, the Governing Documents, PREDFDA, the PRED Regs, the Code, all applicable state and local codes, regulations and ordinances, the

76

standards and/or requirements of the plans and/or specifications approved by Township of Manchester, and the Standards as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS;

560.    The Developer failed to supervise the Developer's Agents in order to prevent the failings described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS and discussed above;

561.    The Developer's Trustees failed to supervise the Developer's Agents in order to prevent the failings described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS and discussed above;

562.    The Developer, the Developer's Agents and the Developer's Trustees failed to discover the defects described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS and/or failed to remedy the defects described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS that they collectively and/or individually did discover;

563.    The Developer, the Developer's Agents and the Developer's Trustees failed to design, develop, construct, improve and/or budget for the Association's Improvements free from defects, in accordance with the Specifications, as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

564.    The Developer, the Developer's Agents and the Developer's Trustees failed to design, develop, construct, improve and/or budget for the Association's Improvements free from defects, in accordance with the Governing Documents, as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS despite a substantial risk of

damage to the Association, the Association's unit owners and its Board;

565.    The Developer, the Developer's Agents and the Developer's Trustees failed to design, develop, construct, improve and/or budget for the Association's Improvements free from defects, in accordance with PREDFDA, as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

566.    The Developer, the Developer's Agents and the Developer's Trustees failed to design, develop, construct, improve and/or budget for the Association's Improvements free from defects, in accordance with the PRED Regs, as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

567.    The Developer, the Developer's Agents and the Developer's Trustees failed to design, develop, construct, improve and/or budget for the Association's Improvements free from defects, in accordance with the Code, as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

568.    The Developer, the Developer's Agents and the Developer's Trustees failed to design, develop, construct, improve and/or budget for the Association's Improvements free from defects, in accordance with all applicable state and local codes, regulations and ordinances, as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

569.    The Developer, the Developer's Agents and the Developer's Trustees failed to design,

develop, construct, improve and/or budget for the Association's Improvements free from defects, in accordance with the standards and/or requirements of the plans and/or specifications approved by The Township of Manchester, as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

570.    The Developer, the Developer's Agents and the Developer's Trustees failed to design, develop, construct, improve and/or budget for the Association's Improvements free from defects, in accordance with the Standards, as described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

571.    The Developer, the Developer's Agents and the Developer's Trustees failed to discover said defects described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS and/or failed to remedy the defects described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS that they collectively and/or individually did discover despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

572.    The Developer failed to supervise the Developer's Agents in order to prevent the failings described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS as discussed above despite a substantial risk of damage to the Association, the Association's unit owners and its Board;

573.    The Developer's Trustees failed to supervise the Developer's Agents in order to prevent the failings described in the CONSTRUCTION DEFECT FACTS and the FINANCING DEFECT FACTS and discussed above despite a substantial risk of damage to

79

the Association, the Association's unit owners and its Board;

574.     As a direct and proximate result of the breach by the Developer, the Developer's Agents and the Developer's Trustees of their duties as set forth above, the Association sustained damages that have caused, and will in the future cause, the Association to expend substantial sums of money to complete, alter, correct, fix, cure, remedy, rectify, repair, replace, service and/or adjust the Association's Improvements;

575.     Pursuant to N.J.S.A. §45:22A-45(c) the Developer and the Developer's Trustees are liable as fiduciaries to the owners for their acts and/or omissions;

576.     Pursuant to N.J.A.C. §5:26-8.3(b) the Developer and the Developer's Trustees are liable as fiduciaries to the owners for their acts and/or omissions;

577.     Pursuant to N.J.S.A. §45:22A-44(d) the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

**WHEREFORE**, the Association demands judgment against the Developers, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

a.     Compensatory, consequential, incidental, and statutory damages;

b.     Interest;

c.     Attorney fees and costs; and

d.     Such other relief as is equitable, appropriate and just.

## COUNT 10 - CONSUMER FRAUD

578.     The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 9 are hereby incorporated by reference as if fully set forth herein;

579.     The Developer, the Developer's Trustees and/or agents hired by the Developer's Trustees engaged in conduct to further the Developer's interests, which was done at the peril of the Association, its unit owners and its Board, as alleged in the PARTIES AND BACKGROUND FACTS, more particularly the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, which are incorporated herein as if set forth at length;

580.     The Developer, the Developer's Trustees and/or agents hired by the Developer's Trustees engaged in unlawful conduct in violation of the Consumer Fraud Act, N.J.S.A. 56:8-1 et. seq. when they failed to disclose this relevant information to the prospective purchasers;

581.     The Developer, the Developer's Trustees and/or agents hired by the Developer's Trustees engaged in unlawful conduct in violation of the Consumer Fraud Act, N.J.S.A. 56:8-1 et. seq. when they misrepresented this relevant information to the prospective purchasers;

582.     The Developer, the Developer's Trustees and/or agents hired by the Developer's Trustees engaged in unlawful conduct in violation of the Consumer Fraud Act, N.J.S.A. 56:8-1 et. seq. when they failed to comply with the PRED regulations;

583.     The practices the Developer, the Developer's Trustees and/or agents hired by the Developer's Trustees used were unlawful and constituted violations of the Consumer Fraud Act, N.J.S.A. 56:8-1 et. seq. as Defendants engaged in unconscionable commercial practices, deception, fraud, false pretenses, false promises and misrepresentations as alleged in the PARTIES AND BACKGROUND FACTS, more particularly the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, which are incorporated herein as if set forth at length;

584.     During its sale and advertisement of said real estate, the Developer, the Developer's

81

Trustees and/or agents hired by the Developer's Trustees also knowingly concealed, suppressed and/or omitted these material facts with the intent that homeowners, the Association and the Board would rely upon them;

585.    Through their conduct, the Developer, the Developer's Trustees and/or agents hired by the Developer's Trustees furthered the Developer's, and their own personal interests at the expense of the Association;

586.    As a result of the Developer, the Developer's Trustees and/or agents hired by the Developer's Trustees aforementioned unlawful acts the Association and its membership have been damaged and have suffered an ascertainable loss;

587.    The unlawful conduct by the Developer, the Developer's Trustees and/or agents hired by the Developer's Trustees is the direct and proximate cause of the damage to the Association and its membership;

588.    Pursuant to N.J.S.A. §45:22A-45(c), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts and/or omissions;

589.    Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the owners for their acts and/or omissions;

590.    Pursuant to N.J.S.A. §45:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

**WHEREFORE**, the Association demands judgment against the Developers, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

      a.     Compensatory, consequential, incidental, and statutory damages;

82

b.      Treble damages pursuant to <u>N.J.S.A.</u> 56:8-1 <u>et</u>. <u>seq</u>.;

c.      Interest;

d.      Court costs and attorney fees; and

e.      Such other relief as is equitable, appropriate and just.

## COUNT 11 - INTENTIONAL FRAUD

591.   The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 10 are hereby incorporated by reference as if fully set forth herein;

592.   In connection with its creation and construction of the Community and during its administration of the Association as the controller of the Board, the Developer and the Developer's Trustees made the material misrepresentations and/or omissions as alleged in the PARTIES AND BACKGROUND FACTS, more particularly the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, which are incorporated herein as if set forth at length;

593.   The Developer and the Developer's Trustees intended that the false material misrepresentations and/or omissions would induce reliance on the part of purchasers, unit owners, the Association, the Board and any others to whom the misrepresentations were made;

594.   Those persons and/or entities to whom the Developer or the Developer's Trustees made misrepresentations and/or omissions reasonably relied thereon;

595.   When the Developer employed deception, fraud, false pretenses, false promises and misrepresentation as alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, in order to

83

solicit sales of units, it was extremely likely that the Association, individual unit owners and purchasers would be seriously harmed as a result;

596.    The Developer was fully aware of the reckless disregard of the likelihood that serious harm would befall the Association, individual unit owners and purchasers as a result of its deceptive and fraudulent practices and misrepresentations described herein;

597.    The Developer, upon learning that its deceptive and fraudulent practices and misrepresentations were likely to harm the Association, individual unit owners and purchasers, continued in its actions with disregard for the harm likely to result therefrom;

598.    The Developer continued to employ deceptive and fraudulent practices and to propagate misrepresentations throughout the construction, development and sale of units within the Association;

599.    The Developer benefited financially by employing deceptive and fraudulent practices and by propagating misrepresentations by, among other things, enticing purchasers to buy units in the Association, in which improvements were developed and constructed in an inadequate manner and for which an inadequate budget had been created;

600.    The Developer's and the Developer's Trustees' misrepresentations damaged purchasers, homeowners, the Association and the Board;

601.    Pursuant to N.J.S.A. §45:22A-45(c), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts and/or omissions;

602.    Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts and/or omissions;

603.    Pursuant to N.J.S.A. §45:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the

unit owners individually;

**WHEREFORE**, the Association demands judgment against Developer, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

      a.     Compensatory, consequential, incidental, statutory and punitive damages;

      b.     Interest;

      c.     The reasonable expense of litigation caused by the fraud; and

      d.     Such other relief as is equitable, appropriate and just.

## COUNT 12 - NEGLIGENT FRAUD/MISREPRESENTATION

604.    The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 11 are hereby incorporated by reference as if fully set forth herein;

605.    In connection with its creation and construction of the Community and during its administration of the Association as the controller of the Board, the Developer and the Developer's Trustees negligently provided the false information and misrepresentations as are alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, which are incorporated herein as if set forth at length;

606.    The false information was negligently provided to reasonably foreseeable recipients including without limitation purchasers, unit owners, the Association and the Board as described above and elsewhere herein;

607.    Said purchasers, unit owners, the Association and the Board detrimentally relied upon that information;

608.    The reliance by said purchasers, homeowners, the Association and the Board was

reasonable;

609.    The Developer's and the Developer's Trustees' misrepresentations in this regard proximately caused damage to purchasers, homeowners, the Association and the Board;

610.    Pursuant to N.J.S.A. §45:22A-45(c), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts and/or omissions;

611.    Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts and/or omissions;

612.    Pursuant to N.J.S.A. §45:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

**WHEREFORE**, the Association demands judgment against the Developers, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

      a.    Compensatory, consequential, incidental, statutory and punitive damages;

      b.    Interest;

      c.    Attorney fees and costs; and

      d.    Such other relief as is equitable, appropriate and just.

### COUNT 13- FRAUDULENT CONCEALMENT BY A FIDUCIARY

613.    The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 12 are hereby incorporated by reference as if fully set forth herein;

614.    The Developer's Trustees were parties to a fiduciary relationship with the Association;

615.    In the context of that fiduciary relationship, the Developer's Trustees intentionally concealed and failed to disclose known facts as alleged in the PARTIES AND

BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS,

TRUSTEE BREACH OF FIDUCIARY DUTY FACTS, DEVELOPER'S

MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, which are

incorporated herein as if set forth at length;

616.    Purchasers, unit owners, the Association and the Board relied upon the Developer's

Trustees in regard to the concealed and undisclosed facts to their detriment;

617.    Purchasers, unit owners, the Association and the Board reasonably relied on the

concealed and undisclosed facts;

618.    When the Developer's Trustees intentionally concealed and failed to disclose known

facts as alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the

FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and

DECEPTIVE ADVERTISING FACTS, it was extremely likely that the Association, unit

owners and the Board would be seriously harmed as a result;

619.    The Developer's Trustees were fully aware of the reckless disregard of the likelihood

that serious harm would arise from their intentional concealment and failure to disclose

known facts as alleged in the PARTIES AND BACKGROUND FACTS, more particularly in

the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS,

and DECEPTIVE ADVERTISING FACTS;

620.    The Developer's Trustees, upon learning that their intentional concealment and failure

to disclose known facts, as alleged in the PARTIES AND BACKGROUND FACTS, more

particularly in the FINANCING DEFECT FACTS, DEVELOPER'S

MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, was likely

to cause harm, continued in their actions with disregard for the harm likely to befall the

Association, unit owners and the Board;

621.    The Developer's Trustees continued to intentionally conceal and fail to disclose known facts, as alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, throughout their tenure on the Association's Board of Trustees;

622.    The Developer benefited financially by virtue of the Developer's Trustees' intentional concealment and failure to disclose known facts as alleged in the PARTIES AND BACKGROUND FACTS, more particularly the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, by, among other things lowering its cost to construct and develop the Association's Improvements, lowering its cost by underfunding the Association's reserves and increasing its revenues by soliciting purchasers of units without making proper disclosures;

623.    The Developer's and the Developer's Trustees actions in this regard proximately caused damage to purchasers, homeowners, the Association and the Board;

624.    Pursuant to N.J.S.A. §45:22A-45(c), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts and/or omissions;

625.    Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for the acts and/or omissions;

626.    Pursuant to N.J.S.A. §45:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

**WHEREFORE**, the Association demands judgment against the Developers, the Developer's

Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

a. Compensatory, consequential, incidental, statutory and punitive damages;

b. Interest;

c. Attorney fees and costs; and

d. Such other relief as is equitable, appropriate and just.

## COUNT 14 – VIOLATION OF NON-PROFIT CORPORATIONS ACT

627. The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 13 are hereby incorporated by reference as if fully set forth herein;

628. The Developer and the Developer's Trustees were obligated to comply with the Nonprofit Act in the context of their control of the Association and the Board;

629. The Nonprofit Act, §15A:5-24, requires an association and/or its board to keep books and records and minutes of its proceedings, with same to be open to inspection by said association's membership;

630. The Nonprofit Act, §15A:6-14, requires the Developer and the Developer's Trustees to discharge their duties in good faith and with that degree of diligence, care and skill which ordinary prudent persons would exercise under similar circumstances in like positions;

631. The Association while controlled by the Developer and the Developer's Trustees failed to properly keep the Association's books and records as is alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, which are incorporated herein as if set forth at length;

632. The Developer and the Developer's Trustees did not discharge their duties in good

89

faith or with the requisite degree of diligence and care by virtue of numerous acts and/or omissions, which include without limitation those acts and/or omissions as are alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, which are incorporated herein as if set forth at length;

633.     When the Developer's Trustees failed to discharge their duties in good faith or with the requisite degree of diligence and care by virtue of numerous acts and/or omissions, which include without limitation those acts and/or omissions as are alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, it was extremely likely that the Association, unit owners and the Board would be seriously harmed as a result;

634.     The Developer's Trustees were fully aware of the reckless disregard of the likelihood that serious harm would arise from their failure to discharge their duties in good faith or with the requisite degree of diligence and care by virtue of numerous acts and/or omissions, which include without limitation those acts and/or omissions as are alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS;

635.     The Developer's Trustees, upon learning that their failure to discharge their duties in good faith or with the requisite degree of diligence and care by virtue of numerous acts and/or omissions, which include without limitation those acts and/or omissions as are alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT

90

FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE

ADVERTISING FACTS, was likely to cause harm, continued in their actions with disregard

for the harm likely to result to the Association, unit owners and the Board;

636.    The Developer's Trustees continued in their failure to discharge their duties in good

faith or with the requisite degree of diligence and care by virtue of numerous acts and/or

omissions, which include without limitation those acts and/or omissions as are alleged in the

PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT

FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE

ADVERTISING FACTS, throughout their tenure on the Association's Board of Trustees;

637.    The Developer benefited financially by virtue of the Developer's Trustees' failure to

discharge their duties in good faith or with the requisite degree of diligence and care by virtue

of numerous acts and/or omissions, which include without limitation those acts and/or

omissions as are alleged in the PARTIES AND BACKGROUND FACTS, more particularly

in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS,

and DECEPTIVE ADVERTISING FACTS;

638.    The Association and its membership have been damaged;

639.    The Developer's and the Developer's Trustees' actions in this regard proximately

caused damage to purchasers, unit owners, the Association and the Board;

640.    Pursuant to N.J.S.A. §45:22A-45(c), the Developer and the Developer's Trustees are

liable as fiduciaries to the unit owners for their acts and/or omissions;

641.    Pursuant to N.J.A.C. §5:26-8.3(b), the Developer and the Developer's Trustees are

liable as fiduciaries to the unit owners for the acts and/or omissions;

642.    Pursuant to N.J.S.A. §45:22A-44(d), the Association may assert tort claims concerning

the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

**WHEREFORE**, the Association demands judgment against Developers, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

  a.  Judgment in its favor pursuant to <u>N.J.S.A.</u> 2A:16-50, <u>et seq.</u>, declaring the rights, remedies and/or obligations of the parties with respect to the Nonprofit Act;

  b.  Adjudging that the Developer and the Developer's Trustees violated the Nonprofit Act by failing to properly keep the Association's books and records;

  c.  Compensatory, consequential, incidental, statutory and punitive damages;

  d.  Interest;

  e.  Attorney fees and costs; and

  f.  Such other relief as is equitable, appropriate and just.

<u>**COUNT 15 – BREACH OF IMPLIED COVENANT OF**</u>
<u>**GOOD FAITH AND FAIR DEALING**</u>

643.  The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 14 are incorporated by reference as if fully set forth herein;

644.  The Developer implicitly and/or explicitly contracted with the Association and the unit owners to design, develop, construct, install and/or budget for the Association's Improvements to be free from defects; in conformity with the Specifications, the Governing Documents, PREDFDA, the PRED Regs, the Nonprofit Act, the Code, all applicable state

and local codes, regulations and ordinances, the standards and/or requirements of the plans

and/or specifications approved by Township of Manchester, and the Standards; and be fit for

their intended purposes;

645.    The Developer contracted with the Developer's Agents to fulfill those obligations;

646.    The Association is a third-party beneficiary of any contracts between the Developer

and the Developer's Agents in regards to the Association's Improvements;

647.    As alleged in the PARTIES AND BACKGROUND FACTS, and more particularly in

the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS,

and DECEPTIVE ADVERTISING FACTS, the Developer acted in bad faith in order to

deprive the Association of its rights and benefits under the contracts;

648.    As alleged in the PARTIES AND BACKGROUND FACTS, and more particularly in

the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS,

and DECEPTIVE ADVERTISING FACTS, the Developer and Developer's Trustees

purposefully employed evasive practices in order to deny the Association and its members the

bargain initially intended by the parties;

649.    The Developer's and Developer's Trustees bad faith acts damaged the Association and

unit owners;

650.    When the Developer and Developer's Trustees acted in bad faith, which includes

without limitation those acts and/or omissions as are alleged in the PARTIES AND

BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS,

DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING

FACTS, it was extremely likely that the Association and unit owners would be seriously

harmed as a result;

651.     The Developer and Sponsor Trustees were fully aware of the reckless disregard of the likelihood that serious harm would befall the Association and unit owners as a result of its bad faith acts, which include without limitation those acts and/or omissions as are alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS;

652.     The Developer and Developer's Trustees, upon learning that its bad faith acts, which include without limitation those acts and/or omissions as are alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, were likely to cause harm, continued in its actions with disregard for the harm likely to result to the Association and unit owners;

653.     The Developer and Developer's Trustees continued in its bad faith acts, which include without limitation those acts and/or omissions as are alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, throughout the development and construction of the Association's Improvements and throughout the time period when the Developer was selling units;

654.     The Developer benefited financially by virtue of its bad acts, which include without limitation those acts and/or omissions as are alleged in the PARTIES AND BACKGROUND FACTS, more particularly in the FINANCING DEFECT FACTS, DEVELOPER'S MISREPRESENTATIONS FACTS, and DECEPTIVE ADVERTISING FACTS, by, among other things lowering its cost to construct and develop the Association's Improvements and by

94

enticing purchasers of units to consummate additional sales;

655.    The Developer's and the Developer's Trustees' actions in this regard proximately caused damage to purchasers, unit owners, the Association and the Board;

656.    Pursuant to <u>N.J.S.A.</u> §45:22A-45(c), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for their acts and/or omissions;

657.    Pursuant to <u>N.J.A.C.</u> §5:26-8.3(b), the Developer and the Developer's Trustees are liable as fiduciaries to the unit owners for the acts and/or omissions;

658.    Pursuant to <u>N.J.S.A.</u> §45:22A-44(d), the Association may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted by the unit owners individually;

**WHEREFORE**, the Association demands judgment against the Developers, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

      a.      Compensatory, consequential, incidental, statutory and punitive damages;

      b.      Interest;

      c.      Attorney fees and costs; and

      d.      Such other relief as is equitable, appropriate and just.

**<u>COUNT 16 – TORT – VICARIOUS LIABILITY</u>**

659.    The PARTIES AND BACKGROUND FACTS and the allegations of Counts 1 through 15 are incorporated by reference as if fully set forth herein;

660.    The Developer, the Developer's Trustees and the Developer's Agents committed torts against the Association, including, but not limited to:  Negligence; Breach of Express Warranty; Breach of Implied Warranty; Strict Liability; Breach of Contract; Violations of

95

PREDFDA and the PRED Regs, including Failure to Pay for Benefits Derived and Failure to Meet Reserve Funding Requirements; Gross Negligence; Consumer Fraud; Breach of Fiduciary Duty; Intentional Fraud; Negligent Fraud; Fraudulent Concealment by a Fiduciary; Violations of the New Jersey Non-Profit Corporations Act; and Breach of the Implied Covenant of Good Faith and Fair Dealing;

661.    The Association and its membership have been damaged by the Developer's, the Developer's Trustees' and the Developer's Agents' acts and/or omissions as is alleged in the PARTIES AND BACKGROUND FACTS, which are incorporated herein as if set forth at length;

662.    These acts and/or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts and/or omissions;

663.    The Developer, the Developer's Trustees, the Developer's Agents and the Doe Defendants are vicariously liable for any punitive damages assessed against any employee thereof as the Developer, the Developer's Trustees, the Developer's Agents or the Doe Defendants specifically participated in or ratified the wrongful acts, as is alleged in the PARTIES AND BACKGROUND FACTS, which are incorporated herein as if set forth at length, and which were of such high authority as to be fairly considered executive in character;

664.    For the reasons set forth in the PIERCING THE CORPORATE VEIL FACTS, and elsewhere herein, Pulte Home Corporation of the Delaware Valley, Del Webb Corporation, Pulte Group, Inc. and Pulte Home Corporation  should be held liable to the Association in addition to Defendant  Pulte Homes of NJ, Limited Partnership, t/a River Pointe by Del

Webb.

**WHEREFORE**, the Association demands judgment against the Developers, the Developer's Trustees, the Developer's Agents and the Doe Defendants, jointly, severally and in the alternative as follows:

      a.      Compensatory, consequential, incidental, statutory and punitive damages;

      b.      Interest;

      c.      Attorney fees and costs; and

      d.      Such other relief as is equitable, appropriate and just.

> McGovern Legal Services, LLC
> Attorneys for Plaintiff, River Pointe
> Homeowners Association, Inc.

Date: _September 27, 2019_        By: _/s/Damon M. Kress___
>        DAMON M. KRESS, ESQ.

## DEMAND FOR JURY TRIAL

    The Association hereby demands a trial by jury.

> McGovern Legal Services, LLC
> Attorneys for Plaintiff, River Pointe
> Homeowners Association, Inc.

Date: _September 27, 2019_        By: _/s/Damon M. Kress___
>        DAMON M. KRESS, ESQ.

## CERTIFICATION

Pursuant to Rule 4:5-1, the undersigned certifies that, at the time of the filing of this Complaint, the matter in controversy is not subject to any other pending actions and/or Arbitration proceeding and that no other parties should be joined. However it is contemplated that there may be additional claims and/or actions brought by Plaintiff against the Developer Defendants and/or the Contractor Defendants and any additional parties that have not yet been identified for any additional construction defects that are identified in the remainder of the Community that is still being evaluated and/or under construction. I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

McGovern Legal Services, LLC
Attorneys for Plaintiff, River Pointe
Homeowners Association, Inc.

Dated:  September 27, 2019         By:  __Damon M. Kress_____
DAMON M. KRESS, ESQ.

# EXHIBIT 6



Great American Insurance Group Tower
301 E. Fourth St.
Cincinnati, OH 45202

# Acknowledgement

I, <u>Ken Nieberding</u>, of  **Great American Risk Solutions**, states as follows:

**Policy #**  <u>8CG36111</u>

**Insured Name**  <u>Nassau Construction</u>

**Policy Term**:  *11/25/2008*  to  *09/20/2009*

**I have reviewed and confirm that a true and complete copy of the above policy along with all endorsements is attached to this acknowledgement.**

Ken
Nieberdin
g

Digitally signed by Ken
Nieberding
DN: cn=Ken Nieberding, o=Risk
Solutions, ou=Risk Solutions,
email=knieberding@gaig.com,
c=US
Date: 2021.12.06 13:09:24
-05'00'

_____
**Underwriting Representative**

<u>12/06/2021</u>
**Date**

Risk Solutions for the Wholesale Broker Market

GAIG.com



**American Empire Surplus
Lines Insurance Company**
A Delaware Stock Company:
Administrative Offices, Cincinnati, Ohio

**DECLARATIONS** 

**COMMERCIAL GENERAL
LIABILITY POLICY**

## POLICY NO.  8 CG 3 61 11

*New Jersey # F0094-08-00386*

---

**NAMED INSURED & MAILING ADDRESS:**

Nassau Construction Co., Inc.
Nassau Holdings 2001, LLC
P.O. Box 525
Delanco, NJ  08075

AmWins Brokerage of New York
88 Pine St., 6th Floor
New York, NY  10005

392H              15 %

---

Policy Period:  From  <u>11-25-2008</u>  To  <u>9-20-2009</u>     12:01 A.M. Standard Time at the mailing address shown above.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS AND CONDITIONS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

LIMIT OF INSURANCE

| | | | |
|---|---|---|---|
| GENERAL AGGREGATE LIMIT (Other Than Products-Completed Operations) | $ | 2,000,000. | Per project subject to overall limit of $5,000,000. See Endt. #2 |
| PRODUCTS-COMPLETED OPERATIONS AGGREGATE LIMIT | $ | 1,000,000. | |
| PERSONAL AND ADVERTISING INJURY LIMIT   *Any One Person or Organization* | $ | 1,000,000. | |
| EACH OCCURRENCE LIMIT | $ | 1,000,000. | |
| DAMAGE TO PREMISES RENTED TO YOU LIMIT   *Any One Premises* | $ | 50,000. | |
| MEDICAL EXPENSE LIMIT   *Any One Person* | $ | 5,000. | |

Amount and Basis of Deductible    <u>$5,000.</u> per occurrence.

---

Form Of Business:

_____ Individual      _____ Partnership      _____ Joint Venture      _____ Trust      _____ Limited Liability Company

  X    Organization, Including A Corporation (But Not Including A Partnership, Joint Venture or Limited Liability Company )

Business Description:      Carpentry Contractor

Location of All Premises You Own, Rent or Occupy:   Same as noted above, see Endorsement for additional Locations.

---

| CLASSIFICATION | CODE NO. | PREMIUM BASIS* | RATES | | ADVANCE PREMIUMS | |
|---|---|---|---|---|---|---|
| | | | PR/CO | ALL OTHER | PR/CO | ALL OTHER |
| Refer to SL0271A | | | | | | |

Subject to the conditions in SL0297, the minimum earned policy premium will be 25% of the premium payable at inception.

**Premium payable at inception:**  ██████████

*a) Area  b) Beds  c) Total Cost  m) Admissions  p) Payroll  s) Gross Sales  u) Units  r) Gross Receipts

Audit Period:  Annual (Unless Otherwise Stated)   Adjustable at $26.08 per $1,000. of Gross Receipts.  Estimated Receipts $3,030,300.

Forms Applicable:  See Endorsement No. 1

---

ISSUE DATE: 01/26/2009
SL 0527  (7/02)

**Authorized Representative**

**COMPANY COPY**



# AMERICAN EMPIRE GROUP®

# NOTICE

This policy was underwritten and priced based upon information and data provided to the company by a licensed representative for the Insured.

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I – COVERAGES

## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

  © ISO Properties, Inc., 2006   □

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

© ISO Properties, Inc., 2006

(2) Any loss, cost or expense arising out of any:

   (a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

   (b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

   (a) Less than 26 feet long; and

   (b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

   (a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

   (b) the operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

© ISO Properties, Inc., 2006

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Distribution Of Material In Violation Of Statutes**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

(3) Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

 © ISO Properties, Inc., 2006  □

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

## COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

### 1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

### 2. Exclusions

This insurance does not apply to:

a. **Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

b. **Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

c. **Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

d. **Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

e. **Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

f. **Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

g. **Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

h. **Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

i. **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

j. **Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of websites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a.**, **b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Distribution Of Material In Violation Of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

(1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

(2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

(3) Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**COVERAGE C MEDICAL PAYMENTS**

**1. Insuring Agreement**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(a) The accident takes place in the "coverage territory" and during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

 © ISO Properties, Inc., 2006 ☐

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A**.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

   **a.** All expenses we incur.

   **b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

   **c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

   **d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

   **e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

   **f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

   **g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

   These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

   **a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

   **b.** This insurance applies to such liability assumed by the insured;

   **c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

   **d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

   **e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

   **f.** The indemnitee:

      **(1)** Agrees in writing to:

         **(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

         **(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

         **(c)** Notify any other insurer whose coverage is available to the indemnitee; and

         **(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

      **(2)** Provides us with written authorization to:

         **(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

   **a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   **b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   **c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   **e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   **a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

      **(1)** "Bodily injury" or "personal and advertising injury":

         **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

         **(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

         **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

         **(d)** Arising out of his or her providing or failing to provide professional health care services.

      **(2)** "Property damage" to property:

         **(a)** Owned, occupied or used by,

         **(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

         you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

© ISO Properties, Inc., 2006

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

   **(1)** With respect to liability arising out of the maintenance or use of that property; and

   **(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   **a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   **b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

   **c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   **a.** Insureds;

   **b.** Claims made or "suits" brought; or

   **c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

   **a.** Medical expenses under Coverage **C**;

   **b.** Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   **c.** Damages under Coverage **B**.

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   **a.** Damages under Coverage **A**; and

   **b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

**1. Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

   **(1)** How, when and where the "occurrence" or offense took place;

   **(2)** The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

b. If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

No person or organization has a right under this Coverage Part:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. **Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

a. **Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

b. **Excess Insurance**

(1) This insurance is excess over:

(a) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(i) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(ii) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(iii) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(iv) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section I – Coverage **A** – Bodily Injury And Property Damage Liability.

(b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

(2) When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

 © ISO Properties, Inc., 2006 ☐

(3) When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

    (a) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

    (b) The total of all deductible and self-insured amounts under all that other insurance.

(4) We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

 © ISO Properties, Inc., 2006     ☐

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph a. above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in Paragraph a. above;

      (2) The activities of a person whose home is in the territory described in Paragraph a. above, but is away for a short time on your business; or

      (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

      Paragraph f. does not include that part of any contract or agreement:

      (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

      (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

         (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

         (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

      (3) Under which the insured, if an architect engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

   © ISO Properties, Inc., 2006     □

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

    a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

    b. While it is in or on an aircraft, watercraft or "auto"; or

    c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    b. Vehicles maintained for use solely on or next to premises you own or rent;

    c. Vehicles that travel on crawler treads;

    d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

        (1) Power cranes, shovels, loaders, diggers or drills; or

        (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

    e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

        (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

        (2) Cherry pickers and similar devices used to raise or lower workers;

    f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

    (1) Equipment designed primarily for:

        (a) Snow removal;

        (b) Road maintenance, but not construction or resurfacing; or

        (c) Street cleaning;

    (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    a. False arrest, detention or imprisonment;

    b. Malicious prosecution;

    c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

    d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

    f. The use of another's advertising idea in your "advertisement"; or

    g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

 © ISO Properties, Inc., 2006 **CG 00 01 12 07** ☐

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

**(2)** The providing of or failure to provide warnings or instructions.

 © ISO Properties, Inc., 2006 **CG 00 01 12 07** □



## AMERICAN EMPIRE SURPLUS LINES®
### INSURANCE COMPANY
A DELAWARE STOCK COMPANY: ADMINISTRATIVE OFFICES, CINCINNATI, OHIO

## ENDORSEMENT

**DEDUCTIBLE LIABILITY INSURANCE**
(Including Costs and Expenses)

**EFFECTIVE INCEPTION DATE OF POLICY**
unless otherwise indicated

1   Our obligation under the coverages afforded by this policy to pay damages on your behalf applies only to the amount of damages in excess of the deductible amount stated in the Declarations, and the limits of insurance applicable to "each claim," "each occurrence" or "any one fire" for such damages will be reduced by the amount of the Deductible

2   The deductible amount applies to all damages sustained by one person or organization as the result of any one claim

3   The deductible amount stated shall also apply towards investigation, adjustment and legal expenses incurred in the handling and investigation of each claim, whether or not payment is made to claimant, compromise settlement is reached or claim is denied

4   The terms of this policy including those with respect to

     (a)   Our right and duty to defend any "suits" seeking those damages, and

     (b)   Your duties in the event of an "occurrence," claim or suit

     apply irrespective of the application of the deductible amount

5   We may

     (a)   pay any part or all of the deductible amount to effect settlement of any claim or suit, and upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us or

     (b)   simultaneously upon receipt of notice of any claim or at any time thereafter, call upon you and request you to pay over and deposit with us all or any part of the deductible amount, to be held and applied by us as herein provided

     YOUR FAILURE TO PAY ALL THE DEDUCTIBLE AMOUNT SHALL BE EQUIVALENT TO NONPAYMENT OF PREMIUM AND SUBJECT THIS INSURANCE OR ANY RENEWAL(S) THEREOF TO CANCELLATION FOR SUCH NONPAYMENT AS PROVIDED FOR IN COMMON POLICY CONDITIONS A CANCELLATION

6   The provisions of this endorsement do not apply to COVERAGE C, MEDICAL PAYMENTS

7   All other Provisions and Conditions remain unchanged

SL 0270A (07/03)



# COMMERCIAL
# GENERAL LIABILITY SCHEDULE

Policy No: _____ **8CG36111**

| CLASSIFICATION | CODE NO. | • PREMIUM BASIS | RATES | | PREMIUMS | |
|---|---|---|---|---|---|---|
| | | | PR/CO | ALL OTHER | PR/CO | ALL OTHER |
| | | | | | | |
| | | * a) Area c) Total Cost m) Admissions p) Payroll s) Gross Sales u) Units r) Gross Receipts | | | | |
| | | | | TOTAL | | |

The foregoing discloses all hazards insured hereunder known to exist at the effective date of this policy, unless otherwise stated herein.

SL 0271A (12/91)

**AMERICAN EMPIRE SURPLUS LINES**
INSURANCE COMPANY®

COMPLETE SPACES BELOW ONLY IF ENDORSEMENT IS NOT ATTACHED TO THE POLICY WHEN ISSUED.

ENDORSEMENT NO._____ TO POLICY NO. _____

EFFECTIVE DATE _____

NAMED INSURED _____

PRODUCER _____

(ADDITIONAL) (RETURN) PREMIUM:

DUE HEREWITH                    $ _____

REVISED FUTURE INSTALLMENTS  $

## EXPLANATORY POLICY PREMIUM ENDORSEMENT

The policy conditions relating to premiums shall be amended to incorporate the following:

1. It is understood and agreed that this policy is subject to a minimum policy premium as stated in the Declarations. If the policy remains in force until the expiration date of the policy, this minimum policy premium shall apply unless the audit condition of this policy develops a greater premium. In no event shall the premium be less than the minimum policy premium should the policy remain effective the complete policy term.

2. It is further agreed should this policy be cancelled prior to its expiration date the premium payable to the Company shall be no less than:

   a. The minimum earned policy premium set forth in the Declarations; or if greater,

   b. The actual prorata earned premium, if cancelled by the Company; or,

   c. The actual short rate earned premium, if cancelled by the Named Insured.

3. The actual prorata earned premium shall be the greater of:

   a. The premium determined by applying prorata factors to the minimum policy premium; or

   b. The audit premium for the term the policy was effective.

4. The actual short rate earned premium shall be the greater of:

   a. The premium determined by applying short rate factors to the minimum policy premiums; or,

   b. The audit premium for the term the policy was effective increased by a factor of ten percent as the short rate cancellation penalty.

This endorsement prevails over any conflicting provisions in the policy.

_____
Authorized Representative

SL 0297B (4/97)



**AMERICAN EMPIRE SURPLUS LINES®**
INSURANCE COMPANY

A DELAWARE STOCK COMPANY: ADMINISTRATIVE OFFICES, CINCINNATI, OHIO

## EXCLUSION – ABSOLUTE ASBESTOS

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**EXCLUSION – ABSOLUTE ASBESTOS**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

In consideration of the premium charged, it is specifically understood and agreed this insurance does not apply to "bodily injury" or "property damage" arising out of the existence or manufacturing, sale, handling, use or distribution of asbestos or of any product containing asbestos material.  It is further understood and agreed that we will not be liable or responsible to defend you in any action or litigation for any asbestos or asbestos related allegations including the failure to warn.



**AMERICAN EMPIRE
SURPLUS LINES®**
INSURANCE COMPANY

**EXCLUSION – LEAD CONTAMINATION**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**EXCLUSION – LEAD CONTAMINATION**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

This insurance does not apply to:

a.  "Bodily injury" arising out of the ingestion, inhalation or absorption of lead in any form; or
b.  "Property damage" arising from any form of lead; or
c.  "Personal and advertising injury" arising from any form of lead; or .
d.  Medical expense arising from any form of lead; or
e.  Any loss, cost or expense arising out of any request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or in any way respond to or assess the effects of lead; or
f.  Any loss, cost or expense arising out of any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to cr assessing the effects of lead.

**SL0367A (01/06)**



**AMERICAN EMPIRE
SURPLUS LINES
INSURANCE COMPANY®**

**EXCLUSION-DESIGNATED WORK
EXTERIOR INSULATION AND
FINISH SYSTEM**

## COMMERCIAL GENERAL LIABILITY

### THIS ENDORSEMENT CHANGES THE POLICY    PLEASE READ IT CAREFULLY

### EXCLUSION-DESIGNATED WORK   EXTERIOR INSULATION AND FINISH SYSTEM

This endorsement modifies insurance provided under the following

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

Description of your work

1    The design, manufacture, construction, fabrication, preparation, installation, appl ication, maintenance or repair, including remodeling, service, correction, or replacement of an "exterior insulation and finish system" (commonly referred to as synthetic stucco) or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caul kings or sealants in connection with such a system

2    Any work or operations with respect to any exterior component, fixture or feature of any structure if any "exterior insulation and finish system" is used on any part of that structure

For the purposes of this endorsement an "exterior insulation and finish system" means an exterior cladding or finish system used on any part of any structure and consisting of

a)   a rigid or semi-rigid insulation board made of expanded polystyrene or other materials, and

b)   the adhesive and/or mechanical fasteners used to attach the insulation board to the substrate, and

c)   a reinforced base coat, and

d)   a finish coat providing surface texture and color

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement)

This insurance does not apply to "bodily injury" or "property damage" included in the "products - completed operations hazard" and arising out of "your work" shown in the Schedule

SL0466 (7/97)

 **AMERICAN EMPIRE SURPLUS LINES® INSURANCE COMPANY**

EXCLUSION - MOLD, SPORES OR FUNGUS

**THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY**

## EXCLUSION – MOLD, SPORES OR FUNGUS

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL GENERAL LIABILITY COVERAGE PART CG 0001**

**This insurance does not apply to "bodily injury," "property damage," or "personal and advertising injury" arising out of the actual or threatened existence, growth, release, transmission, migration, dispersal or exposure to "mold," "spores" or "fungus;"**

    **(a) including, but not limited to, "bodily injury," "property damage," or "personal and advertising injury" resulting from any actual or threatened exposure to, inhalation, absorption or ingestion of, or physical contact with "mold," "spores" or "fungus;"**

    **(b) including, but not limited to, "bodily injury," "property damage," or "personal and advertising injury" resulting from any actual or threatened "mold," "spores" or "fungus" upon any real property or personal property, product or work, premises, site or location, or any other tangible property of any insured or any other person(s) or organization(s), located anywhere in the world;**

    **(c) including, but not limited to, "bodily injury," "property damage," or "personal and advertising injury" resulting from any loss, cost or expense arising out of any request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "mold," "spores" or "fungus."**

**"Mold," "spores" or "fungus" means any mold, spores or fungus of any type or nature whatsoever that can cause or threaten harm to any living organism or can cause or threaten physical damage, deterioration, loss of use or loss of value or marketability, to any tangible property whatsoever. This includes, but is not limited to, any type(s) of mold, spores or fungus that are harmful or potentially harmful to health or welfare or that are damaging or potentially damaging to tangible property or that can otherwise cause or threaten to cause "bodily injury," "property damage," or "personal and advertising injury."**

SL 0520 (04/03)

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# REJECTION
# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**A.  Rejection of Offer**

You have rejected the offer of terrorism coverage for Acts of Terrorism that are certified under the Terrorism Risk Insurance Act as an Act of Terrorism.  An exclusion of terrorism losses has been made a part of this policy.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.  However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.  **You have rejected this offer of coverage.**

**SL 0528B  (1/08)**

 **AMERICAN EMPIRE
SURPLUS LINES®**
INSURANCE COMPANY

EXCLUSION - SILICOSIS

**THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY**

### EXCLUSION – SILICOSIS
This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

It is understood and agreed this insurance does not apply to "bodily injury," "property damage," or "personal and advertising injury" arising out of silicosis or any other disease or condition caused by the inhalation, ingestion, or absorption of silica dust.

It is further understood and agreed that this insurance does not apply to any claim, suit, demand or judgment based upon or alleging the contraction, aggravation or exacerbation of cancer, carcinoma, arteriosclerosis, lung disease, heart disease or any other disease of the human body as a result of products sold, handled or distributed by the named insured or operations performed by or on behalf of the named insured.

It is further understood and agreed that this insurance does not apply to the defense of any claim, suit, demand or judgment excluded by the preceding paragraphs.

SL 0530 (07/03)

POLICY NUMBER:   8CG36111

**COMMERCIAL GENERAL LIABILITY**
CG 20 10 07 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): | Location(s) Of Covered Operations |
|---|---|
| All entities required by written contract to be included for coverage as additional insured's in respect to operations performed by the Named Insured or on their behalf. | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1. Your acts or omissions; or

2. The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

1. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

2. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

CG 20 10 07 04 © ISO Properties, Inc., 2004

POLICY NUMBER:       8CG36111

**COMMERCIAL GENERAL LIABILITY**
CG 20 26 07 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s) |
|---|
| Pulte Communities of NJ Limited Partnership<br>100 Davidson Ave., Suite 205<br>Somerset, NJ  08873 |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

**A.** In the performance of your ongoing operations; or

**B.** In connection with your premises owned by or rented to you.

**© ISO Properties, Inc., 2004**                   ☐

POLICY NUMBER:    8CG36111

**COMMERCIAL GENERAL LIABILITY**
CG 20 37 07 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): | Location And Description Of Completed Operations |
|---|---|
| All entities required by written contract to be included for coverage as additional insured's in respect to operations performed by the Named Insured or on their behalf. | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

CG 20 37 07 04                    © ISO Properties, Inc., 2004                    Page 1 of 1

COMMERCIAL GENERAL LIABILITY
CG 21 47 07 98

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2.**, **Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

   **(a)** Refusal to employ that person;

   **(b)** Termination of that person's employment; or

   **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2.**, **Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

   **(a)** Refusal to employ that person;

   **(b)** Termination of that person's employment; or

   **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

Copyright, Insurance Services Office, Inc.,  1997 □

COMMERCIAL GENERAL LIABILITY
CG 21 49 09 99

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

Copyright, Insurance Services Office, Inc., 1998

POLICY NUMBER:    8CG36111

COMMERCIAL GENERAL LIABILITY
CG 21 54 01 96

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – DESIGNATED OPERATIONS COVERED BY A CONSOLIDATED (WRAP-UP) INSURANCE PROGRAM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Description and Location of Operation(s):**

**Any project, location or operation performed by the "Insured"; the "Insured's" agents' or subcontractors' with respect to construction or demolition operations or other contracting operations insured under a (wrap-up) or any similar rating plan.**

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The following exclusion is added to paragraph **2.,** Exclusions of COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section **I** – Coverages):

This insurance does not apply to "bodily injury" or "property damage" arising out of either your ongoing operations or operations included within the "products-completed operations hazard" at the location described in the Schedule of this endorsement, as a consolidated (wrap-up) insurance program has been provided by the prime contractor/project manager or owner of the construction project in which you are involved.

This exclusion applies whether or not the consolidated (wrap-up) insurance program:

**(1)** Provides coverage identical to that provided by this Coverage Part;

**(2)** Has limits adequate to cover all claims; or

**(3)** Remains in effect.

Copyright, Insurance Services Office, Inc.,  1994

□

COMMERCIAL GENERAL LIABILITY
CG 21 73 01 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism".

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

© ISO Properties, Inc., 2007

□

COMMERCIAL GENERAL LIABILITY
CG 22 43 07 98

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

Professional services include:

1. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

2. Supervisory, inspection, architectural or engineering activities.

Copyright, Insurance Services Office, Inc.,  1997

POLICY NUMBER:  8CG36111

**COMMERCIAL GENERAL LIABILITY**
CG 24 04 10 93

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

**Name of Person or Organization:**     All entities when required by a written contract executed prior to loss, to provide this extension of coverage.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US Condition (Section **IV** – COMMERCIAL GENERAL LIABILITY CONDITIONS) is amended by the addition of the following:

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.



**AMERICAN EMPIRE
SURPLUS LINES**
INSURANCE COMPANY

| | |
|---|---|
| Endorsement No. | 1 |
| Policy No. | 8CG36111 |
| Effective Date | 11-25-2008 |
| Additional Premium: | Included |

Named Insured: Nassau Construction Co., Inc.
Nassau Holdings 2001, LLC

## SCHEDULE OF FORMS AND ENDORSEMENTS

| | |
|---|---|
| SL 0527 | Declarations Commercial General Liability |
| SL 0537 | Notice |
| CG 00 01 | Commercial General Liability Coverage Form |
| SL 0270A | Deductible Liability Insurance |
| SL 0271A | Commercial General Liability Schedule |
| SL 0273H | Commercial General Liability Policy Jacket |
| SL 0297B | Explanatory Policy Premium Endorsement |
| SL0298B | Exclusion – Absolute Asbestos |
| SL 0367A | Exclusion - Lead Contamination |
| SL 0466 | Exclusion – Designated Work:  Exterior Insulation & Finish System |
| SL 0520 | Exclusion – Mold, Spores or Fungus |
| SL 0528B | Rejection Disclosure Pursuant to Terrorism Risk Insurance Act |
| SL 0529 | Compliance with U.S. Economic Sanctions Laws |
| SL 0530 | Exclusion – Silicosis |
| CG 20 10 | Additional Insured – Owners, Lessees or Contractors – Scheduled Person or Organization |
| CG 20 26 | Additional Insured – Designated Person or Organization |
| CG 20 37 | Additional Insured – Owners, Lessees or Contractors – Completed Operations |
| CG 21 47 | Employment – Related Practices Exclusion |
| CG 21 49 | Total Pollution Exclusion Endorsement |
| CG 21 54 | Exclusion – Designated Operations Covered By a Consolidated (Wrap-Up) Insurance Program |
| CG 21 73 | Exclusion of Certified Acts of Terrorism |
| CG 22 43 | Exclusion  - Engineers, Architects or Surveyors Professional Liability |
| CG 24 04 | Waiver of Transfer of Rights of Recovery Against Others To Us |
| Endorsement No. 1 | Schedule of Forms and Endorsements |
| Endorsement No. 2 | Designated Construction Project(s) General Aggregate Limit |
| Endorsement No. 3 | Cross Liability Limitation |

**SL 0494  (2/00)**

**Authorized Representative**

<table>
<tr><td rowspan="2"><br>**AMERICAN EMPIRE<br>SURPLUS LINES**<br>INSURANCE COMPANY</td><td>Endorsement No.</td><td>2</td></tr>
<tr><td>Policy No.</td><td>8CG36111</td></tr>
</table>

| | | |
|---|---|---|
|  **AMERICAN EMPIRE SURPLUS LINES** INSURANCE COMPANY | Endorsement No. | 2 |
| | Policy No. | 8CG36111 |
| | Effective Date | 11-25-2008 |
| Named Insured:  Nassau Construction Co., Inc. Nassau Holdings 2001, LLC | Additional Premium: | Included |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# DESIGNATED CONSTRUCTION PROJECT(S) GENERAL AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

## SCHEDULE

Designated Construction Projects:

**All Projects**

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

A.  For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under COVERAGE A (SECTION I), and for all medical expenses caused by accidents under COVERAGE C (SECTION I), which can be attributed only to ongoing operations at a single designated construction project shown in the Schedule above:

1.  A separate Designated Construction Project General Aggregate Limit applies to each designated construction project, and that limit is equal to the amount of the General Aggregate Limit shown in the Declarations.

    However, the most we will pay under the Designated Construction Project General Aggregate Limit for all projects combined is $5,000,000.

2.  The Designated Construction Project General Aggregate Limit is the most we will pay for the sum of all damages under COVERAGE A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard", and for medical expenses under COVERAGE C regardless of the number of:

    a.  Insureds;
    b.  Claims made or "suits" brought; or
    c.  Persons or organizations making claims or bringing "suits".

3.  Any payments made under COVERAGE A for damages or under COVERAGE C for medical expenses shall reduce the Designated Construction Project General Aggregate Limit for that designated construction project.  Such payments shall not reduce the General Aggregate Limit shown in the Declarations nor shall they reduce any other Designated Construction Project General Aggregate Limit for any other designated construction project shown in the Schedule above.

4.  The limits shown in the Declarations for Each Occurrence, Fire Damage and Medical Expense continue to apply.  However, instead of being subject to the General Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Designated Construction Project General Aggregate Limit.

SL 0494  (2/00)                                                          **Authorized Representative**

B.   For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under COVERAGE A (SECTION I), and for all medical expenses caused by accidents under COVERAGE C (SECTION I), which cannot be attributed only to ongoing operations at a single designated construction project shown in the Schedule above:

   1.   Any payments made under COVERAGE A for damages or under COVERAGE C for medical expenses shall reduce the amount available under the General Aggregate Limit or the Products-Completed Operations Aggregate Limit, whichever is applicable; and

   2.   Such payments shall not reduce any Designated Construction Project General Aggregate Limit.

C.   When coverage for liability arising out of the "products-completed operations hazard" is provided, any payments for damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard" will reduce the Products-Completed Operations Aggregate Limit, and not reduce the General Aggregate Limit nor the Designated Construction Project General Aggregate Limit.

D.   If the applicable designated construction project has been abandoned, delayed, or abandoned and then restarted, or if the authorized contracting parties deviate from plans, blueprints, designs, specifications or timetables, the project will still be deemed to be the same construction project.

E.   The provisions of Limits Of Insurance (SECTION III) not otherwise modified by this endorsement shall continue to apply as stipulated.

SL 0494   (2/00)                                                    **Authorized Representative**



**AMERICAN EMPIRE**
**SURPLUS LINES**
INSURANCE COMPANY

| | |
|---|---|
| Endorsement No. | 3 |
| Policy No. | 8CG36111 |
| Effective Date | 11-25-2008 |
| Additional Premium: | Included |

Named Insured: Nassau Construction Co., Inc.
Nassau Holdings 2001, LLC

# CROSS LIABILITY LIMITATION

It is hereby understood and agreed that the insurance afforded by this policy does not apply to any liability for claims or suits which are brought by any insured covered under this policy against any other insured hereunder.

SL 0494 (2/00)

**Authorized Representative**

**General Service of Suit Endorsement**
**(Not Applicable in Delaware or Pennsylvania)**

Pursuant to any statute of any state or district of the United States of America that makes provision therefor, the Insurer hereby designates the commissioner, superintendent or director of insurance or other officer specified for that purpose in the statute and his or her successors in office and duly authorized deputies in the state where this policy is issued, as the Insurer's true and lawful attorney for service of legal process in any action, suit or proceeding brought in the state where this policy is issued by or on behalf of an insured or beneficiary against the Insurer arising out of the insurance issued under this policy. Any legal process received by such attorney for service of legal process shall be forwarded, except as provided below, to the attention of: Eve Cutler Rosen, General Counsel, Great American Insurance Company, 580 Walnut Street, Cincinnati, Ohio 45202.

In **California**, any legal process received by the Insurer's statutory attorney for service of process shall be forwarded to the attention of: Jere Keprios, The CT Corporation System, 818 West Seventh Street, Los Angeles, California 90017;

In **Maine**, the Insurer hereby designates CT Corporation System as its attorney for service of legal process in any action relating to this policy, and directs that all such legal process be mailed to: CT Corporation System, One Portland Square, Portland, Maine 04101.

In **Oregon**, the Insurer and the insured policyholder hereby agree to waive the provisions of Oregon Insurance Code Section 735.490 requiring that service of legal process in any action relating to this policy shall be served on the insurance agent who registered or delivered this policy, and instead agree that such service of legal process be mailed directly to Eve Cutler Rosen, General Counsel, Great American Insurance Company 580 Walnut Street, Cincinnati, Ohio 45202.

In **Rhode Island**, the Insurer hereby designates CT Corporation System as its attorney for service of legal process in any action relating to this policy, and directs that all such legal process be mailed to: CT Corporation System, 10 Weybosset Street, Providence, Rhode Island 02903.

The foregoing designations of attorney for service of legal process upon the Insurer shall not constitute a waiver of the Insurer's rights to remove, remand, dismiss or transfer any suit or proceeding from any court, or to commence any suit or other proceeding in any court of competent jurisdiction.

**Special Service of Suit Endorsement**
**(Applicable in Delaware and Pennsylvania Only)**

It is agreed that in the event of the failure of the Insurer(s) or Underwriter(s) hereon to pay any amount claimed to be due hereunder, the Insurer(s) or Underwriter(s) hereon, at the request of the Insured (or reinsured), will submit to the jurisdiction of any court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give such Court jurisdiction, and all matters arising hereunder shall be determined in accordance the law and practice of such Court. It is further agreed that in any such action instituted under this contract, the Insurer(s) and/or Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Service of process shall be made pursuant to any statute of any state, territory or district within the United States of America that makes provision for interstate and international service of legal process. When making service of process by mail, such process shall be mailed to Eve Cutler Rosen, General Counsel, Great American Insurance Company, 580 Walnut Street, Cincinnati, Ohio 45202. The above named is authorized and directed to accept service of process on behalf of the Insurer(s) or Underwriters in any such suit and/ or upon the request of the Insured or (reinsured) to give a written undertaking to the Insured (or reinsured) that she will enter a general appearance upon the Insurer(s) or Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States of America which makes provision therefor, the Insurer(s)/ or Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute or his or her successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the insured (or reinsured) or any beneficiary hereunder arising out of this contract of insurance (or reinsurance) and hereby designate the above named as the person to whom the said officer is authorized to mail such process  or a true copy thereof.

The foregoing designation of attorney for service of legal process upon the Insurer shall not constitute a waiver of its rights to remove, remand, dismiss or transfer any suit or proceeding from any court, or to commence any suit or other proceeding in any court of competent jurisdiction.



AMERICAN EMPIRE
SURPLUS LINES®
INSURANCE COMPANY

A DELAWARE STOCK COMPANY: ADMINISTRATIVE OFFICES, CINCINNATI, OHIO

# Commercial General Liability Policy

MEMBER OF GREAT AMERICAN INSURANCE GROUP

SL 0273H (8/04)

SL 0273H (8/04)

## COMMON POLICY CONDITIONS

All Coverage Forms included in this policy are subject to the following conditions.

### A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

### B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

### C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

### D. INSPECTIONS AND SURVEYS

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statues, ordinances or regulations of boilers, pressure vessels or elevators.

### E. PREMIUMS

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

### F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

*Secretary*

*President*

---

_____ [Attach Declarations, Schedules, and Endorsements Here] _____

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

   "Hazardous properties" include radioactive, toxic or explosive properties.

   "Nuclear material" means "source material," "special nuclear material" or "by-product material."

   "Source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

   "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor."

   "Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility."

   "Nuclear facility" means:

      (a) Any "nuclear reactor";

      (b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel," or (3) handling, processing or packaging "waste";

      (c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

      (d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

   and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

   "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

   "Property damage" includes all forms of radioactive contamination of property.



American Empire Surplus Lines®
Insurance Company

American Empire Insurance Company®

## TO OUR PRODUCERS AND POLICYHOLDERS

### Compliance With U.S. Economic Sanctions Laws

Under various federal laws, the Office of Foreign Assets Control (OFAC), a division of the U.S. Department of the Treasury, administers and enforces economic sanctions against   certain countries and groups of individuals, such as terrorists and narcotics traffickers.

**These laws prohibit United States citizens, corporations, and others from engaging in virtually all business transactions with certain countries, entities and individuals designated on the list of Specially Designated Nationals and Blocked Persons (the SDN list).**

Insurance companies, their agents and brokers are prohibited from making payments to anyone on the SDN list or those otherwise subject to U.S. Economic Sanction Laws.   It is the intention of American Empire to do what is necessary to insure its compliance with all applicable federal laws and regulations relating to economic sanctions.

You can access the U.S. Department of the Treasury OFAC website at **www.ustreas.gov/offices/enforcement/ofac/** for additional information or contact your legal counsel if you have any questions pertaining to this matter.

**This communication is for informational purposes only.   It is not intended to be an exhaustive treatment of the legal issues discussed, nor is it intended to furnish legal advice appropriate to any particular circumstances. This information is not intended to create and does not create an attorney-client relationship, and this information does not constitute an attorney-client communication.**

MEMBER OF GREAT AMERICAN.
INSURANCE GROUP